## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GAIL CUSTADIO,<br>Administratrix of the Estate of Stephen Custadio<br><br>Plaintiff,<br>v.<br><br>EUROPEAN COLOUR PLC<br><br>Defendant. | Civil Action No. 05-CV-10556-JLT |

### DEFENDANT EUROPEAN COLOUR PLC'S MEMORANDUM
### OF LAW IN SUPPORT OF ITS MOTION TO DISMISS OR, IN
### THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

This lawsuit is a blatant attempt to circumvent the statutory restrictions of the Massachusetts Worker's Compensation Act and the fundamental corporate doctrine of limited liability. *See* Mass. Gen. Laws ch. 152, § 1 *et seq* (2000). Although Plaintiff is receiving already worker's compensation benefits, she has brought a wrongful death action – not against her decedent's former employer – but against the former employer's *ultimate parent* corporation, which is incorporated under the laws of England and Wales. Plaintiff Gail Custadio ("Custadio"), as administratrix of the estate of Stephen Custadio, alleges that Defendant European Colour plc ("European Colour"), the ultimate British parent of Roma Color, Inc. ("Roma"), negligently caused the death of Custadio's husband, Stephen Custadio (the "Decedent"), while he was employed at Roma.

The Complaint must be dismissed and European Colour is entitled to judgment as a matter of law for several reasons. First, this Court lacks the power to exercise personal jurisdiction over European Colour. Custadio has not pled sufficient facts for this Court to

exercise either general or specific *in personam* jurisdiction. Moreover, exercise of either type of jurisdiction would offend all notions of "fair play and substantial justice" implicit in the Fourteenth Amendment to the United States Constitution. Further, Custadio has failed to present any evidence – much less the requisite "clear evidence" – that piercing the corporate veil to exercise personal jurisdiction is both necessary and warranted to remedy any gross inequity.

Even if this Court finds that European Colour is subject to personal jurisdiction, European Colour is entitled to summary judgment under Fed. R. Civ. P. 56. First, European Colour is not *directly* liable to Custadio because European Colour never owed a duty to the Decedent to ensure a safe working environment at Roma. Second, European Colour is not *indirectly* liable because there is no evidence (or even an allegation) to justify piercing Roma's corporate veil and the corporate veils of the several intermediate parent entities necessary to reach European Colour. Finally, even assuming *arguendo* that this Court could pierce Roma's corporate veil, European Colour is still entitled to summary judgment as the Worker's Compensation Act bars any recovery from European Colour by Custadio.

## STATEMENT OF FACTS[1]

On or about November 20, 2003, the Decedent, an employee at Roma, was fatally injured when the materials lift at Roma (the "lift") fell approximately two stories while Decedent was standing on it. Compl. at ¶¶ 5-6. Custadio filed a claim for benefits through Roma's worker's compensation policy and has been receiving weekly payments of $884.46 in connection with the Decedent's death since November 26, 2003, approximately six days after his death. Affidavit of Nadilio D. Almeida ("Almeida Aff.") at ¶ 17 (submitted herewith).

---

[1] European Colour relies on and incorporates by reference herein its L.R. 56.1 Statement of Undisputed Material Facts set forth in *European Colour plc's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment* submitted herewith.

Roma is a Massachusetts corporation located in Fall River, Massachusetts. *Id.* at ¶ 3. European Colour is a foreign corporation organized under the laws of England and Wales with a usual place of business located at Hempshaw Lane, Stockport, Cheshire, United Kingdom. Affidavit of Stephen Ralph Smith ("Smith Aff.") at ¶ 3 (submitted herewith). In both 2003 and the present, Roma was a subsidiary corporation within a "family" of corporate organizations with European Colour as the ultimate parent, Roma as a fifth-tier subsidiary, and several intermediate parent corporations between Roma and European Colour. *Id.* at ¶ 4. Two of these intermediate corporations are, like European Colour, incorporated under the laws of England and Wales and the other intermediate corporations are, like Roma, Massachusetts corporations. *Id.*

European Colour has <u>no</u> corporate presence in Massachusetts.

- It does not sell products here.

- It does not buy products here.

- It does not pay taxes here.

- It does not own property here.

- It does not have a license to do business here.

- It does not have corporate offices here.

- It does not have corporate officers or employees here.

- It does not transact or solicit business here.

*Id.* ¶¶ at 6, 9-11, and 12.

Further, executives of European Colour have had limited contact with Massachusetts and limited, if any, contacts relating to the lift prior to the Decedent's accident. *See id.* at ¶¶ 16 and 19. In fact, at no point prior to Decedent's accident did anyone at European Colour have any discussions involving the operation, maintenance, and/or the safety of the lift or any knowledge

of any potential safety issues or hazards relating to the lift.  Almeida Aff. at ¶ 15; Smith Aff. at ¶ 19.

## ARGUMENT

**I.   THE COMPLAINT SHOULD BE DISMISSED UNDER FED. R. CIV. P. 12(b)(2) BECAUSE THIS COURT LACKS THE POWER TO EXERCISE JURISDICTION OVER EUROPEAN COLOUR, A BRITISH CORPORATION, WHOSE ACTIVITIES DO NOT MEET THE STATUTORY OR DUE PROCESS REQUIREMENTS FOR PROPER EXERCISE OF PERSONAL JURISDICTION.**

It is well settled that "[a] federal district court has no inherent authority to assert jurisdiction over a foreign defendant." *In re: Lupron(R) Marketing and Sales Practice Litig*, 245 F. Supp. 2d 280, 288 (D. Mass. 2003).  Instead, a federal court sitting in diversity looks to Massachusetts state law to determine whether a foreign defendant is subject to personal jurisdiction in Massachusetts.  *See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 51 (1st Cir. 2002).  Custadio bears the burden of proving the existence of personal jurisdiction over European Colour.  *In re: Lupron(R)*, 245 F. Supp. 2d at 289.  To meet this burden, Custadio cannot simply rely on unsupported allegations in her Complaint to defeat a motion to dismiss for lack of personal jurisdiction.  *See Boit v. Gar-Tec Products, Inc.*, 967 F.2d 671, 675 (1st Cir. 1992).  Rather, Custadio must make a *prima facie* showing with affirmative admissible evidence, beyond the facts pled in her Complaint, as to each jurisdictional element. *See In re: Lupron(R)*, 245 F. Supp. 2d at 289-90 (citations omitted).

While the Court should not "credit conclusory allegations or draw farfetched inferences," *Ticketmaster-N.Y., Inc. v. Alioto*, 26 F.3d 201, 203 (1st Cir. 1994), it must accept Custadio's *prima facie* evidence as true (assuming the same is produced) and "then add to the mix facts put forward by the defendants, to the extent that they are uncontradicted." *Daynard*, 290 F.3d at 51. Indeed, this Court should rely on all uncontroverted facts submitted by European Colour to

determine personal jurisdiction. *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998).

A.   **There is no basis for this Court to exercise general *in personam* jurisdiction over European Colour because it has not engaged in "continuous and systematic activity" in Massachusetts.**

This Court has the power to exercise general jurisdiction over European Colour only if Custadio proves that European Colour "has maintained a continuous and systematic linkage" with Massachusetts such that it has subjected itself to the jurisdiction of a Massachusetts state court "with respect to all matters, even those that are unrelated to the defendant's contacts with the forum." *First Act, Inc. v. Brook Mays Music Co.*, 311 F. Supp. 2d 258, 260 (D. Mass. 2004) (citations omitted). This general jurisdiction inquiry "gaug[es] the intensity and duration of the contacts between a nonresident defendant and the forum state." *In re: Lupron(R)*, 245 F. Supp. 2d at 288.

To determine whether this Court may properly exercise general jurisdiction, this Court considers whether European Colour:  (1) owns property in Massachusetts; (2) is licensed to do business in Massachusetts; (3) has ever paid Massachusetts state taxes; (4) has any corporate offices in Massachusetts; (5) has any corporate officers and/or employees in Massachusetts; and (6) has regularly transacted and solicited business in Massachusetts. *In re: Lupron(R)*, 245 F. Supp. 2d at 289. Further, this Court's exercise of general jurisdiction must comport with due process. *Lawson v. Affirmative Equities Co., L.P.*, 341 F. Supp. 2d 51, 58 (D. Mass. 2004).

Custadio's vague allegation that European Colour "regularly conducts business within the Commonwealth of Massachusetts . . ." is on its face wholly insufficient to prove that European Colour engaged in "continuous and systematic activity" in Massachusetts. Compl. at ¶ 4. *See Aquae Int'l, Inc. v. M/Y Osiana II*, 2004 U.S. Dist. LEXIS 13711, at *8 n.4 (D. Mass. July 21,

2004) (finding that plaintiff's vague allegation that defendant's website stated that it had worked "all along the eastern seaboard" failed to meet the "stringent constitutional requirement" of "'continuous and systematic activity'"). In fact, each of the six factors weighs *against* this Court exercising general jurisdiction as follows:

- European Colour does not own property in Massachusetts.

- European Colour is not registered or licensed to do business in Massachusetts.

- European Colour has never paid Massachusetts state taxes.

- European Colour does not have corporate offices in Massachusetts.

- European Colour does not have corporate officers or employees in Massachusetts.

- European Colour does not buy or sell products of any type in Massachusetts and thus does not transact any business whatsoever in Massachusetts.

- European Colour does not supply any materials to Roma for its manufacturing operations.

Smith Aff. at ¶¶ 6, 9-14. In light of this overwhelming evidence, there is no basis for this Court to exercise general personal jurisdiction over European Colour.

> **B.    There is no basis for this Court to exercise specific *in personam* jurisdiction over European Colour because Custadio's claims do not arise from any European Colour activity sufficient to satisfy the Massachusetts long arm statute and Constitutional due process concerns.**

Lacking general jurisdiction, this Court's power to exercise personal jurisdiction over European Colour must depend on the existence of specific jurisdiction. *Daynard*, 290 F.3d at 51. In contrast to the sweeping scope of general jurisdiction, specific jurisdiction "may only be relied upon 'where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts.'" *Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994) (citations omitted). Indeed, a Court cannot exercise personal jurisdiction "whenever the connection between the cause of action and

the defendant's forum-state contacts seems attenuated and indirect." *United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1089 (1st Cir. 1992).

For this Court to exercise specific jurisdiction, Custadio must "make a *prima facie* showing as to every fact required to satisfy both the Massachusetts long-arm statute and the due process clause of the Constitution." *Am. Home Assurance Co. v. Sport Maska, Inc.*, 808 F. Supp. 67, 72 (D. Mass. 1992); *see* U.S. Const. amend. XIV; Mass. Gen. Laws ch. 223A, § 3. However, this Court "may sidestep the statutory inquiry [of the Massachusetts long arm statute] and proceed directly to the constitutional analysis . . . because the Supreme Judicial Court of Massachusetts has interpreted the state's long-arm statute as 'an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States.'" *Daynard,* 290 F.3d at 52 (quoting *"Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp.*, 361 Mass. 441 (1972)).[2] Indeed,

> '[t]he Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.' . . . 'Due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'

*Daynard*, 290 F.3d at 52 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (citations omitted) and *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (citations omitted)).

Under the First Circuit's tripartite "minimum contact" due process analysis, Custadio must submit affirmative admissible evidence that:  (1) her claims "relate to or arise out of"

---

[2] To the extent that this Court finds that only the § 3(a) "transacting business" section of the long-arm statute has been held co-extensive with Constitutional limits, *see Walsh v. National Seating Co., Inc.*, 411 F. Supp. 564, 568 (D. Mass. 1976) (Tauro, J.), then European Colour may be entitled to <u>greater</u> protection under the long arm statute than under the Constitution.

European Colour's contacts with Massachusetts; (2) such contacts constitute "purposeful availment of the benefits and protections afforded by Massachusetts law;" and (3) jurisdiction is reasonable and fair under the gestalt factors. *First Act, Inc.*, 311 F. Supp. 2d at 260; *see Phillips Exeter Academy v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 288 n.1 (1st Cir. 1999) (cautioning "that the relative strength or weakness of the plaintiff's showing on the first two elements bears upon the third element (the overall fairness of an exercise of jurisdiction)").

To be sure, this Court's inquiry of whether European Colour has sufficient "minimum contacts" with Massachusetts, "is far from exact: 'the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative.'" *Pritzker*, 42 F.3d at 60 (quoting *Int'l Shoe Co.*, 326 U.S. at 319); *see Micro Networks Corp. v. HIG Hightec, Inc.*, 195 F. Supp. 2d 255, 262 (D. Mass. 2001) (noting that the constitutional assessment of personal jurisdiction is "'more an art than a science'" (citations omitted)). The minimum contacts inquiry is "highly idiosyncratic, involving an individualized assessment and factual analysis of the precise mix of contacts that characterize each case." *Pritzker*, 42 F.3d at 60

> 1. There is no substantial nexus between European Colour's contacts with Massachusetts and any of Custadio's claims sufficient to meet the relatedness prong of the Constitutional analysis.

The so-called "relatedness" factor of the Constitutional analysis "is not met merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must *directly arise out of* the specific contacts between the defendant and the forum state.'" *Lawson*, 341 F. Supp. 2d at 59 (citing *Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir. 1995)) (emphasis added); *see Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 715-16 (1st Cir. 1996) (finding the nexus sufficiently strong where a plaintiff "is harmed while engaged in

activities integral to the relationship the corporation sought to establish . . ."). In a tort claim, this Court "customarily look[s] to whether the plaintiff has established 'cause in fact (i.e., the injury would not have occurred but for the defendant's forum-state activity) and legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action).'" *Mass. Sch. of Law at Andover, Inc.*, 142 F.3d at 35 (citations omitted). The relatedness factor "ensures that the element of causation remains in the forefront of the due process investigation." *Ticketmaster-N.Y., Inc.*, 26 F.3d at 207.

As a preliminarily matter, Custadio does not even attempt to plead that European Colour is subject to jurisdiction in Massachusetts. Moreover, the Complaint is devoid of any allegation that any European Colour contact with Massachusetts was the factual and legal proximate cause of the Decedent's injuries. The mere fact that Custadio suffered injury in Massachusetts is not enough to subject European Colour to jurisdiction in this Court. *See Mass. Sch. of Law at Andover*, 142 F.3d at 36 (stating Massachusetts effects of the defendant's New York actions are, without more, insufficient to assert personal jurisdiction). Further, the incontrovertible fact is that European Colour had nothing whatsoever to do with the operation, maintenance, or safety of the lift. Smith Aff. at ¶ 18.

2.    European Colour did not purposefully avail itself of the benefits and protections afforded by the laws of Massachusetts.

The purposeful availment prong – focusing on voluntariness and foreseeability – requires that European Colour's contacts with Massachusetts be: (1) "voluntary – that is, not based on the unilateral actions of another party or a third person[;]" and (2) "such that [it] should reasonably anticipate being hauled into court there." *Nowak*, 94 F.3d at 716. This prong "ensures that jurisdiction is not premised on 'random, isolated, or fortuitous' contacts with [Massachusetts], . . . but rather guarantees that the exercise of jurisdiction is 'fair, just, or

reasonable.'" *Id.* (citations omitted).  Indeed, this Court must look beyond any formalistic requirements to "evaluate the nature of the contacts and, relatedly, the degree to which they represent a purposeful availment of the forum's protections and benefits." *Prizker*, 42 F.3d at 62; *see Turpin v. Mori Seiki Co., Ltd.*, 56 F. Supp. 2d 121, 126 (D. Mass. 1999).

Custadio has not offered any evidence to suggest that European Colour purposefully availed itself of the benefits and protections of Massachusetts law such that it was voluntary and foreseeable.  In fact, Custadio has not offered *any* evidence of *any* contact between European Colour and Massachusetts.  Moreover, European Colour is not incorporated here.  It is not registered or licensed to do business here.  It does not buy or sell goods or services here.  It does not own real estate here.  It does not even have offices, officers, or employees located here. Smith Aff. at ¶¶ 3, 6, 9-11.

      3.    <u>Subjecting European Colour to jurisdiction in Massachusetts would subvert the goal of achieving substantial justice and offend all notions "fair play and substantial justice" under the gestalt factors.</u>

The Due Process Clause of the Fourteenth Amendment bars this Court from asserting jurisdiction over European Colour if doing so would offend any notion of "fair play and substantial justice" even if Custadio makes a "minimally sufficient showing of relatedness and purposefulness." *Ticketmaster-N.Y., Inc.*, 26 F.3d at 210; *see* U.S. Const. amend XIV.  To evaluate reasonableness, the so-called gestalt factors[3] assist courts in "achieving substantial justice" by balancing the interests of sovereign forums, the interests of the parties, and

---

[3] Specifically, this Court's analysis of the gestalt factors in this case includes the balancing of: (1) European Colour's burden of appearing; (2) Massachusetts' interest in adjudicating this dispute; (3) Custadio's interest in obtaining relief; (4) this Court's interest in obtaining effective resolution of the controversy; and (5) the common interest among Massachusetts and the United Kingdom in promoting substantive social policies. *Lawson v. Affirmative Equities Co, L.P.*, 341 F. Supp. 2d 51, 58 (D. Mass. 2004).

overarching efficiency concerns.  *See Nowak*, 94 F.3d at 717; *Micro Networks Corp.*, 195 F. Supp. 2d at 263.  Indeed,

> the Due Process Clause bars a court from asserting jurisdiction over the person of a defendant if doing so would be fundamentally unfair.  In this context, gauging fairness requires an assessment of reasonableness for, in certain circumstances, unreasonableness can trump a minimally sufficient showing of relatedness and purposefulness.  We think, moreover, that the reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction.

*Ticketmaster-N.Y., Inc.*, 26 F.3d at 210.

Subjecting European Colour to jurisdiction in Massachusetts would be fundamentally unfair and unjust in light of the gestalt factors.  Specifically, Massachusetts has minimal interest in adjudicating this claim because Custadio is already receiving worker's compensation benefits as provided for by Massachusetts law, (Almeida Aff. at ¶ 17), there is no connection whatsoever between European Colour and the Decedent's accident at Roma, and all of European Colour's witnesses are located in the United Kingdom.  Smith Aff. ¶ at 6.  These facts, combined with Massachusetts' deep-rooted respect for the separateness and independence of corporate entities[4] overwhelmingly supports the conclusion that subjecting European Colour to jurisdiction in Massachusetts is wholly unjust, unfair, and unreasonable such that it offends all notions of fair play and substantial justice.

### C.    There is no justification for this Court to pierce the corporate veil of Roma for the purpose of exercising personal jurisdiction over European Colour.

One of the primary benefits of the corporate form is the ability to limit liability and to protect the assets of other corporations operating within the overall corporate structure.  *See My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 618 (1968).  This "concept of

---

[4] See *Birbara v. Locke*, 99 F.3d 1233, 1239 (1st Cir. 1996); *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 618 (1968).

limited liability is so basic a principle of corporate law that courts are hesitant to disregard the independent corporate structure as between a parent corporation and its corporate subsidiaries." *Schaefer v. Cybergraphic Sys, Pty., Ltd.*, 886 F. Supp. 921, 924 (D. Mass. 1994); *see Intergen N.V. v. Grina*, 344 F.3d 134, 150 (1st Cir. 2003) (stating that limited liability is "'the cornerstone of corporate law'" (citations omitted)).   Further, "'Massachusetts has been somewhat more 'strict' than other jurisdictions in respecting the separate entities of different corporations.'" *Birbara v. Locke*, 99 F.3d 1233, 1238 (1st Cir. 1996) (quoting *My Bread Baking Co.*, 353 Mass. at 619).

Under limited circumstances, this Court can "pierce" a subsidiary's corporate form – or veil – to hold a parent corporation liable for a subsidiary's actions.  *My Bread Baking Co.*, 353 Mass at 618.  However, the "doctrine of corporate disregard is an equitable tool that authorizes courts, *in rare situations*, to ignore corporate formalities, *where such disregard is necessary to provide a meaningful remedy for injuries and to avoid injustice*."  *Attorney Gen. v. M.C.K., Inc.*, 432 Mass. 546, 555 (2000) (emphasis added); *see My Bread Baking Co.,* 353 Mass. at 620 (noting that it may be necessary to disregard the corporate form "in rare particular situations in order to prevent gross inequity").  Thus, this Court must first determine whether Custadio has established an adequate justification for piercing the corporate veil.  *See M.C.K., Inc.*, 432 Mass. at 555.

In certain situations, a court will pierce the corporate veil to exercise personal jurisdiction over a parent corporation.  *United Elec., Radio & Mach. Workers*, 960 F.2d at 1089 (noting that the factors used to determine whether to pierce the corporate veil for liability purposes also apply to the jurisdictional inquiry).  However, "where personal jurisdiction over the parent has been found to exist, there is invariably a 'plus' factor -- something beyond the subsidiary's mere

presence within the bosom of the corporate family." *Donatelli v. Nat'l Hockey League*, 893 F.2d

459, 465-66 (1st Cir. 1990).  Notably,

> customary incidents of a parent-subsidiary relationship -- ownership, common
> personnel, profits, and managerial oversight . . . are not suspect, as federal case
> law makes clear, they are insufficient in and of themselves to permit the assertion
> of vicarious jurisdiction.  If they were, any foreign corporation that established an
> affiliate in the United States or purchased a controlling interest in an American
> corporation would subject itself to the jurisdiction of the courts of the United
> States.  The case can be made that this should be so, but it is not the law, nor
> would such a result necessarily be desirable given the probability of claims of
> reciprocal jurisdiction by countries in which American corporations do business
> through subsidiaries of their own.

*In re: Lupron(R)*, 245 F. Supp. 2d at 289-90.

1.    <u>There is no evidence that piercing Roma's corporate veil is necessary to
     prevent any gross inequity.</u>

Custadio has not even pled, let alone produced "strong evidence" of, a gross inequity or

other justification for piercing the corporate veil of Roma.  *See id.* at 289 (requiring "'clear

evidence' of parent subjugation" to pierce the corporate veil); *M.C.K., Inc.*, 432 Mass. at 555

(veil piercing authorized only "where such disregard is necessary to provide a meaningful

remedy for injuries and to avoid injustice").  Moreover, piercing the corporate veil to defeat

fraud requires that, "[t]he participation of the parent in the affairs of the subsidiary must . . . itself

be an element of the fraud -- the participation must somehow make the fraud possible or further

its accomplishment." *Giuliano v. Nations Title*, 938 F. Supp. 78, 82 (D. Mass. 1996); *see Omni-

Wave Elecs. Corp. v. Marshall Indus.*, 127 F.R.D. 644, 647 (D. Mass. 1989) (refusing to address

whether the pleadings sufficiently meet the commingling requirement "because the plaintiff

alleges no facts whatsoever that demonstrate the need to pierce the corporate veil in order to

avoid fraud or gross inequity"); *NCR Credit Corp. v. Underground Camera, Inc.*, 581 F. Supp.

609, 612 (D. Mass. 1984) (finding that without a showing of gross inequity, there is no need to address the issue of "confused intermingling").

Importantly, Custadio has already filed for and received, and continues to receive, weekly compensation for the Decedent's accident under the Worker's Compensation Act as mandated by the laws of Massachusetts. Almeida Aff. at ¶ 17; *see* Mass. Gen. Laws ch. 152, § 7. Indeed, as set forth below in Section IV, the recovery under the Worker's Compensation Act is Custadio's *exclusive remedy* for her and the Decedent's injuries. *See* Mass. Gen. Laws ch. 152, § 32. Piercing Roma's corporate veil and the corporate veils of the other intermediate corporations in order to subject a British corporation to personal jurisdiction in Massachusetts for injuries which Custadio has already been compensated for, does not "prevent some gross inequity." *See My Bread*, 353 Mass. at 620. Rather, it would only undermine the policies behind the Worker's Compensation Act and destroy the protections granted by limited liability. Further, Custadio does not allege any fraud by either Roma or European Colour, let alone that European Colour encouraged such non-existent fraud to take place.

    2.    <u>European Colour does not exercise pervasive control with a fraudulent consequence or a confused commingling with substantial disregard of the corporate identities sufficient to warrant piercing the corporate veil.</u>

Even if this Court does find gross inequity, Custadio must still produce clear evidence to *warrant* piercing the corporate veil. *See Birbara*, 99 F.3d at 1240-41. To pierce the corporate veil in Massachusetts, there must be a showing either of a parent corporation's "pervasive control" over its subsidiary and some fraudulent consequence of such intercorporate relationship, or a "confused commingling" of at least two corporations with "substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting." *Birbara*, 99 F.3d

14

at 1238 (quoting *My Bread Baking Co.*, 353 Mass. at 619). Relying on *My Bread Baking Co.*, the First Circuit established a twelve factor test to determine whether to pierce the corporate veil in any given situation.[5] *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 14-16 (1st Cir. 1985); *see M.C.K., Inc.*, 432 Mass. 546, 555 (2000) (adopting *Pepsi-Cola*'s twelve-factor test).

However, this Court should refuse to pierce the corporate veil where both the parent and the subsidiary were "extremely careful about maintaining formal distinctions" and "[t]here was no evidence showing that [the subsidiary] was a sham or merely a shield behind which [the parent] could hide to escape liability for its own obligations." *Birbara*, 99 F.3d at 1239. Indeed, the First Circuit refused to find pervasive control or a confused comingling sufficient to disregard the corporate form where: (1) directors occasionally acted on behalf of the parent and the subsidiary; (2) the board of directors of the parent and the subsidiary overlapped; (3) the parent benefited from the profits earned by the subsidiary; (4) the parent's transfer of money to the subsidiary in the form of loans were properly recorded in the financial records of both corporations; and (5) the plaintiffs were never misled about the identity of the corporate entity they were dealing with in any given situation. *Birbara*, 99 F.3d at 1239-40.

Indeed, "'it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to

---

[5] These factors include:

> (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

*Attorney Gen. v. M.C.K., Inc.*, 432 Mass. 546, 555 n.19 (2000) (citing *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 14-16 (1st Cir. 1985)).

liability for its subsidiary's acts." *U.S. v. Bestfoods*, 524 U.S. 51, 69 (1998) (citations omitted). Indeed, "[t]his recognition that the corporate personalities remain distinct has its corollary in the 'well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent two corporations separately, despite their common ownership.'" *Id.* (noting that "courts generally presume 'that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary'" (citations omitted)). Moreover, a parent's ownership of all of a subsidiary's stock or the fact that the parent corporation maintains control incident to ownership of stock does not justify piercing the corporate veil. *Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 905 (1st Cir. 1980).

Custadio's single and conclusory allegation that European Colour "controlled, supervised, directed and/or was involved and responsible for the operation, safety, and supervision" of Roma is insufficient to pierce Roma's corporate veil as a matter of law. *See Omni-Wave Elecs. Corp.*, 127 F.R.D. at 647 (noting that "[i]n the absence of any alleged factual basis, neither a conclusory allegation . . . nor a bland assertion that defendants are 'alter egos' . . . is sufficient to withstand a motion to dismiss"); *see* Compl. at ¶ 7. Applying the *Pepsi-Cola* test to these facts, there is no legal basis to pierce Roma's corporate veil because Roma operates as a wholly distinct and independent entity as demonstrated by the following:

- Roma is a wholly owned Massachusetts corporation that has observed required corporate formalities.

- Roma has its own board of directors and its own executive officers.

- Roma is registered to do business in Massachusetts and maintains current and accurate filings with the Massachusetts Secretary of State.

- Roma takes and records the action of its stockholders and Board of Directors in its corporate minute book.

- Roma's local management makes all decisions regarding the day-to-day operations of Roma's business.

- Roma has adequate capitalization and has maintained its own line of credit with a commercial bank independently of any parent corporation, and without guarantees or other credit enhancements of any parent corporation.

- Roma maintains separate financial records and bank accounts under the Roma name.

- Roma maintains separate copies of all of its corporate records.

- Roma pays out dividends when available.

- Roma was not insolvent at the time of the Decedent's accident with the lift.

- Roma purchases supplies for its manufacturing operations from distributors and companies in the United States.

- Roma's associate handbook, which was provided to the Decedent, explicitly stated that Roma is committed to a safe work environment and lists the safety practices that Roma expects its employees to follow.

- The operation of the Roma facility is conducted and supervised by Roma employees and/or executives.

- Roma has adequate insurance coverage and Roma pays the total cost of its worker's compensation insurance.

Almeida Aff. at ¶¶ 4-16.

Moreover, simply piercing the corporate veil of Roma does not subject European Colour to jurisdiction in this Court because there are a series of intermediate corporations between Roma and European Colour. Smith Aff. at ¶ 4. Thus, to reach European Colour, Custadio would have

to pierce the corporate veil of *each* intermediate corporation.[6]  *C.f.* Stephen B. Presser, *Piercing the Corporate Veil*, § 2.22 n.1 (2004) (citing *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1376 (Fed. Cir. 1999)). In addition to failing to produce any evidence to warrant piercing the corporate veil of Roma, Custadio has not pled, and cannot show, *a single fact* that would justify piercing the corporate veil of each intervening corporation.

Additionally, Custadio has offered absolutely no evidence that there has been a fraudulent or injurious consequence *as a result of* the intercorporate relationship of Roma and European Colour.  *See The George Hyman Construction Company v. Gateman*, 16 F. Supp. 2d 129, 158 (D. Mass. 1998) (declining to pierce the corporate veil in the absence of "fraudulent or injurious consequence" resulting from the intercorporate relationship).  Custadio has not alleged, and cannot allege, that Decedent died as a result of the intercorporate relationship between European Colour and Roma.  Nor can Custadio allege that she was prevented from receiving fair compensation for her harm as a result of the intercorporate relationship because she is currently collecting benefits under the Worker's Compensation Act.  *See* Almeida Aff. at ¶ 17.

---

[6] Most states apply the law of the state of incorporation to conduct a veil-piercing analysis.  *See* Restatement (Second) of Conflicts of Law § 307.  Thus, in addition to applying Massachusetts law to the Massachusetts corporations, this Court must also apply the laws of England and Wales to "lift the corporate veil of those intermediate corporations that are incorporated under the laws of the United Kingdom."  Stephen B. Presser, *Piercing the Corporate Veil*, § 5.3 (2004).  Similar to Massachusetts,

> English courts still maintain that lifting the veil is done only in extreme cases of misconduct.  The judges recognize that this doctrine 'is a strong power which can be exercised to achieve justice [where necessary], but which, misused, would be likely to cause not inconsiderable injustice.'  Without clear evidence of fraud, many English judges refuse to lift the corporate veil.

*Id.*  (citing *Creasey v. Breachwood Motors Ltd and Others* [1993] BCLC 480, [1992] BCC 638).

## II.    EUROPEAN COLOUR IS ENTITLED TO SUMMARY JUDGMENT ON ALL COUNTS OF THE COMPLAINT BECAUSE EUROPEAN COLOUR DID NOT OWE A DUTY TO THE DECEDENT.[7]

Custadio's claim that European Colour was "responsible for the operation, safety, and supervision of Roma Color, Inc. and owed a duty to Roma Color, Inc. and its employees to ensure a safe working environment" must fail as a matter of law. *See* Compl. at ¶ 7. This Court should grant summary judgment in favor of European Colour if the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In addition, this Court should "construe the evidence in the light most favorable to the non-moving party." *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). To prevail on a motion for summary judgment, European Colour "must show that there is an absence of evidence to support [Custadio's] position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). Accordingly, "'[i]f the evidence is merely colorable, or is not significantly probative,

---

[7] By moving for summary judgment as an alternative ground, European Colour does not waive its arguments that it is not subject to personal jurisdiction in this Court. European Colour relies on its summary judgment arguments *only if* this Court finds that European Colour is subject to jurisdiction here, and without waiving its right to appeal immediately from any finding that this Court has power to exercise personal jurisdiction in this case. Moreover, all of the facts that European Colour relies on for its summary judgment argument come from the facts that European Colour relies on in support of its personal jurisdiction arguments. *See* Fed. R. Civ. P. 12(h)(1) (stating that the personal jurisdiction defense is waived "if it is neither made by motion under this rule nor included in a responsive pleading . . .); *Tramonte v. Korean War Veteran's Ass'n, Inc.*, 2002 U.S. Dist. LEXIS 7243, at **4-5 (D. Mass. Feb. 5, 2002) (stating "the relevant inquiry is whether the defendant included the lack of personal jurisdiction in its 'first defensive move, be it a Rule 12 Motion or a responsive pleading'" (quoting *Glater v. Eli Lilly Co.*, 712 F.2d 735, 738 (1st Cir. 1983)); *Reliable Tire Distributors, Inc. v. Kelly Springfield Tire Co.*, 623 F. Supp. 153, 156 (D. Pa. 1985) (finding waiver of personal jurisdiction when "[a]t no time did [defendant] state that this motion [to assert a counterclaim] was in *the alternative to the defense[] of lack of jurisdiction . . .*") (emphasis added); *see also Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 284 F. Supp. 2d 204, 211 (stating that one defendant "moved individually to dismiss for lack of personal jurisdiction or, in the alternative, for summary judgment"); *Milford Power Ltd. P'ship by Milford Power Assocs. v. New England Power Co.*, 918 F. Supp. 471, 478 (D. Mass. 1996) (stating that "[b]ecause a motion to dismiss for lack of personal jurisdiction seeks the same relief as a motion for summary judgment, the First Circuit Court of Appeals has found that 'the difference in name is unimportant. In any event, the affidavits presented are available on either motion'" (quoting *Am. Express, Int'l v. Mendez-Cappellan*, 889 F.2d 1175, 1178 (1st Cir. 1989)).

summary judgment may be granted.'" *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 975 F.

Supp. 30, 33 (D. Mass. 1997) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50

(1986)).

It is a well settled principle that "in the absence of 'some act or omission in violation of a

legal duty' there can be no negligence." *Eipp v. Peak, Inc.*, 154 F. Supp. 2d 110, 114 (D. Mass.

2001) (quoting *Little v. Lynn & Marblehead Real Estate Co.*, 301 Mass. 156, 160 (1938)).

Although *Roma* has a "nondelegable duty to provide for the safety of its employee in the work

environment," this duty does not extend to *European Colour*. *See Muniz v. National Can Corp.*,

737 F.2d 145, 148 (1st Cir. 1984). Indeed, "[t]he parent-shareholder is not responsible for the

working conditions of its subsidiary's employees merely on the basis of [the] parent-subsidiary

relationship." *Id*. As the Supreme Court noted,

> Activities that involve the facility but which are consistent with the parent's
> investor status, such as monitoring of the subsidiary's performance, supervision of
> the subsidiary's finance and capital budget decisions, and articulation of general
> policies and procedures, should not give rise to direct liability.' . . . The critical
> question is whether, in degree and detail, actions directed to the facility by an
> agent of the parent alone are eccentric under accepted norms of parental oversight
> of a subsidiary's facility.

*Bestfoods*, 524 U.S. at 72.

Rather, "[a] parent corporation may be liable for unsafe conditions at a subsidiary *only if*

it assumes a duty to act by *affirmatively* undertaking to provide a safe working environment at

the subsidiary." *Muniz*, 737 F.2d at 148 (emphasis added); *see Pomales v. Becton Dickinson &

Co.*, 839 F.2d 1, 7 (1st Cir. 1988) (noting that plaintiff must demonstrate the existence of a parent

corporation's duty by "competent evidence"). This "undertaking may be express, as by contract

between the parent and the subsidiary, or it may be implicit in the conduct of the parent." *Muniz*,

737 F.2d at 148.

It is precisely "[b]ecause an employer has a nondelegable duty to provide safe working conditions for its employees, [that courts] not lightly assume that a parent corporation has agreed to accept this responsibility." *Id.* As such, "[n]either mere concern with nor minimal contact about safety matters creates a duty to ensure a safe working environment for the employees of a subsidiary corporation." *Id.* Accordingly, "[t]o establish such a duty, the subsidiary's employee must show some proof of a positive undertaking by the parent corporation."[8] *Id.* Such a duty necessarily requires more than an "incidental rendering of service by a parent corporation to establish a duty for the safe operations of a subsidiary." *Id.* at 149. Instead, "[t]he plaintiff must establish either that the parent *agreed* to provide the service or that the parent *intended to* confer benefits, either for a fee or gratuitously, on the subsidiary. A duty is not proved by conduct consistent with an intention solely or primarily to serve the parent's own purposes." *Id.* (emphasis added).

In *Muniz*, evidence showing a parent corporation's "issuance of general safety guidelines, not specifically directed to the concentration of lead in the workplace," and its "inten[tion] for these general guidelines to be implemented by local management" was insufficient to impose an affirmative duty on the parent to protect it subsidiary's employees from exposure to toxic lead fumes. *Id.* at 149-50. The First Circuit found that "[t]here is no evidence in this case that [the parent] assumed responsibility for [the subsidiary]. Nor does the evidence show that [the subsidiary] relied on [the parent] for this purpose by lessening or omitting its own safety measures." *Id.* at 149. Importantly, the court dismissed the action even though the parent corporation had *actual knowledge* of such toxic exposure. *Id.*

---

[8] The *Muniz* rule is of general applicability because it is based on the Restatement (Second) of Torts even though the decision involved Puerto Rico law. *DaSilva v. Am. Brands, Inc.*, 845 F.2d 356, 363 (1st Cir. 1988); *Dorn v. Astra USA, Inc.*, 1997 U.S. Dist. LEXIS 7009, at *8 (D. Mass. Apr. 2, 1997).

Following *Muniz*, the First Circuit found that the following evidence was insufficient to refute, as a matter of law, the district court's conclusion that the subsidiary's management – and not the parent corporation – was responsible for the subsidiary's safety programs:

> (1) several officers and employees of [the parent] were aware of the safety problems at [the subsidiary]; (2) [the parent] provided [the subsidiary] with some assistance in evaluating and inspecting the safety conditions; and that (3) [parent] personnel were involved in the *initial* design of the [subsidiary] plant, and in some start-up operations.

*Pomales*, 839 F.2d at 7 (emphasis in original).  Apropos to this case, the First Circuit in *Pomales* took great lengths to explain that, "[t]he plaintiffs here could not seek damages from their employer, [the subsidiary] and thus sought to impose liability on the parent corporation" because "[u]nder the Puerto Rico Workmen's compensation law . . . plaintiffs are precluded from recovering against [the subsidiary] beyond their compensation award."  *Id*. at 6-7 and n.2 (citing to the exclusivity provision, 11 P.R.L. § 21 (2000))[9].

Further, another court is this District found that where a plaintiff subsidiary employee's strongest evidence showed:  "(1) [the parent] supplied its subsidiaries . . . with a safety manual, parts of which created obligations binding on the [subsidiary where plaintiff worked]; (b) [the parent] supplied not merely general advice, but also guidance on machine guarding -- a kind of accident prevention that relates directly to [plaintiff's] injury; [and] (c) [the parent] trained [the subsidiary's] personnel about safety, and [the subsidiary] relied on [the parent] safety manager, presumably for advice on injury prevention," such evidence was *insufficient as a matter of law* to find that the parent corporation assumed any duty to ensure a subsidiary's safe working

---

[9] While *Muniz* specifically involved the Puerto Rico's Workmen's Compensation Act, such fact should not deter this Court from following the same reasoning.  The exclusivity provisions in the Puerto Rico and Massachusetts Acts exist to achieve the same result – to provide an exclusive remedy to an employee in the event of injury or death in the workplace.  *See* Mass. Gen. Laws ch. 152, § 23 (2000); 11 P.R.L. § 21 (2000).

environment. *Allen v. Borden, Inc.*, No. 92-10005, slip op. at 6-7, 9 and 13 (D. Mass. Sept. 16, 1993) (attached hereto as Exhibit 1). The *Borden* Court found that "not only has [the plaintiff] shown no contract between [the parent] and [the subsidiary] concerning workplace safety, which is prerequisite to his maintaining an action under existing Massachusetts law in closely analogous circumstances, but also [the plaintiff] also has failed to show any 'positive undertaking' by [the parent] sufficient under the <u>Muniz</u> standard . . ." *Id*. at 9.

Specifically, although the *Borden* Court acknowledged that an entire section of the parent corporation's safety guidelines set out "particular advice and directives" for the *specific machine* that injured the plaintiff, the parent assumed "'no duty to discover or correct any defect' in [the subsidiary's] machines . . . or to act in any respect with regard to workplace safety at [the subsidiary]." *Id*. at 11 (citations omitted). Indeed, just like the facts in this case, the Court noted that this was "not a case in which [the parent] provided guidance to [the subsidiary] relating to the machine on which [the plaintiff] was injured, or one in which [the parent] had special knowledge of a risk which it had an implied duty to assist its subsidiary in avoiding." *Id*. at 11-12. Further, even though the subsidiary *requested* the parent corporation's safety manager to visit the subsidiary, the Court found that "such request[] did not 'evidenc[e] [the subsidiary's] reliance on [the parent],' in the sense required for [the parent] to be liable in tort for [the plaintiff's] injury." *Id*. at 12.

In sum, the *Borden* Court found that "there is no record evidence that [the subsidiary] delegated to [the parent] any aspect of its duty of care to its workers. However, there is uncontradicted record evidence that [the subsidiary] had responsibility for the safety of its own workers." *Id*. at 12-13. Specifically, "there [was] no record evidence that [the parent had]

assumed any of [the subsidiary's] duties to ensure workplace safety, gratuitously or for consideration." *Id.* at 13.

Here, Custadio has not established, and cannot establish any duty owed by European Colour to the Decedent. First, Custadio's bare allegation that European Colour owed "a duty to Roma [] and its employees to ensure a safe work place," without more, does not give rise to an affirmative legal duty to act. Compl. at ¶ 7. Indeed, both the First Circuit and the *Borden* Court have squarely rejected this argument. *See Muniz*, 737 F.2d at 149; *Borden*, No. 92-100005, slip op. at 6.

Further, even if Plaintiff could show European Colour's direct involvement in safety issues at Roma, such evidence is not enough to establish a duty as a matter of law. *See Pomales*, 839 F.2d at 3; *Borden*, No. 92-10005, slip op. at 11. In addition to European Colour never issuing any guidelines relating specifically to the lift, it has never discussed the lift, its operation, its maintenance, or offered any guidance whatsoever related to its safety, with any Roma employee or representative prior to Decedent's death. *See* Almeida Aff. at ¶ 14-15; Smith Aff. at ¶ 19. Further, like *Borden*, European Colour had no knowledge of any safety issue, hazard, or concern relating to the lift at Roma. Smith Aff. at ¶ 19; *see Borden*, No. 92-10005, slip op. at 11-12. Moreover, there was no *contract* between European Colour and Roma for safety issues. Thus, as a matter of Massachusetts law, Custadio cannot establish a duty owed by European Colour to Custadio. *See Borden*, No. 92-10005, slip op. at 8 (citing *Parent v. Stone & Weber Eng'g Corp.*, 408 Mass. 108, 114 (1980)).

Finally, just as the First Circuit did in *Pomales,* this Court should consider the underlying context in which Custadio has filed her Complaint. *See* 839 F.2d at 6-7. As Custadio is already recovering worker's compensation benefits, the Worker's Compensation Act's exclusivity

provision statutorily precludes Custadio from recovering damages from its direct employer Roma.    Thus, Custadio seeking to impose liability on European Colour results in double recovery.    Accordingly, this Court should find that European Colour did not owe any duty to Decedent as a matter of law.

**III.    THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR EUROPEAN COLOUR ON ALL COUNTS OF THE COMPLAINT BECAUSE THERE IS NO BASIS TO IMPOSE LIABILITY ON EUROPEAN COLOUR BY PIERCING THE CORPORATE VEIL OF ROMA.**

Just as there is no basis to pierce Roma's corporate veil to exercise personal jurisdiction, there is no justification or legal basis to impose liability against European Colour on a veil piercing theory.    European Colour relies on the arguments, set forth above in Section I, to support its motion for summary judgment on substantive liability grounds.

**IV.    SHOULD THIS COURT PIERCE THE CORPORATE VEIL OF ROMA, EUROPEAN COLOUR IS ENTITLED TO SUMMARY JUDGMENT BECAUSE CUSTADIO'S CLAIMS ARE BARRED BY THE EXCLUSIVITY PROVISION OF THE WORKER'S COMPENSATION ACT.**

In the event that this Court does pierce Roma's corporate veil, either to assert personal jurisdiction or to hold European Colour liable on substantive grounds, the Massachusetts Worker's Compensation Act bars all of Custadio's claims as a matter of law.    In Massachusetts, when an employee is injured in the scope of his employment and he elects to collect worker's compensation benefits, the employer is released "from all tort claims which [the employee] might have as a result of this accident." *Liberty Mutual Ins. Co. v. Westerlind*, 374 Mass. 524, 526 (1978) (citing Mass. Gen. Laws ch. 152, § 23); *McDonnell v. Berkshire St. Ry. Co.*, 243 Mass. 94, 96 (1922).    The Worker's Compensation Act specifically states that "when the employee is dead," the term "employee" shall include "legal representatives, dependents and

other persons to whom compensation may be payable." Mass. Gen. Laws ch. 152, § 1(4); *see McLaughlin v. Stackpole Fibers Co., Inc.*, 403 Mass. 360, 361-62 (1988).

Massachusetts law "is clear that once [an employee's] widow filed a claim and received compensation under the act, she was barred from recovering in any actions against the employer for common law claims arising from her husband's injury." *McLaughlin*, 403 Mass. at 362; *see Cozzo v. The Atl. Refining Co.*, 299 Mass. 260, 263 (1938). Further, any wrongful death claim that a widow may have against an employer is also barred by the Worker's Compensation Act's exclusivity provision. *Ferriter v. Daniel O'Connell's Sons, Inc.*, 381 Mass. 507, 508 (1980) (finding that a deceased employee's dependents were barred from recovering under the Wrongful Death Statute against an employer covered by the Worker's Compensation Act). Indeed, the Worker's Compensation Act specifically states that the Wrongful Death Statute does not apply to employees who are even *entitled to* collect benefits under the Act, let alone those employees who are *already* collecting benefits. Mass. Gen. Laws ch. 152, § 68; *see Peerless Ins. Co. v. Hartford Ins. Co.*, 48 Mass. App. Ct. 551, 553 (2000).

In the present case, Custadio has been receiving weekly worker's compensation benefit checks totaling $ 884.46 in connection with the death of the Decedent. Almeida Aff. at ¶ 17. As a result, all of Custadio's claims against *Roma* are barred under the Worker's Compensation Act. If Custadio pierces the corporate veil of Roma, it necessarily follows that Custadio's claims are also barred as against *European Colour*. *See Alvarado-Morales v. Digital Equipment Corp.*, 843 F.2d 613, 616 (1st Cir. 1988) (noting that plaintiff's attempt to pierce the subsidiary's corporate veil to exert personal jurisdiction over the parent "of course, would have the unintended effect of precluding [plaintiffs'] claims against [the parent], due to the exclusivity of the Workmens' Comp. statute as a remedy against the employer"); *Muniz*, 737 F.2d at 147 (noting that because

the parties entered into a stipulation that the parent and the subsidiary were separate corporate entities, the parent "therefore is not entitled to the shield provided by the workers' compensation scheme"); *Cruz*, 619 F.2d at 906 (noting that plaintiff's "argument that [the subsidiary] is either the agent or alter ego of [the parent], if accepted, would defeat his substantive claim. [The parent] would then in fact be plaintiff's employer and the Puerto Rican workmen's compensation statute would immunize it from suit").

Thus, if Custadio is allowed to pierce Roma's corporate veil to reach European Colour, the Worker's Compensation Act's exclusivity provision would automatically immunize European Colour from *any and all* liability to Custadio arising out of the Decedent's accident at Roma.[10]  *See* Mass. Gen. Laws ch. 152, § 23; *Cruz*, 619 F.2d at 906.  The Supreme Judicial Court of Massachusetts has already adopted similar reasoning in a wrongful death action.  *Gurry v. Cumberland Farms*, 406 Mass. 615, 621 (1990).  In *Gurry*, the court found that because the Worker's Compensation Act's exclusivity provision barred plaintiff from bringing any claims against a predecessor corporation, the Act barred all claims against the newly merged corporation for the same reason.  406 Mass. at 621.  Simply stated, as a result of the merger, "any liability or privilege those [predecessor] entities possessed is lodged by the law in [the new corporation]."  *Id*. at 620.  The situation is no different here.  Once this Court pierces the several corporate veils to reach European Colour, all of Roma's liabilities *and* benefits are passed on to European Colour (or of course, any intermediate corporation).

Moreover, equity, fairness, and the public policy reasons supporting the purpose and goal of the Worker's Compensation Act indisputably mandate this result.  Massachusetts enacted its

---

[10] While *Cruz* specifically involved Puerto Rico's Workmen's Compensation Act, the First Circuit's reasoning applies equally to this case.  The exclusivity provisions in both the Puerto Rico and Massachusetts acts exist to achieve the same result – to provide an *exclusive* remedy to an employee in the event that he or she is injured in the workplace.  *See* Mass. Gen. Laws ch. 152, § 23; 11 P.R.L. § 21.

workers' compensation laws "to rectify inequities in the common law by providing fixed compensation to employees injured at work. In return, the employer was granted immunity from his employees' tort claims." *Gurry*, 406 Mass. at 621. Borrowing the words of the First Circuit, Custadio "cannot have it both ways." *Cruz*, 619 F.2d at 906. Accordingly, this Court should find that Custadio's claims are barred as a matter of law because the Worker's Compensation Act's exclusivity provision bars any and all claims against European Colour.

## CONCLUSION

For the foregoing reasons, Defendant European Colour, PLC, hereby requests that this Court dismiss the Complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). In the alternative, this Court should grant summary judgment in favor of European Colour because European Colour did not owe the Decedent any duty to ensure a safe working environment for Roma's employees. In addition, there is no justification or legal basis to pierce Roma's corporate veil. However, even if this Court pierces Roma's corporate veil, either to assert personal jurisdiction or to impose liability on European Colour as Decedent's employer, this Court should still grant summary judgment in favor of European Colour because the exclusivity provision of the Worker's Compensation Act bars all of Custadio's claims.

## REQUEST FOR ORAL ARGUMENT

European Colour respectfully requests oral argument on this Motion.

Respectfully submitted,

EUROPEAN COLOUR PLC

By its attorneys,


_____/s/ Timothy W. Mungovan_____
J. William Codinha, BBO No. 087740
Timothy W. Mungovan, BBO No. 600702
Gina M. McCreadie, BBO No. 661107
NIXON PEABODY LLP
100 Summer Street
Boston, MA  02110
Tel:  (617) 345-1000
Fax:  (617) 345-1300

Dated:  April 27, 2005

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VINCENT ALLEN, PATRICIA ALLEN,     )
Individually and as PPA of         )    CIVIL ACTION NO.
JOSHUA ALLEN and NICOLE ALLEN,     )    92-10005-WD
    Plaintiffs,                  )
                                   )
          v.             )
                                   )
BORDEN INC. and JOHN DOE           )
MANUFACTURING CO.,                 )
    Defendants.                  )

_DOCKETED_

## MEMORANDUM AND ORDER
September 16, 1993

This litigation began in November, 1991, when Vincent Allen, Patricia Allen, Joshua Allen, and Nicole Allen,[1] brought suit in Essex Superior Court, from which defendant Borden, Inc. removed the case to this court under 28 U.S.C. § 1446(e). Allen alleges that he was injured cleaning a press machine while working at Vernon Plastics, Inc. ("Vernon") in Haverhill, Massachusetts. Borden, Vernon's parent corporation, seeks summary judgment against Allen, arguing that the plain language of the Massachusetts Workmen's Compensation Act gives Borden immunity against Allen's claims; and that Allen has failed to establish that Borden assumed any duty of care towards Vernon's employees.

I

On April 22, 1991, Allen was injured while cleaning a press machine at Vernon. Allen's injury required that three of his fingers be amputated. Allen filed a workmen's compensation claim naming Vernon as his employer, and had received, by July of 1992,

---

[1] "Allen" herein means Vincent Allen, but I use his name to stand collectively for the plaintiffs.



approximately $21,000 in compensation benefits and $23,000 in medical benefits.

Vernon, a New York corporation, is a wholly-owned subsidiary of Borden Delaware Holding, Inc. ("BDHI"), a Delaware corporation. BDHI is a wholly-owned subsidiary of Borden, a New Jersey corporation with its principal place of business in Ohio. Borden is a licensed self-insurer for purposes of payments under the Massachusetts Workmen's Compensation Act, and its license "includes coverage for Borden and all of Borden's Massachusetts subsidiaries, including Vernon."[2]

## II

Borden claims it is entitled to summary judgment as a matter of law, for the Massachusetts Workmen's Compensation Act ("Act"), G.L. c. 152 (1991 ed.) provides Borden complete immunity from Allen's claims. Borden advances three separate arguments which it claims entitle it to summary judgment.[3] First, that the plain language of the statute, G.L. c. 153, § 23, applies to release an insurer from any common law liability to a worker, when the insurer pays to that worker benefits under the Act. Because Allen accepted a claim under c. 152, and because that claim was paid by Borden, an insurer, the argument goes, all

---

[2]Borden's Motion for Summary Judgment at 2.

[3]Borden developed its first two arguments in its initial memoranda submitted in support of its motion for summary judgment. Its third argument was made in supplemental briefing, submitted after the hearing on its motion for summary judgment. That supplemental briefing was based, in part, on additional discovery conducted by Allen which focussed on whether Borden assumed any duty to ensure Vernon's plant was safe.

common law claims by Allen against that insurer are barred.  In
this vein, Borden argues further that under Massachusetts law
insurers which undertake safety programs to assist their insureds
in reducing accidents are immune from suit.

Second, Borden claims that for Allen to prevail, he must
"impose[] the duty of an employer on Borden to provide for a safe
working environment, a status that extends to Borden the
immunities under the Act."[4]

Third, even if Borden is merely Vernon's corporate parent,
and is considered neither Vernon's insurer nor Allen's employer,
Allen--Borden argues--has not advanced facts sufficient to
support his claim that Borden assumed any duty to ensure
workplace safety at Vernon.  Because of my resolution of this
third ground favorably to Borden, I need not consider Borden's
other two arguments.

Initially, Allen provided only slender factual support for
his claim that Borden assumed some duty to ensure workplace
safety at Vernon.[5]  Borden did not dispute Allen's alleged
facts, but rather agreed to assume they were true, and conceded
for purposes of its motion that Borden did assume certain of
Vernon's duties of care towards its employees, hoping thereby to

---

[4]Borden's Memorandum in Support of its Motion for Summary
Judgment at 2.

[5]On August 30, 1992, this court entered a protective order
against Allen's Rule 30(b)(6) deposition of Borden, pending
resolution on the merits of Borden's motion for summary judgment.
After the hearing on Borden's motion for summary judgment, I
permitted Allen further discovery on the limited question of
whether Borden assumed any duties of workplace safety at Vernon.

3

step into Vernon's shoes as Allen's employer, or otherwise to obtain immunity. The basis for Allen's claim that Borden assumed a duty was that Borden admits its "Safety Department periodically sends general safety statistics, safety bulletins, and safety program updates to Vernon";[6] and that discovery in a separate action has shown Borden's head of corporate safety visited Vernon, and that Borden employees advised Vernon on "machinery guarding and identification of nip points and barrier guards."[7] While those facts did not show that Borden necessarily assumed any duty to ensure safety at Vernon, they did provide a good faith basis for making such a claim.[8] See Restatement (Second) of Torts, § 321A (1965).

However, since the hearing on Borden's motion for summary judgment, the parties have availed themselves of the opportunity to develop the factual record, and Borden now chooses, in its

---

[6]Borden's Answer to Plaintiff's Interrogatory 22.

[7]Allen's Memorandum in Opposition at 15.

[8]Heinrich v. Goodyear Tire & Rubber Co., 532 F.Supp. 1348, 1354 (D. Maryland 1982) (duty implied from parent's provision of direct guidance to subsidiary on use of chemicals which caused plaintiff's injury); Ramirez Pomales v. Becton Dickinson & Co., S.A., 649 F.Supp. 913, 919 (D. Puerto Rico 1986) (on "scant" evidence, mere "fact that [parent] officials were aware of necessary safety precautions to prevent mercury contamination through their experience with [one subsidiary's] plant and were involved in the transfer of operations from [one subsidiary] to [another] is sufficient to suggest that parent had a duty to assure a safe work environment at [that second subsidiary], or at the least a duty to inform the local management of proper safety procedures"), aff'd, 839 F.2d 1 (1st Cir. 1988); Searcy v. Paul, 20 Mass. App. Ct. 134, 141 (1985) ("[i]f... these defendants undertook to supply a ladder to Searcy, it was their duty to supply one which was safe").

4

supplemental briefing, to challenge the factual basis of Allen's claim.

In addition to the facts noted above, Allen advances several new grounds to bolster its charge that Borden assumed the duty of securing a safe workplace at Vernon. Taken together, and as now challenged by Borden, none of these grounds raises a genuine issue of material fact about whether Borden assumed such a duty, and Borden is entitled to judgment as a matter of law.

Allen contends:

Borden assumed responsibility for, and was deeply involved in, safety practices at Vernon Plastics, and Vernon Plastics relied on Borden's assistance. Specifically, Borden provided Vernon Plastics with the "Borden Safety & Loss Prevention Guide." In addition to setting forth guidelines applicable to employees such as the plaintiff, Borden also provided guidelines as to the role of management in preventing accidents. The guidelines were not merely advisory; they constituted "minimum requirements." Although some of Borden's guidelines were discretionary, others were mandatory. For example, monthly safety audits and reviews, the utilization of safety committees and the enforcement of certain rules were mandatory. Borden provided incentives to its subsidiaries for complying with safety requirements. Borden also set forth procedures for identifying job hazards and correcting them, and issued safety bulletins and provided training of Vernon's safety coordinators. Borden's guidelines were not only "general"; some related specifically to machine guarding, an issue directly raised in the present litigation.

Borden's assistance was not limited to providing written documents. Vernon's management reported directly to Borden. Borden also sent personnel to Vernon Plastics to assist in the prevention of safety-related accidents. In fact, personnel from Vernon Plastics even requested visits from Borden's safety manager, evidencing Vernon Plastics' reliance on Borden.[9]

These facts, as adduced by Allen, and examined in the light

---

[9]Allen's Supplemental Memorandum at 3-4 (record references omitted).

most favorable to him, <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S.
242, 255 (1986), either do not bear directly on whether Borden
assumed any of Vernon's duties of care, or when they do seem
directly so to bear, they involve misstatements or
misinterpretations of the record.

In order to survive a well-supported motion for summary
judgment, a non-moving party who would bear the ultimate burden
of proof at trial must present "definite, competent evidence to
rebut the motion." <u>Mesnick</u> v. <u>General Electric Co.</u>, 950 F.2d
816, 822 (1st Cir. 1991), <u>cert. denied</u>, 112 S.Ct. 2965 (1992).
Allen cannot rest his claims upon "vague and conclusory
statements" in his pleadings but rather must "demonstrate
<u>specific</u> facts which establish a genuine issue for trial."
<u>Posadas de Puerto Rico, Inc.</u> v. <u>Radin</u>, 856 F.2d 399, 401 (1st
Cir. 1988). Moreover, Allen cannot satisfy his burden by
presenting evidence that is "merely colorable." <u>Anderson</u> v.
<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986). Allen must
sufficiently substantiate his factual allegations so that a
rational jury could return a verdict in his favor. "The mere
existence of a scintilla of evidence in support of the [non-
moving party's] position will be insufficient" for that purpose.
<u>Id</u>. at 252.

Allen's strongest evidence for Borden's assumption of
Vernon's duties is: (a) Borden supplied its subsidiaries,
including Vernon, with a safety manual, parts of which created
obligations binding on Vernon; (b) Borden supplied not merely

6

general advice, but also guidance on machine guarding -- a kind
of accident prevention that relates directly to Allen's injury;
(c) Borden trained Vernon personnel about safety, and Vernon
relied on Borden's safety manager, presumably for advice on
injury prevention.

To determine the key issue here, "whether the defendant owed
a duty to the plaintiffs," Swift v. American Mutual Ins. Co., 399
Mass. 373, 376 (1984), I must apply Massachusetts law.  Borden
cites Muniz v. National Can Corp., 737 F.2d 145 (1st Cir. 1984),
as supplying the proper standard for determining whether a third
party assumed the employer's duty of care to its employees.  In
Muniz, however, the First Circuit was applying the law of Puerto
Rico, id. at 147, and the standard fashioned by the Muniz court,
while demanding in itself, may still be more relaxed than that
applied in Massachusetts.  Nonetheless, the First Circuit's
treatment of the parent-shareholder problem is valuable in the
present case, which presents a similar fact-pattern, and one not
yet addressed directly by the Supreme Judicial Court.

> An employer has a nondelegable duty to provide for the
> safety of its employees in the work environment.  The
> parent-shareholder is not responsible for the working
> conditions of its subsidiary's employees merely on the basis
> of parent-subsidiary relationship.  A parent corporation may
> be liable for unsafe conditions at a subsidiary only if it
> assumes a duty to act by affirmatively undertaking to
> provide a safe working environment at the subsidiary.
>
> Such an undertaking may be express, as by contract
> between the parent and the subsidiary, or it may be implicit
> in the conduct of the parent....
>
> Because an employer has a nondelegable duty to provide
> safe working conditions for its employees, we do not lightly
> assume that a parent corporation has agreed to accept this

responsibility.  Neither mere concern with nor minimal
contact about safety matters creates a duty to ensure a safe
working environment for the employees of a subsidiary
corporation.  To establish such a duty, the subsidiary's
employee must show some proof of a positive undertaking by
the parent corporation.

Muniz, 737 F.2d at 148 (citations omitted).

Massachusetts requires that, in the usual case, for a third

party to be a tortfeasor on the ground of failing to make safe a

workplace, the tortfeasor must be an independent contractor.

Under the Massachusetts standard, as enunciated in cases whose

circumstances are analogous to this one, Allen would need to show

that Borden provided safety-related services to Vernon and

received a fee in return.  See Parent v. Stone & Webster

Engineering Corp., 408 Mass. 108, 114 (1980) (independent

contractor "is liable to third persons not parties to the

contract who are foreseeably exposed to danger and injured as a

result of its negligent failure to carry out that obligation"),

quoting Banaghan v. Dewey, 340 Mass. 73, 80 (1959).  No facts in

evidence support such a conclusion, and were it certain that

Massachusetts courts would extend their reasoning from other,

similar, cases to the issues presented here, I would grant

summary judgment to Borden on these grounds alone.[10]  However, I

will go on to consider, in the alternative, whether the facts

presented by Allen are sufficient to make out a claim that Borden

---

[10]Allen twice cites Parent, Allen's Supplemental Memorandum at
2, 5, but asserts no more than that Massachusetts law permits third
parties to be "held liable for their negligence in rendering safety
assistance at one's place of employment," id. at 2.  Allen fails to
explain how, under Massachusetts standards, Borden could be found
liable.

8

could be liable under the standard set out in <u>Muniz</u>.  To forecast my conclusion:  not only has Allen shown no contract between Borden and Vernon concerning workplace safety, which is prerequisite to his maintaining an action under existing Massachusetts law in closely analogous circumstances, but also Allen also has failed to show any "positive undertaking" by Borden sufficient under the <u>Muniz</u> standard, a rule which could be adopted by Massachusetts courts to treat this sort of situation in particular.

Contrary to Allen's assertions, Borden's safety manual sets out few obligations that are binding on its subsidiaries, and those few do not establish that Borden took up any of Vernon's non-delegable duty to ensure workplace safety.  The guidelines, by their terms, do provide "minimum requirements for safe work procedures and reporting," § 11.01;[11] but there are few individual guidelines which mandate any particular form of workplace safety.  The guidelines function, instead, as a set of suggestions to assist subsidiaries in setting up their own safety programs.  Although section 11.01 speaks in terms of "implementation of ... guidelines," that is business jargon for an arrangement by which Borden supplies its subsidiaries with general safety guidelines, which Vernon must sort out and fashion to suit the needs of its plant.  Vernon itself retains

---

[11]Selections from Borden's safety guide are provided in Exhibit B to Allen's Supplemental Memorandum.

responsibility for ensuring workplace safety,[12] and Borden's
role is limited to advising its subsidiary on how well it is
performing its safety duties.[13]

> This Safety and Loss Prevention Guide is intended to assist
> <u>management</u> and <u>those assigned</u> the safety and loss prevention
> function to plan and establish an effective safety and loss
> prevention program.... It may be found that the procedures
> published in the Guide do not provide the safeguards desired
> at a specific location. If so, <u>local management</u> should
> prepare supplemental procedures.... (Section 11.04)
> (emphasis added)

Thus Borden's safety guidelines leave "the safety and loss
prevention function" with subsidiaries and divisions.

Again contrary to Allen's contention,[14] Borden's safety
rules, although they include seemingly mandatory penalty clauses
such as "[f]ailure to comply with applicable safety rules will
result in disciplinary action...," are not rules binding on
Vernon. Actually, these rules are only Borden's suggestion of a
way its subsidiary should go about things.[15] The Borden guide
states, "[a]ll locations, regardless of size, <u>should have</u> written
safety rules which, when enforced, result in efficient production

---

[12]Borden's Supplemental Memorandum, Exhibit 3 (Miller
deposition at 34-41).

[13]Borden's Supplemental Memorandum, Exhibit 2 (Miller
Affidavit, ¶¶ 6, 8, 10); section 11.01 (Borden's "Corporate Safety
Division Managers are available for assistance in achieving
implementation of these guidelines"; each subsidiary "can and
should expand or add to these guidelines to meet specific
requirements").

[14]Allen's Supplemental Memorandum at 3 (as to section 12.18,
"the enforcement of certain safety rules w[as] mandatory").

[15]The "failure to comply..." language comes from Exhibit A to
§ 12.18, which furnishes only "[a]n example of General Safety
Rules."

with minimal risk of injury." Section 12.18.  This is an
exhortation, not a command; or if it is a command, Borden only
goes so far as directing its subsidiary to provide written safety
rules, which does not show Borden is assuming its subsidiary's
duty of care.[16]  So too with "safety committees":  Borden
requires its subsidiaries to have them; beyond that, Borden only
makes suggestions for how to organize and compose them.[17]

One section of the Borden Guide is devoted to "machine and
equipment guarding,"[18] but although this section sets out
particular advice and directives, Borden assumes "no duty to
discover or correct any defect" in Vernon's machines, DaSilva,
845 F.2d at 363, or to act in any respect with regard to
workplace safety at Vernon.  This is not a case in which Borden
provided guidance to Vernon relating to the machine on which
Allen was injured, or one in which Borden had special knowledge
of a risk which it had an implied duty to assist its subsidiary

---

[16]Section 14.06, which Allen states is evidence that Borden
assumed some duty, instead requires that Borden's subsidiaries
perform their own monthly safety "audits," noting that "[a]
supervisor responsible for the safety and welfare of employees has
a special role as an 'Inspector.'"  The guide also suggests "what
should be inspected," a list that includes, among many other items,
machine guards.  Again, however, Borden in its Guide assumes no
duties to ensure safety.  Proper machine guarding rests with
Vernon, as is shown by Exhibit A to section 14.06, the "sample
safety inspection" ("Machine Guarding: Are all machines guarded to
protect operators from point of operation hazards?....  Are
interlocks installed and operational?", with a box to check for
"yes" or "no").

[17]See section 12.16 ("[t]here are several types of committees
and any one, or a combination of them, may be appropriate.  The
various types are listed below...").

[18]Section 14.32.

in avoiding. See Muniz, 737 F.2d at 149 ("the evidence shows that NCC provided general safety guidelines, not specifically directed to the concentration of lead in the workplace, and that NCC intended for these general guidelines to be implemented by local management") (footnote omitted); DaSilva, 845 F.2d at 363 (no liability when "the fee charged by American to Acushnet was only for brief inspections, for designing and suggesting general safety procedures, and for checking compliance with OSHA regulations"). Compare Heinrich, 532 F.Supp. at 1354 (parent provided specific guidance to subsidiary concerning chemical which injured plaintiff); Ramirez Pomales, 649 F.Supp. at 919 (parent's experience with dangers of mercury contamination at one subsidiary implied duty in parent at least to inform second subsidiary of necessary safety procedures).

While, as Allen asserts, "personnel from Vernon Plastics even requested visits from Borden's safety manager," such requests did not "evidenc[e] Vernon Plastics' reliance on Borden,"[19] in the sense required for Borden to be liable in tort for Allen's injury.[20] That is, there is no record evidence that Vernon delegated to Borden any aspect of its duty of care to its

---

[19]Allen's Supplemental Memorandum at 3-4.

[20]Allen need not show that Borden assumed the full duties of his employer, but merely that Borden assumed some duty to secure a safe workplace (a duty delegated by Vernon to Borden, or assigned to Borden by contract, or taken up by Borden in a number of other ways) for the safety of the press machine.

workers.[21]   However, there is uncontradicted record evidence
that Vernon had responsibility for the safety of its own workers.
Vernon owns its own plant and "maintains and repairs [its own]
machinery and equipment."[22]   Borden provides advice to and
consults with Vernon about maintaining proper plant safety,[23]
but there is no record evidence that Borden has assumed any of
Vernon's duties to ensure workplace safety, gratuitously or for
consideration.   Borden's provision of a safety guide to all its
subsidiaries and divisions, including Vernon, a guide which sets
out the general principles of adequate machine guarding, is
insufficient to establish Borden's assumption of any duty, even
when several of Borden's general guidelines (such as its call for
subsidiaries to establish safety committees) were "mandatory."
In sum, were the Supreme Judicial Court to apply the standard
provided by the First Circuit in Muniz to the facts of a case
such as this--rather than applying the more demanding principles
of independent contractor liability--Allen has failed to

---

[21]   A.   ... I know that the safety manager has been [to Vernon]
on request, et cetera.  But that's really all I know about it....

        Q.   And do you know in connection with what aspects of
safety the safety manager went to Vernon Plastics?

        A.  What aspects?  I wouldn't be able to say the specific
aspects, no.

Allen's Supplemental Memorandum, Exhibit A (Miller deposition at
44).

[22]Borden's Supplemental Memorandum, Exhibit 1 (Borden's Answers
to Interrogatories); Exhibit 2 (Miller Affidavit, ¶ 3).

[23]Borden's  Supplemental  Memorandum,  Exhibit  3  (Miller
Deposition at 34-40).

demonstrate an essential element of his tort claim.

III

For the reasons set forth more fully above, the defendant's motion for summary judgment is hereby ALLOWED.

DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

14