UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

GAIL CUSTADIO, ADMINISTRATRIX OF
THE ESTATE OF STEPHEN CUSTADIO,

<div style="margin-left:2em">Plaintiff</div>

vs.                                                    No. 05-CV-10556-JLT

EUROPEAN COLOUR PLC,

<div style="margin-left:4em">Defendant</div>

**THE PLAINTIFF, GAIL CUSTADIO'S RESPONSE TO THE L.R. 56.1
STATEMENT OF UNDISPUTED MATERIAL FACTS OF THE
DEFENDANT, EUROPEAN COLOUR, AND STATEMENT OF MATERIAL
FACTS CREATING A GENUINE ISSUE TO BE TRIED**

1.    In 1999, European Colour PLC ("European Colour") acquired Roma Color, Inc. ("Roma"). (*European Colour PLC Annual Report 2003*, Tab 1, p. 3)

2.    There is no documentation available to the plaintiff to support the existence of several corporations between Roma and European Colour.

3.    The plaintiff, Gail Custadio ("Custadio"), has not had the opportunity to conduct discovery which would allow her to verify the financial and corporate status of European Colour vis-a-vis Roma.

4.    In the 2003 Annual Report of European Colour, the following statements are made:

    a.    "European Colour employs approximately 190 people at three major manufacturing locations;  two in the United Kingdom ... and one in the United States at Fall River, Massachusetts." (*European Colour PLC Annual Report 2003*, Tab 1, p. 3);

      b.      "The business has developed a new three-year strategic plan ... [which includes] a shift in the balance of US manufactured product range away from commodities to higher value-added products." (*European Colour PLC Annual Report 2003*, Tab 1, p. 3);

      c.      "At the sales level, there was a redefinition of territories both in the UK and US business...." (*European Colour PLC Annual Report 2003*, Tab 1, p. 4)

5.      In the 2004 Annual Report of European Colour, the following statements are made:

      a.      "Our teams in the UK and USA are focused on delivering the products and services that our customers rely on us to provide." (*European Colour PLC Annual Report 2004*, Tab 2, p. 1);

      b.      "This year was another phase in the rebuilding, refocusing and invigoration of European Colour and its operating units, EC Pigments in the UK and the USA." (*European Colour PLC Annual Report 2004*, Tab 2, p. 1);

      c.      "We have also made changes to our organizational approach and the management teams in both the UK and the USA." (*European Colour PLC Annual Report 2004*, Tab 2, p. 1);

      d.      "In Europe and the USA we now serve our customers directly, with local sales representatives and customer service offices in both regions." (*European Colour PLC Annual Report 2004,* Tab 2, p. 2).

6.      European Colour's only business presence in the United States is the Roma facility in Fall River, Massachusetts.

7.    The 2004 Annual Report of European Colour is dedicated to the memory of Mr. Custadio.  In that dedication, Mr. Custadio is described as a member of European Colour's "Fall River team."  (*European Colour Annual Report 2004 Dedication*, Tab 2)

8.    At the meeting of the Audit Committee of European Colour dated May 27, 2004, the potential of a claim by Custadio against European Colour is discussed, as well as other litigation matters in Massachusetts.  These items are made a regular board agenda item.  (*May 27, 2004 Minutes of a Meeting of the Audit Committee of European Colour PLC,* Tab 3, *2(i)*)

9.    Stephen Smith became Chairman of the Board of European Colour on August 4, 2003, less than four months before Mr. Custadio's death.  (*European Colour PLC, Interim Results for the Six Months Ended 30 September 2003*, November 25, 2003, Tab 4, p. 3; *European Colour PLC Annual Report 2004*, Tab 2, p. 6)

10.    On November 20, 2003, Stephen Custadio was working at the Roma Color facility ("Roma") in Fall River, Massachusetts.  As he attempted to fix a malfunctioning mechanical lift, the lift suddenly plunged 20 feet, fatally injuring Mr. Custadio  (*Portions of OSHA Investigation Documents of the Custadio Incident*, Tab 5)

11.    Mr. Custadio was attempting to clear a jam on the lift when the accident happened.  As the lift plunged 20 feet, Mr. Custadio was impaled by a guardrail. (*Portions of OSHA Investigation Documents of the Custadio Incident*, Tab 5)

12.    Investigation after the event revealed that the safety device to prevent the lift from falling in the event of a mechanical failure was not functioning.  (*Portions of OSHA Investigation Documents of the Custadio Incident*, Tab 5)

13.    The mechanical lift in question was almost 20 years old.  (*December 3, 2003 letter from Mike Clayton, EC Pigments,* Tab 7)

14.    The lift had been in a dangerous condition for several years prior to Mr. Custadio's death, due to a lack of proper maintenance. *(December 8, 2003 letter of Giant Lift,* Tab 6)

15.    The mechanical lift had similar free falling incidents in January 2002 and September 2003. The lift was not rebuilt until after Mr. Custadio's death. *(Portions of OSHA Investigation Documents of the Custadio Incident*, Tab 5 and *December 8, 2003 letter of Giant Lift,* Tab 6)

16.    As of November, 2003, any repair and/or capital improvement over $10,000 at the Roma Fall River facility required approval by European Colour. *(Portions of OSHA Investigation Documents of the Custadio Incident*, Tab 5)

17.    On or around January 18, 2002, Giant Lift sent a quote (#39768) to Roma for replacing the mechanical lift which caused Mr. Custadio's death. The replacement quote was over $17,000. *(December 8, 2003 Letter of Giant Lift with Invoice #39768,* Tab 6)

18.    The new lift was not purchased by Roma prior to Mr. Custadio's death. *(December 8, 2003 Letter of Giant Lift with Invoice #39768,* Tab 6)

19.    After Mr. Custadio's death the lift in question and a second lift were rebuilt by Accurate Elevator for $87,000.00 and a maintenance contract was purchased. *(Portions of OSHA Investigation Documents of the Custadio Incident,* Tab 5)

20.    Roma is one of two principal subsidiaries of European Colour. *(European Colour PLC Annual Report 2003*, Tab 1, p. 44 and *European Colour PLC Annual Report 2004*, Tab 2, p. 33)

21.    European Colour owns one hundred percent of the stock of Roma. *(European Colour PLC Annual Report 2003*, Tab 1, p. 35)

**CONCLUSION**

For the reasons stated in the accompanying Opposition, the Court should defer any action on European Colour's Motion to Dismiss until written and deposition discovery can be conducted on the subject matter of personal jurisdiction. European Colour's Motion to Dismiss/Summary Judgment under a piercing of the corporate veil theory should be denied as premature.

Custadio asks that the Court:

1.    deny European Colour's Motion without prejudice;

2.    order European Colour to answer the Complaint within 14 days; and

3.    order a Scheduling Conference to discuss the scope of discovery.

Respectfully submitted,

SUGARMAN AND SUGARMAN, P.C.
Attorneys for Plaintiff

/s/Jodi M. Petrucelli
Neil Sugarman - BBO #484340
Jodi M. Petrucelli - BBO #561911
One Beacon Street
Boston, MA  02108
Tel:  (617) 542-1000
Fax:  (617) 542-1359

Dated:  May  27 , 2005

IMAN 164932v1

# european colour plc

ANNUAL REPORT 2003

# Results Summary

|  | 2003 | 2002 | % change |
|---|---|---|---|
| Turnover | £38.93m | £41.28m | -6% |
| Total Operating Profit Before Exceptional Items and Goodwill Amortisation | £2.99m | £2.16m | 38% |
| Profit Before Tax, Exceptional Items and Goodwill Amortisation | £2.41m | £1.36m | 77% |
| Headline Earnings Per Share Before Exceptional Items and Goodwill Amortisation | 2.49p | 2.10p | 19% |
| Dividend Per Share | 0.64p | - | 100% |
| Capital Expenditure | £0.79m | £0.71m | 11% |
| Operating Cash Flow | £2.25m | £3.68m | -39% |

TURNOVER BY REGION



UK   CWE   ROW   USA

£2.9m
£13.3 m
£8.4m
£14.3 m

TURNOVER BY DIVISION



 Coatings     Pigments

£6.4m
£32.5m

1



## Chairman's Statement



Paul Deakin: Non-Executive Chairman

**Chairman's statement**

The last financial year was a period of great change for European Colour. We started the year with two businesses, Coatings and Pigments, a Group head office, debt totalling £12.2 million and facing the prospect of preference share redemptions of £2 million.

By the end of the year we had sold our Coatings business, closed our head office saving over £0.5 million each year, reduced our debt to less than £2 million and redeemed, purchased or cancelled all of our preference shares. These changes in our Group structure have allowed us to refocus on our Pigments business which had suffered in recent years through lack of funding and various management changes.

While being careful to ensure that all projects are carefully researched, in recent months we have approved significant new investment in our Pigments business which we believe will help to relieve bottlenecks and address product quality and consistency issues that have been identified. We have also devoted considerable effort to strengthening our management team with the recruitment in April last year of George Hughes, who is now Managing Director, and in April this year of Brian Quinn, who has become Sales and Marketing Director.

It is still too early to see the benefit of these changes in the results we are announcing but I believe we now have the team, the strategy and the funding necessary to return European Colour to profitable growth.

**Results**

The consolidated results we are presenting cover a year during which Tor Coatings was part of the Group for a little over six months and therefore do not solely reflect the financial performance of the continuing Group. In the period prior to its sale, Tor contributed turnover of £6.4 million and operating profit of £1.4 million to the Group's results.

The Pigments business increased sales 5% to £32.5 million and operating profit before exceptional items increased 94% to £2.4 million. Group costs were down to £1 million and are expected to fall further during 2003/4 as the full benefits of closing our head office in December 2002 are realised. Interest costs before exceptional interest items are down from £0.8 million to £0.6 million and are forecast to fall substantially this year with debt now much reduced. Headline earnings per share

before exceptional items and goodwill amortisation in the year were 2.49p up 19% on last year.

**Dividends**

Now that debt levels have been reduced and all of our preference shares have been redeemed, purchased or cancelled, the Board is delighted to be in a position to propose a final dividend of 0.43 pence per share, bringing the total for the year to 0.64 pence per share.

**Corporate Governance**

I would draw your attention to the Corporate Governance Statement on pages 40 and 41 and the Remuneration Report on pages 8 to 14.

The current structure of the Board comprises two executive directors and three non-executive directors.

**People**

I would formally like to record my thanks to everyone who has worked so hard to help overcome our recent problems and ensure that European Colour is now in a position to move forward strongly. Particular thanks go to Nick Hawkins for his contribution over the last 12 months in restructuring the business and to George Hughes who has kept a calm head and focussed on the real business issues at a time when everything around him was in a state of change.

**Prospects**

At the trading level, the world continues to be an uncertain place and, although the first signs in 2003/4 look encouraging, it is still too early to give any guidance on the longer term outlook. However, with low debt and a much stronger management team, we are far better placed to deal with any difficulties, and capitalise on any opportunities, that might arise.

A significant matter for the future of European Colour is the emergence of Jarvis Porter as a 29.7% shareholder. Public comments made by Jarvis Porter have merely confirmed that they believe European Colour is a good investment opportunity. Whilst there has been press speculation concerning the long-term intentions of Jarvis Porter, the Board has no knowledge of Jarvis Porter's intentions, beyond that which they have already stated.

Paul Deakin
Non-Executive Chairman
18 June 2003

2



# Managing Director's Review



George Hughes: Managing Director

## Products & Markets

European Colour was formed by the merger in 1985 of two long established British companies in the pigment industry, Ellis Jones and Horace Cory.

The Pigments business was further expanded in 1999 by the acquisition of Roma Color in the United States; a family owned business whose ideals and market strategy fitted perfectly with European Colour's desire to expand its business.

The Pigments business supplies specialty products for the colouration of inks, plastics and coatings. The product range encompasses colours manufactured in the Group's own manufacturing plants and products from the Group's joint venture plant in China, the Group's interests in which was acquired at the time of the Roma Color acquisition in 1999. In addition, products sourced from third parties, primarily in developing economies, are sold alongside the manufactured range. These products and services are supplied to customers located in over 50 countries and on every continent.

The colours are found in a wide variety of end uses:
- cans, wrappers and cartons for the food and drinks market;
- flexible packaging for other consumer products;
- plastic colouration for injection and blow moulded articles;
- industrial and decorative coatings;
- textile printing; and
- high quality magazines.

European Colour employs approximately 190 people at three major manufacturing locations: two in the United Kingdom at Stockport and Woolwich and one in the United States at Fall River, Massachusetts.

## Managing Director's Review of the Year

As explained in the Chairman's statement, the Group disposed of its Coatings business in October last year. This review therefore concentrates on our remaining activity of pigment manufacture and supply.

## Pigment Business

Sales £32.5 million up 5%.
Operating profit before exceptional items £2.4 million up 94%.
The recovery in turnover experienced in the early part of

calendar year 2002 continued into the 2002/03 financial year and, accordingly, the first half of the year showed a significant increase in sales.

Our European markets were particularly strong in the first half of the year as traditional customers enjoyed a lift in their business activity over the spring and summer period. In the United States, sales also showed steady growth from April to October. However, both businesses saw a significant slowdown in November and December and, although there was a recovery in the last quarter, overall sales in the second half were 14% lower than in the first. The second half slow down in the UK business was particularly marked in relation to sales into Europe. However, sales growth continued in the other geographic regions of the world, particularly in South America.

In spite of the disappointing second half, year on year sales rose 5% overall. This sales growth helped operating profit before exceptional items to increase by 94%. Particularly pleasing was the return to profitability of the US business after a very poor 2001/02.

## Year of Change

2002/03 was a significant year of change for the Pigments business.

The Group's corporate headquarters were closed last December and its functions were absorbed into the activities at the Stockport site. The management team, formed earlier in the year, took over the executive responsibility for these functions and at the end of the year a new sales and marketing director, Brian Quinn, was recruited to fill the position I previously held.

The business has developed a new three-year strategic plan based on the following three key objectives:

- a return to growth of sales into continental Europe;
- a shift in the balance of US manufactured product range away from commodities to higher value-added products; and
- a rapid increase in sales in UK produced specialty products, such as Dyecoms, into the USA.

In addition, the use of resale product items to broaden the product range was redefined for the global businesses and we have redeveloped the relationship with the major partner in our joint venture company in China.

3

# Managing Director's Review (continued)

The development plan of products for the core printing ink market has been modified to focus on these key objectives and a number of marketing initiatives have been introduced in both businesses including the concept of "Key Account Management" for our larger global customers.

At the sales level, there was a redefinition of territories both in the UK and US businesses, and the decision was taken to exit from the use of a distributor for our products in Germany, following the successful introduction of our own salesman in that key market. This was a significant change for the business after a successful partnership which lasted eighteen years with our distributor in Germany. As already mentioned, the sales team was further strengthened at the end of the year by the recruitment of Brian Quinn. Brian has over 25 years of sales management experience gained at a number of pigment and pigment-consuming companies.

## Outlook

With the new management team in place and the business plan now clarified, the foundations are set for restoring the business to a level of profitability enjoyed in the past.

With current uncertainty in the global economy, we anticipate a slow overall recovery during the current financial year. The business intends to gain sales growth by focussing on the core speciality products of the business, particularly Dyecoms manufactured in the UK and Naphthols manufactured in the USA.

The printing ink industry and, within it, packaging inks specifically will remain the core activity of the business going forward and we intend to launch a number of new products into this sector in the coming financial year.

However, management recognises that there is also a large and less concentrated market for products that we manufacture that can be sold into the paint and plastics colouration industries. The business took the opportunity at the Nuremberg Coatings Show to launch a new range of products, primarily focused on the Industrial and Decorative paints market. This, along with our previous initiatives to enter the market for the colouration of plastics, means our product and market spread has now widened.

We will continue to focus on improving customer service and product support and a number of initiatives are already underway. These include modernising our manufacturing operations and seeking to strengthen our product management.

European Colour has been extremely successful in the past by listening to its customers and delivering the products they want. I intend that the business should return to these core values after a number of years of changing management direction and I believe this strategy forms a simple but effective path back to profitable growth.

George Hughes
Managing Director
18 June 2003













4

## Financial Review

### Trading Results

Group turnover was £38.9 million representing a reduction of 6% on prior year (2002: £41.3 million). Group profit before tax, goodwill amortisation and exceptional items was £2.4 million representing a 77% increase on 2002 (2002: £1.4 million).

The reduction in turnover was largely a result of the sale of the Coatings business with only six months contribution of Coatings turnover. The Pigments' business sales increased by 5% on 2002 to £32.5 million (2002: £30.9 million). The upward sales movement along with significant increase in margin in the United States led to a 94% increase in operating profit of the Pigments business before exceptional items to £2.4 million (2002: £1.2 million). The increase in margin in the US was partly due to the impact of lower raw material prices, but also due to the adjustment in resale pigment prices and volumes of resale products within the overall product mix.

### Exceptional Items

During the year, a number of exceptional items arose from fundamental changes to various aspects of the Group. These totalled £6.4 million. £4.2 million related to the loss on disposal of Tor Coatings Limited. Other exceptional items included costs relating to the closure of the Head Office, the restructuring of both the Group and Group finances and a £0.6 million loss resulting from the impairment of the carrying value of the Group's interest in its Chinese joint venture.

In the prior year, the only exceptional charge was £0.3 million, which related to compensation paid to a former director.

### Interest

The net interest charge before exceptional items of £0.6 million is £0.2 million lower than prior year (2002: £0.8 million). This reflects the reduction in borrowings in the second half of the year.

Pure interest cover of profit before interest and exceptional items over interest before exceptional interest items increased to 4.7 times (2002: 2.6 times). This increase reflects the reduction in interest and the increase in operating profit.

### Ordinary Dividends

With the increase in trading profits and the reduction in debt, the Board feel it is appropriate to recommend a final dividend for the year of 0.43 pence (2002: nil), bringing the total for the year to 0.64 pence (2002: nil).

### Net Debt

In light of the changes in the Group during the year, the Group renegotiated its banking facilities. Consequently these facilities now comprise a £2 million overdraft facility and a £2 million revolving credit facility.

The net overdraft balance of the Group was £1.2 million at 31 March 2003. This was after netting off the positive UK subsidiary bank balances against the Company's overdraft of £1.4 million (2002 £4.5 million), in line with the set off arrangements agreed with the Group's banks.

During the year, overall net debt reduced by £11 million due to the receipt of the proceeds of the sale of Tor Coatings Limited.

### Taxation

The taxation charge of £0.9million (2002: £0.2 million) was in respect of a loss after exceptional items but before goodwill amortisation of £4 million. This charge has arisen as a large proportion of the exceptional items are disallowable for corporation tax purposes. Further information is provided in the tax reconciliation in note 10 of the financial statements.

### Operating Cashflow

Operating cash flow decreased by 39% to £2.3 million (2002: £3.7 million) reflecting only six months operating cashflow from the Coatings business. The decrease in cash flow also reflects an increase in working capital requirements from the Pigments business brought about by the increased activity during the year.

### Capital Expenditure

Capital expenditure increased slightly to £0.77 million (2002: £0.68 million) although capital expenditure for the Pigments business alone increased by 27% to £0.65 million (2002: £0.51 million).

5



# Financial Review (continued)

### Risk Management
### Policy

The Group has a formal policy on risk management. The aim of the policy is to limit the potential of a material adverse impact on current year forecast profit. The application of the policy includes treasury management, Group insurance and regular reviews of commercial risks and internal controls.

### Treasury Policy

Under the risk management policy outlined above, varying proportions of forecast foreign currency flows are covered to between 12 and 15 months forward by traditional hedging mechanisms. Percentage cover is higher in earlier months, reflecting greater reliability of shorter term forecast currency flows. These treasury policies and procedures, which are approved by the Board, seek to reduce the financial risk associated with currency fluctuations.

### Financing and interest rate risk

The Group's loans and overdraft facilities are negotiated centrally. The Group's borrowings (excluding forward contracts) are predominantly in sterling. Borrowings through the revolving credit facility are at floating interest rates based on LIBOR plus an agreed margin. Interest on overdraft facilities accrues at an agreed margin over the base rate of the relevant bank.

Christine Thompson FCCA
Chief Financial Officer
18 June 2003

# NOTES TO THE FINANCIAL STATEMENTS

## 26 Subsidiary Undertakings, Joint Ventures and Joint Arrangements

| Name and country of incorporation | Class of capital | Held by European Colour % | Principal activities |
|---|---|---|---|
| **UNITED KINGDOM** | | | |
| European Colour (Pigments) Limited | Ordinary | 100% | Manufacture of chemical colour |
| Ellis Jones & Company (Stockport) Limited | Ordinary | 100% | Dormant |
| Horace Cory Limited | Ordinary | 100%† | Dormant |
| European Colour (No.1) Limited | Ordinary | 100% | Investment company |
| European Colour (No.2) Limited | Ordinary | 100% | Investment company |
| **UNITED STATES** | | | |
| The RFS Corporation | Common | 100%† | Investment company |
| Roma Color Inc | Common | 100%† | Manufacture of chemical colour |
| European Colour (US) | Common | 100%† | General partnership |
| North American Pigments & Chemicals Inc. | Common | 45%† | Trader of pigments and chemicals |
| **CHINA** | | | |
| Changzhou North American Pigments and Chemicals Co. Ltd | Ordinary | 11.25%†* | Manufacture of chemical colour |

†Held by subsidiaries

*Has a financial year ended 31 December 2002. Results incorporated into these financial statements are based on management accounts to 28 February 2003.

## 27 Consolidated Cash Flow Statement

(a) RECONCILIATION OF OPERATING PROFIT TO OPERATING CASH FLOWS

| | Year ended 31 March 2003 | Year ended 31 March 2002 |
|---|---|---|
| | £000 | £000 |
| Operating profit | 1,235 | 1,743 |
| Share of joint venture loss/(profit) | 527 | (6) |
| Depreciation | 847 | 1,000 |
| Loss on sale of tangible fixed assets | 14 | 20 |
| Amortisation of intangible fixed assets | 142 | 154 |
| Write down of shares in trust | 165 | – |
| (Increase)/decrease in stock | (869) | 1,014 |
| Decrease/(increase) in debtors | 269 | (885) |
| (Decrease)/increase in creditors | (77) | 640 |
| Net cash inflow from operating activities | 2,253 | 3,680 |

# NOTES TO THE FINANCIAL STATEMENTS

### 27 Consolidated Cash Flow Statement *(continued)*

**(b) ANALYSIS OF CASH FLOW FOR HEADINGS NETTED IN THE CASH FLOW STATEMENT**

| | Year ended 31 March 2003 | Year ended 31 March 2002 |
|---|---|---|
| | £000 | £000 |
| **RETURNS ON INVESTMENTS AND SERVICING OF FINANCE:** | | |
| Interest received | 22 | 23 |
| Interest paid | (615) | (724) |
| Interest element of finance lease payments | – | (6) |
| Bank charges for early repayment of loans | (140) | – |
| Preference dividend paid | (95) | (210) |
| **Net cash outflow from returns on investments and servicing of finance** | (828) | (917) |
| **CAPITAL EXPENDITURE:** | | |
| Purchase of tangible fixed assets | (794) | (712) |
| Proceeds on sale of tangible fixed assets | 25 | 27 |
| **Net cash outflow from capital expenditure** | (769) | (685) |
| **ACQUISITIONS:** | | |
| Purchase of business and assets | – | (188) |
| **OTHER FINANCING:** | | |
| Issue of ordinary shares | 9 | 1 |
| Purchase of own shares | (154) | – |
| Debt due within one year – repayment of secured loan | (8,798) | (7,665) |
| Debt – new secured loan repayable from 2002 to 2013 | 1,500 | 8,646 |
| Capital element of finance lease payments | (32) | (27) |
| **Net cash (outflow)/inflow from financing** | (7,475) | 955 |

**(c) DISPOSAL OF SUBSIDIARY**

| | Year ended 31 March 2003 | Year ended 31 March 2002 |
|---|---|---|
| | £000 | £000 |
| **NET ASSETS DISPOSED OF:** | | |
| Fixed assets | 2,253 | – |
| Stock | 1,720 | – |
| Debtors | 2,385 | – |
| Cash | 562 | – |
| Creditors | (2,300) | – |
| Provisions for liabilities and charges | (189) | – |
| Net Assets Disposed of | 4,431 | – |
| Cost of disposal | 485 | |
| Goodwill recycled | 12,321 | |
| Loss on Disposal | (4,237) | – |
| Satisfied by | | |
| Cash | 13,000 | – |
| | 13,000 | – |

The Coatings business sold during the year contributed £1.1 million (2002: £1.9 million) to the Group's net operating cashflow and utilised £145,000 (2002: £172,000) for capital expenditure.

# NOTES TO THE FINANCIAL STATEMENTS

## *28 Pensions*

European Colour (Pigments) Ltd operates a Group personal pension plan whereby employees and the Group contribute to individual personal pension plans. The Group's contribution rate is fixed at 7.5% of pensionable salaries and wages.

The Group also contributes amounts to personal pension plans in respect of employees who are not members of the Group personal pension plan.

The pension charge for the year, including personal pension contributions, was £274,000 (2002: £368,000).

Included within creditors falling due within one year is £30,000 (2002: £51,000) in respect of pension costs charged but not yet paid.

Roma Color Inc. maintains retirement plans under section 401(k) of the internal revenue code covering all eligible employees. Employees may contribute up to 20% of their salary, annually, up to a maximum amount of US$12,000. Members who are aged 50 and older may make additional effective deferral contributions to a 401(k) or 403(b) plan equal to US$2,000 for the calendar year 2003.

Roma Color Inc. contributes a predetermined percentage to match the employee's elected deferral amount. In the period from 1 April 2002 to 31 March 2003 Roma Color Inc. matched 50% of contributions up to 4% of employees' salaries. Total cost for the year was US$38,000. The fund, whose assets are held separately from those of the group, had a balance of US$1.3 million at 31 March 2003 (31 March 2002: US$1.3 million).

The defined benefit scheme was disposed of with Tor Coatings Limited, however disclosure in respect of prior year was as follows:

Tor Coatings Limited operated a defined benefit scheme for qualifying employees. The assets of the scheme were held in separate trustee administered funds. The scheme was subject to triennial valuation by independent actuaries, the last valuation being carried out as at 1 April 1999, using the projected unit method, in which the actuarial liability makes allowances for projected earnings. The principal actuarial assumptions were that the annual rate of return in investments would be 8.5% and that salary and wages would increase at a rate of 7% per annum. The total value of the assets was £646,000 and this actuarial value represented 110% of the respective benefits that had accrued to members after allowing for expected increases in earnings. Whilst the company continued to account for pension costs in accordance with statement of Standard Accounting Practice 24, 'Accounting for Pension Costs', under FRS17 'Retirement Benefits' the following transitional disclosures were required:

The valuation at 31 March 2002 was updated by the actuary on an FRS 17 basis as at 31 March 2002.

The major assumptions used in this valuation were:

| | |
|---|---|
| Rate of increase in salaries | 5.00% |
| Rate of increase in pensions in payment | 3.00% |
| Discount rate | 6.75% |
| Inflation assumption | 3.00% |
| Rate of increase in deferred pensions | 3.00% |

The assumptions used by the actuary were the best estimates chosen from a range of possible actuarial assumptions which, due to the timescale covered, might not necessarily have been borne out in practice.

## Scheme assets

The fair value of the scheme's assets, which are not intended to be realised in the short term and may be subject to significant change before they are realised, and the present value of the scheme's liabilities, which are derived from cash flow projections over long periods and thus inherently uncertain, were:

| | Value at 31 March 2003 | Value at 31 March 2002 | Long-term rate of return expected at 31 March 2002 |
|---|---|---|---|
| | £000 | £000 | |
| Equities | – | 800 | 7.00% |
| Bonds | – | 100 | 5.25% |
| Cash | – | 200 | 4.00% |
| Total market value of assets | – | 1,100 | |
| Present value of scheme liabilities | – | (1,100) | |
| Surplus/deficit in the scheme – Pension asset/liability | – | NIL | |
| Related deferred tax liability/asset | – | NIL | |
| Net pension asset/liability | – | NIL | |

# DIRECTORS' REPORT

The directors present their report and financial statements of the Company and its subsidiaries ("the Group") for the year ended 31 March 2003.

## Directors

A list of directors of the Company at the year end appears on page 45. On 7 October 2002, Paul Deakin reverted from Executive Chairman to Non – Executive Chairman, Nick Hawkins resigned as Chief Executive of the Group in order to become a non-executive director, George Hughes was appointed Managing Director of the Group and Phillip Myles became Chief Operating Officer and was appointed to the Board.

Nick Hawkins was re-elected as a director at the 2002 Annual General Meeting.

Paul Deakin, Nick Hawkins and John Colchester acted throughout the year.

In accordance with the Company's Articles of Association, John Colchester will retire by rotation at the forthcoming Annual General Meeting and, being eligible, offers himself for re-election. Biographical details of John Colchester can be found on page 45. John Colchester does not have a service contract with the Company, his appointment being pursuant to a letter of appointment dated 10 September 2002 which provides that, subject to the Company's Articles of Association, he will remain a director until 3 October 2005.

George Hughes and Phillip Myles were appointed to the Board upon the disposal of the Coatings business on 7 October 2002. As a result, they are both standing for re-election at the first annual general meeting of the Company after their appointment. Biographical details of both George Hughes and Phillip Myles can be found on page 45. Both directors have service contracts with the Company which are terminable, in relation to George Hughes, on 12 months' notice and, in relation to Phillip Myles, on 6 months' notice.

## Directors' Interests

The interests of the directors in the share capital of the Company, as disclosed by the register maintained pursuant to the Companies Act 1985, are detailed in the Remuneration Report on page 14.

No director has at any stage during the year had a material interest in a contract with the Company or any subsidiary.

## Principal Activities and Review of Business

European Colour plc heads an international group of manufacturing companies operating in the business sector of specialist pigments. The principal subsidiaries and their activities are listed on page 35. On 7 October 2002, Tor Coatings Limited was sold to a company backed and managed by members, and former members, of its management of Tor Coatings. Reviews of the business and Group developments are considered in the Chairman's Statement, Managing Director's Review and Financial Review on pages 2 to 6 and should be read as part of this report.

## Research and Development

Product development and product improvement within each of the businesses in the Group are key drivers behind their organic growth.

Research and development costs are written off in the year incurred.

Total expenditure on research and development for the year was £0.41 million (2002: £0.47 million).

## Charitable Donations

During the year, the Group made various charitable donations totalling £3,430 (2002: £266).

## Results and Dividends

The audited financial statements for the year ended 31 March 2003 can be found on pages 15 to 37. Loss attributable to the ordinary shareholders amounted to £5,050,000 (2002: profit £627,000).

The directors recommend that a final dividend of 0.43p per share (2002: nil) be paid on 6 August 2003 to ordinary shareholders on the register on 4 July 2003 which, together with the interim dividend of 0.21p (2002: nil), which was paid on 3 January 2003, makes a total of 0.64p per share for the year (2002: nil).

## Share Capital

Details of movements in the Company's authorised and issued share capital during the year are given in note 21 to the financial statements.

On 29 August 2002, 1,000,000 Cumulative Convertible Redeemable Preference Shares of 10p each in the share capital of the Company ("Redeemable Preference Shares") were redeemed at 100 pence per share. On 7 October 2002, the remaining 1,000,000 Redeemable Preference Shares in this class of share were purchased by the Company at 100.0526 pence per share.

In addition, on 7 October 2002, the Employee Benefit Trust, financed by a loan from the Company, purchased from

# DIRECTORS' REPORT

certain members of the Tor Coatings Management Team a total of 767,514 ordinary shares of 5p each at a price of 20p per share, being 1.6% of the total share capital. The maximum number of shares held by the Trust during the year, and held at 31 March 2003, was 1,354,729 shares.

On 28 February 2003, the entire class of 50,000 7½ per cent Cumulative Participating Preference Shares of £1 each ("Cumulative Preference Shares") were cancelled pursuant to the approval of shareholders at an extraordinary general meeting held on 14 January 2003 and the confirmatory order of the High Court on 19 February 2002. Holders of Cumulative Preference Shares were paid 209 pence per Cumulative Preference Share on such cancellation.

### Substantial Shareholdings

At 31 May 2003, the Company had been notified of the following interests of 3% or more in its issued ordinary share capital:

| Holder Name | No of Shares | %* |
|---|---|---|
| Jarvis Porter Group | 13,851,616 | 29.73 |
| Progressive Asset Management Limited | 2,670.045 | 5.73 |
| CSAM | 2,600,000 | 5.58 |
| Mike Armitage | 1,735,526 | 3.73 |

*Percentage of issued ordinary share capital

### Annual General Meeting

The Notice convening the Annual General Meeting to be held on 1 August 2003 is incorporated in a circular which accompanies this report and which explains the special business which is to be transacted at the Meeting.

### Supplier Payment Policy

European Colour requires its operating companies to determine terms and conditions of payment for the supply of capital and revenue items just as rigorously as they negotiate prices and other commercial matters. Payment is then made according to these terms, subject to the terms and conditions being met by the supplier.

As a holding company, European Colour has no trade creditors. Supplier payment policies for the subsidiary companies are disclosed in their respective financial statements.

### Health, Safety and the Environment

European Colour is keenly aware of its responsibilities to the communities in which it operates and is committed to providing a safe environment for its employees to work in.

The Group endeavours to minimise any adverse effect on the physical environment and to meet or, where feasible, exceed legal pollution control standards. Group companies take into account environmental considerations in their decision making for the development of new products, manufacturing processes and other operational matters. The Group continually seeks to reduce energy consumption and waste generation.

### Employment Policies

Each company in the Group is encouraged to implement comprehensive employment policies. Schemes have been introduced to ensure that loyalty and performance are properly rewarded. Consequently, all eligible employees are invited to participate in the European Colour Savings Related Share Option Scheme, for UK employees, and the Employee Savings and Stock Purchase Plan, for US employees, which provide an opportunity to purchase shares in European Colour plc.

Each company in the Group encourages employee involvement and has developed communication programmes which facilitate this.

Applications for employment by disabled persons are always fully considered bearing in mind the respective aptitudes and abilities of the applicant concerned. In the event of members of staff becoming disabled, every effort is made to ensure that their employment with the Group continues and that appropriate training is arranged. It is the policy of the Group that the training, career development and promotion of a disabled person should, so far as possible, be identical to that of a person who is fortunate enough not to suffer from a disability.

### Auditors

A resolution will be proposed at the Annual General Meeting for the re-appointment of KPMG Audit Plc as auditors of the Company.

By order of the Board:
Lisa de Caux A.C.A
Secretary

18 June 2003

39

# CORPORATE GOVERNANCE STATEMENT

The Group continues to be committed to the overall principle of effective corporate governance. This report explains how the Group has applied the principles set out in Section 1 of the Combined Code appended to the Listing Rules published by the UK Listing Authority. The Board confirms that, with the exception of those provisions in respect of the number of directors serving on the Audit Committee (from April 2002 to 6 October 2002), the Audit Committee having a majority of independent, non-executive directors, the Remuneration Committee comprising only independent non-executive directors, the identification of a senior independent non-executive director and the independence of certain of the non-executive directors, the Group has complied with the provisions of Section 1 of the Combined Code.

The Group's non-compliance with these aspects of corporate governance best practice has been due to the restructuring of the Board during the course of the year and, in particular, Paul Deakin and Nick Hawkins change of status on their becoming non-executive directors. Your directors believe that the current size and composition of the Board is appropriate given the size and focus of the business at this time.

The provisions of the Combined Code applicable to European Colour are divided into 4 areas as detailed below.

## 1. DIRECTORS

### The Board of Directors

On 7 October 2002, Paul Deakin reverted to the role of Non-Executive Chairman and Nick Hawkins resigned as Chief Executive of the Group in order to become a non-executive director. In addition, on the same day George Hughes was appointed Group Managing Director and Phillip Myles became Chief Operating Officer and was appointed to the Board. Accordingly, during the year the Board comprised two executive directors (at all times) together with three non-executive directors (save during the period from 31 March 2002 to 6 October 2002 when there was only one non-executive director). The current directors' biographies appear on page 45.

Paul Deakin, Nick Hawkins and John Colchester acted throughout the year.

The Board meets regularly and has a formal schedule of matters reserved specifically to it for decision. There is a clear division of responsibilities at the head of the Company with a non-executive Chairman and a full-time Managing Director. While there is no formal procedure in place for directors to obtain independent professional advice, the directors are, nevertheless, free to take up such advice in the furtherance of their duties at the Company's expense. In addition, all directors have unrestricted access to the Company Secretary. In relation to non-reserved matters, the Board is advised by a number of committees with delegated authority. The composition and roles of the three most important committees, the Audit, Remuneration and Nominations Committees, are described below and (in relation to the Remuneration Committee) on page 9.

| EXECUTIVE | Age |
|---|---|
| George Hughes | 49 |
| *Managing Director* | |
| Phillip Myles | 35 |
| *Chief Operating Officer* | |

George Hughes and Phillip Myles were appointed to the Board upon the disposal of the Coatings business on 7 October 2002. As a result,

they are both standing for re-election at this, the first Annual General Meeting of the Company following their appointment.

| NON-EXECUTIVE | Age |
|---|---|
| Paul Deakin | 44 |
| *Chairman* | |
| Nick Hawkins | 42 |
| *Deputy Chairman* | |
| John Colchester | 64 |
| *Chairman of Remuneration Committee* | |

John Colchester will retire by rotation at the forthcoming Annual General Meeting and, being eligible, offers himself for re-election.

### Non-executive Directors

Three members of the Board have a non-executive role, including the Chairman and Deputy Chairman. However, under the Combined Code, Paul Deakin and Nick Hawkins cannot be considered to be independent for the period under review, due to their former executive roles within the Company. The Board has concluded that it would be inappropriate to appoint an additional independent non-executive director at this time due to the size of the Company and its current focus. This position will, however, be reviewed should the requirements of the Group change during the coming year. The non-executive directors do not have service contracts with the Company as the Company's practice is to appoint non-executive directors under letters of engagement. These letters of engagement set out fixed terms of appointment which may be extended with the agreement of the Board. Each non-executive's remuneration is determined by the Board. The non-executive directors, like all directors, are, in accordance with the Company's articles of association, subject to retirement every three years.

The Board has established three Board committees to fulfil specific functions. Details of these are set out below.

### Audit Committee

The Audit Committee is chaired by Nick Hawkins and comprises Paul Deakin, Nick Hawkins and John Colchester. As detailed above, Nick Hawkins and Paul Deakin cannot be considered independent. The role of this committee is to assist the Board to meet its responsibilities for corporate governance and statutory reporting. In addition, the Audit Committee reviews the scope and results of the Group audit, its cost effectiveness and the independence and objectivity of the Group's auditor. It meets at least twice a year and representatives of the Group's auditor and the Managing Director are usually in attendance.

### Remuneration Committee

The Remuneration Committee is chaired by John Colchester and comprises John Colchester, Paul Deakin and Nick Hawkins (from 7 October 2002). The Remuneration Committee's principal role is to determine, on behalf of the Board and within the framework set by the Board, appropriate levels of remuneration, which includes pension rights and other compensation payments, for the executive directors of the Company and certain senior executives throughout the Group. The report of the Remuneration Committee is set out on pages 8 to 14.

### Nominations Committee

The Nominations Committee is chaired by Paul Deakin and comprises Paul Deakin, Nick Hawkins and John Colchester. The Nominations Committee is responsible for nominating candidates (both executive and non-executive) for the approval of the Board to

fill vacancies or appoint additional persons to the Board. It is also responsible for making recommendations regarding the composition and balance of the Board.

## 2. DIRECTORS' REMUNERATION

The report of the Remuneration Committee is set out on pages 8 to 14.

## 3. RELATIONS WITH SHAREHOLDERS

### Communication with shareholders

The Company seeks to maintain good communications with shareholders. The Managing Director, Deputy Chairman and the Chairman make presentations to institutional shareholders covering the interim and preliminary results.

### Constructive use of the Annual General Meeting

The Company holds an Annual General Meeting, notice of which is sent to shareholders at least 20 working days before the meeting. Separate resolutions are tabled for each substantial issue and these specifically include resolutions relating to the Report and Accounts and the directors' Remuneration Report. All shareholders have the opportunity formally and informally to put questions at the Company's Annual General Meeting and the Chairman makes a statement on current trading conditions at that meeting. The Chairmen of the Audit, Remuneration and Nominations Committees normally attend the Annual General Meeting and will answer questions which may be relevant to the work of those Committees. At the meeting, the numbers of proxy votes are counted and the levels of proxies lodged on each resolution and the balance for and against each resolution are declared after the resolution has been dealt with on a show of hands.

## 4. ACCOUNTABILITY AND AUDIT

### Directors' responsibilities

Company law requires the directors to prepare accounts for each financial year which give a true and fair view of the state of affairs of the Company and of the Group as at the end of the financial year and of the profit or loss of the Group for that period. In preparing those accounts the directors are required to:

- select suitable accounting policies and then apply them consistently;
- make judgements and estimates which are reasonable and prudent;
- state whether applicable accounting standards have been followed; and
- prepare the financial statements on the going concern basis unless it is inappropriate to presume that the Group will continue in business.

The directors confirm that these accounts comply with the above requirements.

The directors are also responsible for keeping proper accounting records which disclose, with reasonable accuracy at any time, the financial position of the Group and to enable them to ensure that the accounts comply with the Companies Act 1985. The directors also have a general responsibility at law for taking such steps that are reasonably open to them to safeguard the assets of the Group and to prevent and detect fraud and other irregularities.

### Internal Control

The Combined Code introduced a requirement that directors review the effectiveness of the Group's system of internal control. This requirement covers all controls including operational, compliance and risk management as well as financial. The Board has had an on-

going process for identifying, evaluating and managing the risks faced by the Company throughout the year ended 31 March 2003 and up to the date of approval of the annual report and accounts.

The Board has overall responsibility for this system of internal control and, in meeting at least nine times a year, continually reviews the effectiveness of this system of control. It should be noted that the system is designed to manage rather than eliminate the risk of failure to achieve business objectives and can only provide reasonable and not absolute assurance against material misstatement or loss as a consequence of the preparation of financial information in relation to the safeguarding of assets.

In addition, the Managing Director and the Audit Committee review an annual report on controls within each business. The external auditor produces a report on internal financial control summarising issues arising from work carried out as part of the normal statutory audit.

The following key procedures have been developed to provide an effective internal control framework.

### Financial Reporting

Annual budgets are prepared, which are reviewed and approved by the Board. Actual performance is reviewed against the original budget on a monthly basis and current year forecasts are regularly updated.

### Treasury Management

The Board adopts a prudent approach to treasury management and seeks to protect the Group from treasury risks. Treasury operations are managed centrally and operate within defined limits that are approved by the Board.

### Risk Management

A review of business risk is performed by the Group Accountant through discussions with operating company management and is reported to the Audit Committee. This procedure aims to identify information regarding the likelihood of a risk arising and the potential impact on the business. A procedure for monitoring risk has been developed, with individuals in each business being responsible for mitigating each business risk. The results of these reviews are reported to the Board periodically.

### Other Key Functions

Key areas such as insurance risk management, all legal matters and assessment of tax implications are managed centrally.

### Investment Appraisal

Procedures are in place for the approval of capital expenditure by the Board.

### Going Concern

The directors are confident, on the basis of current financial projections and facilities available, that the Company and the Group have adequate resources to finance their activities for the foreseeable future. Consequently, the directors consider that it is therefore appropriate to adopt the going concern basis in preparing the financial statements.

# STATEMENT OF DIRECTORS' RESPONSIBILITIES

Company law requires the directors to prepare financial statements for each financial year which give a true and fair view of the state of affairs of the Company and of the Group and of the profit or loss of the Group for that year. In preparing those financial statements, the directors are required to:

- select suitable accounting policies and then apply them consistently;
- make judgements and estimates that are reasonable and prudent;
- state whether applicable accounting standards have been followed, subject to any material departures disclosed and explained in the financial statements; and

- prepare the financial statements on the going concern basis unless it is inappropriate to presume that the Group will continue in business.

The directors are responsible for the maintenance of proper accounting records which disclose with reasonable accuracy at any time the financial position of the Company and to enable them to ensure that the financial statements comply with the Companies Act 1985. They have the general responsibility for taking such steps as are reasonably open to them to safeguard the assets of the Group and to prevent and detect fraud and other irregularities.

## INDEPENDENT AUDITORS' REPORT TO THE MEMBERS OF EUROPEAN COLOUR PLC

We have audited the financial statements on pages 15 to 37. We have also audited the information in the directors' remuneration report that is described as having been audited.

This report is made solely to the Company's members, as a body, in accordance with section 235 of the Companies Act 1985. Our audit work has been undertaken so that we might state to the Company's members those matters we are required to state to them in an auditor's report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the Company and the Company's members as a body, for our audit work, for this report, or for the opinions we have formed.

**Respective responsibilities of directors and auditors**
The directors are responsible for preparing the Annual Report and the directors' remuneration report. As described on page 42 this includes responsibility for preparing the financial statements in accordance with applicable United Kingdom law and accounting standards. Our responsibilities, as independent auditors, are established in the United Kingdom by statute, the Auditing Practices Board, the Listing Rules of the Financial Services Authority, and by our profession's ethical guidance.

We report to you our opinion as to whether the financial statements give a true and fair view and whether the financial statements and the part of the directors' remuneration report to be audited have been properly prepared in accordance with the Companies Act 1985. We also report to you if, in our opinion, the Directors' Report is not consistent with the financial statements, if the Company has not kept proper accounting records, if we have not received all the information and explanations we require for our audit, or if information specified by law or the Listing Rules regarding directors' remuneration and transactions with the group is not disclosed.

We review whether the statement on pages 40 and 41 reflects the Company's compliance with the seven provisions of the Combined Code specified for our review by the Listing Rules, and we report if it does not. We are not required to consider whether the Board's statements on internal control cover all risks and controls, or form an opinion on the

effectiveness of the Group's corporate governance procedures or its risk and control procedures.

We read the other information contained in the Annual Report, including the Corporate Governance Statement and the unaudited part of the director's remuneration report, and consider whether it is consistent with the audited financial statements. We consider the implications for our report if we become aware of any apparent misstatements or material inconsistencies with the financial statements.

**Basis of audit opinion**
We conducted our audit in accordance with Auditing Standards issued by the Auditing Practices Board. An audit includes examination, on a test basis, of evidence relevant to the amounts and disclosures in the financial statements and the part of the directors' remuneration report to be audited. It also includes an assessment of the significant estimates and judgements made by the directors in the preparation of the financial statements, and of whether the accounting policies are appropriate to the Group's circumstances, consistently applied and adequately disclosed.

We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the financial statements and the part of the directors' remuneration report to be audited are free from material misstatement, whether caused by fraud or other irregularity or error. In forming our opinion we also evaluated the overall adequacy of the presentation of information in the financial statements and the part of the directors' remuneration report to be audited.

**Opinion**
In our opinion:
- the financial statements give a true and fair view of the state of affairs of the Company and the Group as at 31 March 2003 and of the loss of the Group for the year then ended; and
- the financial statements and the part of the director's remuneration report to be audited have been properly prepared in accordance with the Companies Act 1985.

Manchester
18 June 2003

KPMG Audit Plc
Chartered Accountants
Registered Auditor

42

# SHAREHOLDER INFORMATION

## *Financial Calendar*

| | |
|---|---|
| Preliminary announcement of results for year ended 31 March 2003 | 18 June 2003 |
| Annual General Meeting, Manchester | 1 August 2003 |
| Announcement of interim results for 2003/2004 | November 2003 |
| Preliminary announcement of results for year ending 31 March 2004 | June 2004 |
| Publication of 2004 Annual Report | June 2004 |

## *Register Analysis*

| By Size of Holding | 30 April 2003 | | | 30 April 2002 | | |
|---|---|---|---|---|---|---|
| | No. of Shareholders | No. of shares (thousands) | % of share capital | No. of Shareholders | No. of shares (thousands) | % of share capital |
| 0 – 999 | 549 | 247 | 0.5% | 557 | 250 | 0.5% |
| 1,000 – 9,999 | 1,227 | 3,681 | 7.9% | 1,296 | 3,907 | 8.4% |
| 10,000 – 49,999 | 270 | 5,160 | 11.1% | 301 | 5,936 | 12.8% |
| 50,000 – 249,999 | 78 | 8,907 | 19.1% | 63 | 7,055 | 15.2% |
| 250,000 – 499,999 | 7 | 2,300 | 5.0% | 11 | 3,267 | 7.0% |
| Above 500,000 | 10 | 26,295 | 56.4% | 12 | 26,133 | 56.1% |
| Total | 2,141 | 46,590 | 100% | 2,240 | 46,548 | 100% |

| By Type of Holder | 30 April 2003 | | | 30 April 2002 | | |
|---|---|---|---|---|---|---|
| | No. of Shareholders | No. of shares (thousands) | % of share capital | No. of Shareholders | No. of shares (thousands) | % of share capital |
| Directors | 2 | 140 | 0.3% | 3 | 100 | 0.2% |
| Other employees | 13 | 357 | 0.8% | 28 | 1,345 | 2.9% |
| Other private investors | 2,110 | 23,295 | 50.0% | 2,191 | 22,915 | 49.2% |
| Institutions | 15 | 21,443 | 46.0% | 15 | 21,534 | 46.3% |
| Other | 1 | 1,355 | 2.9% | 3 | 654 | 1.4% |
| Total | 2,141 | 46,590 | 100% | 2,240 | 46,548 | 100% |

## *Internet Web Page*   http://www.ecplc.com

Our website aims to provide information on the group to a wide audience in the financial community, from analysts to private and professional investors. Background information, copies of formal announcements, press releases and Annual and Interim Reports, are all available. Please visit the site, your feedback will be most welcome.

# COMPANY INFORMATION

The Notice of Annual General Meeting is included in a circular
which is being sent separately to shareholders.

The meeting will take place at 12:00 on 1 August 2003 at
the offices of Addleshaw Goddard,
100 Barbirolli Square, Manchester M2 3AB

---

### HEAD AND REGISTERED OFFICE
european colour plc
Hempshaw Lane
Stockport
Cheshire
SK1 4LG
United Kingdom
Registered number: 65706
Tel: +44 (0)161 480 3891
Fax: +44 (0)161 480 9852

Internet: www.ecplc.com
E-mail: mail@ecplc.com

Company Secretary:
Lisa de Caux ACA

---

### PRINCIPAL SUBSIDIARIES
European Colour (Pigments) Limited
Hempshaw Lane
Stockport
Cheshire
SK1 4LG
United Kingdom
Tel:  +44 (0)161 480 3891
Fax: +44 (0)161 480 9852

Internet: www.ecpigments.com
E-mail: enquiries@ecpigments.com

---

Roma Color Incorporated
749 Quequechan Street
PO Box 5360
Fall River
Massachusetts (MA) 02725
USA
Tel: +1 508 676 3481
Fax: +1 508 676 9011

Internet: www.romacolor.com
E-mail: roma.color@romacolor.com

---

A copy of this report has been sent to each shareholder.
For further copies or information on European Colour plc
please contact the Head Office.

Designed by DF Design, Tel: 07774 111895
mail: DBF7@dircon.co.uk



# European Colour plc

*Annual Report 2004*



# Dedication

This annual report is dedicated to the memory of Steve Custadio. Steve was the maintenance supervisor at the EC Pigments USA site in Fall River, MA. During his 30 years with our company, Steve was always someone who was there to solve a problem, no matter the time. He was an outstanding example of the "can do" attitude of the Fall River team. On 20 November 2003, Steve was working to fix a jammed goods lift and was killed when the lift unexpectedly fell. Steve is survived by his wife Gail and their children, Todd, Adam and Kara. Steve is never far from our thoughts. This annual report presents facts and figures, but the heart of our company is people like Steve Custadio.

# Contents

| | | | |
|---|---|---|---|
| 01 | Chairman's Statement | 14 | Consolidated Profit and Loss Account and Statement of Total Recognised Gains and Losses |
| 02 | Operating & Financial Review | 15 | Balance Sheets |
| 06 | Directors & the Team | 16 | Consolidated Cash Flow Statement |
| 07 | Directors' and Corporate Governance Report | 17 | Notes to the Financial Statements |
| 10 | Remuneration Report | 31 | Shareholder Information |
| 13 | Independent Auditors' Report | 32 | Notice of Annual General Meeting |

# Chairman's Statement

European Colour is a specialist manufacturer of organic pigments. We develop proprietary pigments for sale to our customers around the world in the coatings, inks, plastics and related industries. Our success depends on our ability to develop new products to meet the changing needs of our customers wherever they are. Our teams in the UK and the USA are focused on delivering the products and service that our customers rely on us to provide.

## Results and dividend

After starting the year with good initial trading, competitive pressures and legacy issues took their toll. Group turnover from continuing operations was £28.5 million (2003: £31.7 million), down 10% from the prior year. This lower turnover reflected weak market conditions, price pressures, and a loss of market share in our major markets. Lower turnover resulted in an operating profit from continuing operations before exceptional items and goodwill of £0.3 million versus £1.5 million in the previous year. Fixed costs were consistent with the prior year aside from one-off and exceptional adjustments. The loss per share was 6.76p (2003: £11.07p). Adjusted earnings per share excluding the effect of goodwill amortisation, exceptional items and preference shares dividends was a loss per share of 0.76p (2003: profit 2.49p).

As a part of the rehabilitation process, we undertook a thorough review of our accounting practices and policies, the effects of which are detailed in the Operating and Financial Review. We felt it was important to ensure that future growth for our company is based on a sound and prudent financial foundation.

Because of the magnitude of the internal restructuring and the weak market environment, the board did not feel it was prudent to declare an interim dividend. For the same motive of caution, the board is not recommending a final dividend. The board recognises the need to afford our shareholders a return on their investment. At the moment, however, the board feels that continued caution is the correct course of action.

## Operational change

Like the previous year, this was a year of change. The restructuring over this past year focused on operational change, whereas in the previous year the focus was structural. This year was another phase in the rebuilding, refocusing, and invigoration of European Colour and its operating units, EC Pigments in the UK and the USA. Any change process is difficult, but our people have responded well to the challenges and opportunities brought about by the change process. A stronger and more dynamic company is emerging. This change process is not complete, and I trust it never will be. If our company is to be a leader, we must continually adapt ourselves to best support our customers and thereby reward our shareholders.

Over the course of the year, we have improved our internal planning processes and established clearer internal financial targets as well as new product development goals. We have also developed a set of core values to give us the direction we need for the future. We have put an ethics policy in place to act as a guide to all of our people. The targets, values and ethics policy give us the foundations for the future. To these we have added a new one-year operating plan. We are in the process of finalising our strategic plan from the bottom-up. We have also made changes to our organisational approach and the management teams in both the UK and the USA. These elements give us the platform for growth and further development.

As a part of the change process, there have been a number of alterations to the composition of the board of directors and the board committees. Although our company is still small, we have endeavoured to follow the emerging codes of best practice to the extent possible without sacrificing knowledge, experience or efficiency. Further details are set out in the Operating and Financial Review and the Corporate Governance sections of this annual report.

## Board and governance

There were three changes in executive directors. Phillip Myles left the board and the company in July 2003; Mike Quayle joined as finance director in January 2004; and George Hughes stepped aside in April 2004 to devote his attention to creating an effective sales and marketing team and to restructuring our new product development efforts as chairman of the all important new product development cycle team. John Colchester stepped down as non-executive director in July 2003 and was replaced by David Ingles in September 2003. Paul Deakin resigned as chairman and became senior independent director in August and September 2003 respectively. I joined the board as chairman in August 2003. The board committees were reorganised and re-mandated during the year to improve our governance structures. The committees are detailed in the governance section of this report.

## European Colour people

As with the board, we have made a number of changes to our organisation over the past year. Our structure is a very small group team, supporting operating companies in the UK and the USA, each focused on the requirements of their operating areas and headed by a managing director. As the two businesses serve some of the same customers, although they are freestanding, there is a constant flow of information between the groups across all of the functional areas. Over the year we have strengthened our production, technical and research capabilities. People have been added in these areas. We have also reorganised and refocused our commercial and administrative areas.

As I visited our sites since I joined European Colour, I have always had challenging discussions with a group of people with diverse ideas, but always with the interests of European Colour at heart. This is a fundamental strength of our company. Personally, and on behalf of the board, I thank all of our people for their good work during this difficult year.

## Prospects

In the interim report I characterised trading as challenging and our environment as quite fluid and uncertain. In certain respects our markets are stabilising, but continue to be keenly competitive. The overall environment is more settled. With the changes we have made and a new one-year operating plan as a guide, we are better able to meet the challenges before us. We will continue to maintain a prudent approach to our activities. Over the medium term, our growth will come from a proper understanding of our customers' needs and the application of our expertise and creativity to develop innovative products to meet those needs.

**Steve Smith**
Chairman
10 June 2004

"Our growth will come from a proper understanding of our customers' needs and the application of our expertise and creativity to develop innovative products to meet those needs."

# Operating and Financial Review

The past financial year was another period of transition. The Chairman's Statement highlights many of the specific changes. Operationally, when Mike Quayle joined as finance director in January 2004, he undertook a thorough review of accounting practices in order to ensure a prudent approach to financial stewardship. The financial impact of these changes is set out below. George Hughes returned to the senior commercial role in EC Pigments UK in order to focus and strengthen sales, marketing and product management activities. Robert Edmonston joined EC Pigments USA as president in late March 2004 to sharpen that business. The technology groups in Europe and the USA enjoyed additional investment, people and emphasis. As a specialist organic pigments company European Colour must have strong technology units in order to achieve its potential.

## Trading results

This year's results reflect the first full year of trading following the disposal of Tor Coatings and therefore this review focuses on the results from continuing operations. Group turnover from continuing operations of £28.5 million was 10% lower than the prior year turnover of £31.7 million. This reduction was principally attributable to a 5% reduction in sales volumes and highly competitive markets, particularly for the more mature products where price competition is keen. The weak US dollar resulted in a £1.0 million reduction in turnover on translating the results of EC Pigments USA into Sterling.

Gross margin from continuing operations reduced from 24.4% to 23.5% reflecting a reduction in selling prices, partially offset by lower raw material costs. Operating profit from continuing operations before exceptional items and goodwill was £0.3 million compared to £1.5 million in the prior year. This reduction reflected the decrease in



- The main markets for our products are the ink, paint, plastics and textile industries. We supply products all over the world with many of our key customers in the ink and paint industries operating on a global basis.

gross profit and various one-off charges included within administration expenses following the write down of fixed assets taken at the half year and other one-off costs. Some of these costs related to the Fall River accident where the official enquiry confirmed no fault or liability on behalf of the company.

## Business development

The reduction in sales volumes and prices experienced during the year reflects the continuing trend of intense competition due to industry overcapacity, particularly in the Far East. This is most pronounced in the older, less differentiated, products. The group made insufficient investment in research and development in prior years so that an increasing proportion of our product portfolio was represented by mature and less differentiated products. As such we have been vulnerable to the adverse effects of competition.

- The move to direct sales in Europe has accelerated in 2004 with the creation of a multilingual customer services department based at our Stockport office.

- In Europe and the USA we now serve our customers directly, with local sales representatives and customer services offices in both regions.

- We serve the rest of the world through a network of carefully selected industry specialist agents and distributors operating in over 60 countries



"A stronger and more dynamic company is emerging."

- We seek to solve customers' problems by developing new products to meet their requirements. Many special products are made for a customer's specific application.

- Three new yellow pigments with high gloss and transparency for specialist ink packaging applications.

- Six new products as an extension to our range of high performance red pigments.

- A new range of products specifically for the paint industry was launched in Europe and other selected markets.

Over the past year, significant effort has been directed at updating and broadening our product range with additional differentiated products that offer our customers greater value. The key objective over the next year is to return the proportion of sales from products developed in the last five years to 20% and then in the medium term to 60%. The development of innovative products meeting our customers' requirements was the key strength behind the group's historic success. Returning to this traditional strength is key to our future success. As such, new product development is, and will continue to be, our primary focus. A record number of new products have been launched during the first half of the 2004 calendar year. These products have been well received by our current and potential customers but will take time to establish themselves as customers go through their testing and qualification process.

Although European Colour is not one of the largest organic pigment producers, we do have a capability to supply our increasingly global customers with products designed for their local markets from our technical and production sites in Europe and the USA. Our trans-Atlantic footprint is another important success factor.

We have continued to restructure our sales operation in Europe, selectively moving away from sales agents towards direct sales. This move proved to be successful in Germany last year and is being followed by similar changes elsewhere in Europe where appropriate. In addition to improvements in sales volumes and profitability, direct access to our customers is a valuable source of feedback as we continue to make improvements across our product range.

### Zero standards

The Zero Standards operational excellence programme put in place during the year continues to develop and involves all European Colour people. The Zero Standards - no accidents, no customer complaints, no community complaints, and no environmental excursions - helps to define our operating standards and commitment. All of our locations are ISO 9001:2000 quality certified and European Colour is a participant in the Responsible Care® programme. We recognise that a successful business sets and sustains high standards across all aspects of its activities. Being good at just one thing is no longer good enough.

### Exceptional items and goodwill

Exceptional charges totalled £1.1 million, of which the largest element relates to a one-off charge of £0.7 million to ensure our stock is consistently and prudently stated throughout the group. The balance of £0.4 million was the cost of restructuring the senior management teams in the UK and USA.

"... we do have a capability to supply our increasingly global customers with products designed for their local markets from our technical and production sites in Europe and the USA."

# Operating and Financial Review continued

In addition to the £1.1 million of exceptional charges, the operating loss for the year of £2.8 million includes a £1.9 million charge for the write-off of goodwill relating to the acquisition of EC Pigments USA. Compared to expectations at the time of acquisition in 1999, the business has not generated the planned level of profitability and therefore the appropriate accounting treatment is to eliminate the remaining goodwill.

## Other accounting adjustments

The group will be required to comply with International Financial Reporting Standards (IFRS) in full for its 2006 financial year. Other than the adjustments noted below, no other significant changes have been identified, with the possible exception of development costs which are currently expensed as incurred.

As part of our review of accounting policies and practices a number of adjustments have been made to the prior year results as described in note 1 to these financial statements. In prior years the deferred tax provision has been discounted to reflect the timing of cash flows associated with the reversal of timing differences. This accounting policy will no longer be permitted under International Accounting Standard 12 and therefore we have taken the opportunity to adopt a policy in line with the new standard.

Turnover has been adjusted to remove rebates which were previously recorded as part of turnover and then the cost deducted as a cost of sale. In addition, following the additional guidance given by Annex G to FRS 5 and IFRS 18 with respect to revenue recognition, goods that have been despatched but not delivered have been excluded from turnover where the company insures the goods up to the point of delivery. The impact of these adjustments has been to reduce shareholders' funds by £0.4 million at 31 March 2002 with no profit impact in the prior year.

## Finance costs

The total finance cost for the year of £0.4 million is down £0.7 million on the prior year reflecting the reduction in borrowings following the disposal of Tor Coatings and exceptional finance charges of £0.6 million in 2003. The finance cost for the year includes a £0.3 million loss (2003: £nil) arising on the translation of the company's dollar denominated trading loans to EC Pigments USA. The net bank interest charge for the year of £0.1 million (2003: £0.6 million) is covered 2.4 times by operating profit before exceptional items and goodwill.

## Taxation

A tax credit of £0.1 million was recognised against the loss before tax of £3.2 million. The tax credit was lower than would be expected compared to the standard corporation tax rate of 30% as the goodwill write-off is not deductible for taxation and the potential benefit arising from non-UK tax losses has not been recognised.

## Cash flow and net debt

Cash flow from operating activities decreased from £2.3 million to £0.7 million reflecting the reduction in operating profit from continuing operations and prior year operating cash flows from discontinued operations of £1.1 million. Capital expenditure was £0.3 million in excess of depreciation as we invested in new plant to improve production efficiency. The total cash outflow before financing of £0.6 million included payments for prior year exceptional items totalling £0.3 million.

Net debt (total debt less cash) at the end of the year was £2.0 million (2003: £1.3 million). In April 2004 the group's existing banking facilities were replaced to reduce the cost of debt and provide additional flexibility. The new facilities include a $2 million one-year facility in the USA and a three-year invoice discounting facility of up to £3 million in the UK.

## Treasury

The group is exposed to foreign exchange risk on operational transactions and the translation of the results and net assets of EC Pigments USA from US dollars to Sterling.

At the year end the translational exposure on the net investment of EC Pigments USA was not hedged by locally denominated borrowings. As a result of the significantly weaker US dollar, the total

" . . . we invested in new plant to improve production efficiency."

" . . . a group of people with diverse ideas, but always with the interest of European Colour at heart."



- European Colour is a manufacturer of two distinct chemical families of organic pigments.
- Azo pigments range from green shade yellow through to blue shade reds, Bordeaux and maroons.
- Precipitated dye pigments (Dyecom®), which have three distinct colours, bright blue, pink and violet.

loss on translating the net investment in EC Pigments USA was £0.9 million (2003: £0.1 million profit), of which £0.6 million was taken directly to reserves. In April 2004, a local borrowing facility of $2 million was taken out to act as a partial hedge against the translation risk.

A significant proportion of trading transactions are denominated in Euros and US dollars. The associated foreign exchange risk is mitigated through the use of forward currency arrangements. The group's policy is to protect short-term profits and cash flows from adverse currency movements by hedging between 60% and 90% of net foreign currency exposures on a rolling 12-month basis. The impact of this policy is disclosed in note 18 to the financial statements.

Profitability can nevertheless vary due to the impact of fluctuating exchange rates on the uncovered portion of transaction exposures; from revised forecasts of future trading; and from fluctuations over the medium and long term. The currency policy is overseen by the currency committee which is chaired by the finance director and which reports to the board's treasury committee.

**Future**

Looking ahead, European Colour is working to rebuild profitability to historic levels, by returning to its roots as a specialty organic pigments manufacturer, providing differentiated products which meet and exceed customer expectations. Some aspects of the rebuilding are happening quickly. The businesses have been reorganised, the accounts have been put on a more prudent footing and resources have been added to the technical groups. The benefit of these actions will be manifest over time through a higher ratio of sales of new products developed over the past five years and an increase in operating profit margin. These are two indicators that all shareholders can follow. We will report our progress at each earnings announcement.

**Steve Smith**
Chairman

**Mike Quayle**
Finance Director

"This year was another phase in the rebuilding, refocusing and invigoration of European Colour."

# Directors and Executive Team

## Board of directors

**Paul Deakin** (Senior Independent Director)

Age 45, first appointed non-executive director on 5 July 2001 and non-executive chairman on 2 August 2001. He acted as interim executive chairman from March 2002 until he reverted to non-executive chairman in October 2002. He is a director of three private companies involved in property development and investment, corporate finance and import and distribution and undertakes consultancy projects. He was appointed senior independent director on 23 September 2003 and chairs the treasury committee.

**Nick Hawkins FCA**

Age 43, appointed non-executive director on 10 September 2002, having previously been group finance director (from 1 July 1995) and chief executive. His previous posts include head of finance and IT for a business unit of Ciba in the UK. He is chairman of the remuneration committee.

**Dr David Ingles**

Age 61, appointed non-executive director on 23 September 2003. He worked for 19 years as a chemicals industry analyst and served as a non-executive director for Inspec Group plc. He is a regular speaker at chemical industry and investment conferences. He is chairman of the audit committee.

**Mike Quayle FCA** (Finance Director)

Age 34, appointed finance director on 20 January 2004. He joined the group from KPMG, where he most recently performed a two year secondment as finance director to the Greater Manchester Passenger Transport Executive and prior to that managed a number of large, international transaction-related assignments.

**Steve Smith** (Chairman)

Age 58, appointed chairman on 4 August 2003. He is currently chairman of Tianguis Limited, a private equity adviser and fund manager focused on the chemical and allied processing industries and which advised Shelby Corporation on its acquisition of European Colour shares. He is also a director or non-executive director of two US based firms. He has enjoyed a long and successful career in the international chemical industry. From 1996 to 2002 he was chief executive of Erikem SA and its operating company (Finnish Chemicals OY), implementing a strategic plan to develop the company into an international business. Between 1989 and 1995 he was chief executive of the Australian Penrice Group and the UK Brunner Mond Group, creating a world-leading, integrated, soda ash company, with operations in Australia, Kenya and England. He previously held senior executive positions with Montedison in Italy and with Drew Chemical and Allied Chemical (later Honeywell Inc.) in the US. He is chairman of the nominations committee.

## Executive team

**Robert Edmonston** (President — EC Pigments USA)

Age 59, appointed EC Pigments USA president on 29 March 2004. He has spent all his career developing and managing speciality chemical businesses. From 1994 to 2004 he held a number of senior positions in Morton International. He was corporate group vice president and president, Chemical Specialities for Morton International and, when acquired by Rohm and Hass Company, he was appointed corporate vice president and business unit manager, Performance Chemicals.

**Steve Smith** (Interim Managing Director — EC Pigments UK)

Following the restructuring of the UK senior team on 14 April 2004, he was appointed interim managing director to provide high level executive input during a period of restructuring and changing strategy. A permanent managing director will be recruited later this year.

**Minutes of a Meeting of the Audit Committee of**

**european colour plc**

**at Hempshaw Lane, Stockport, on Thursday 27 May 2004, 9am**

| | |
|---|---|
| Present: | David Ingles (in the Chair) |
| | Paul Deakin |
| In attendance: | Lisa de Caux |
| | Mike Quayle |
| | Steve Smith |
| | Richard Bate (KPMG) |
| | Martin Newsholme (KPMG) |
| | Phil Storer (KPMG) |

## 1. Minutes

**a)** The minutes of the meeting of the european colour plc Audit Committee held on 25 March 2004 were approved by the meeting and signed by the Chairman.

**b)** Matters arising

i)  US state tax

David Ingles enquired as to the current state of the US state tax liability outside of Massachusetts. Mike Quayle noted that KPMG US Tax had been asked to prepare a quotation for resolving the matter.

ii)  Balance sheet

The need for a clean balance sheet was raised at the meeting held on 25 March 2004. Mike Quayle noted that additional write offs had been made as one off and exceptional items. KPMG agreed, following their review, that there were no further potential problems in the balance sheet. Steve Smith queried whether policy was now too aggressive. Martin Newsholme noted that it was not. David Ingles noted that the intention was to maintain consistent policies going forward. Mike Quayle noted that, with regard to deferred tax, the Group was ready to comply with IFRS and that the only subjective write off had been the stock provision, which as now valued at a prudent level.

## 2. KPMG Audit Committee presentation

The Audit Committee presentation document, produced by KPMG, was tabled before the meeting. It was noted that the issues had been discussed with Mike Quayle.

### a) Opinion

Martin Newsholme noted that, based on audit work performed, KPMG intended to give an unqualified opinion on the Annual Report and Financial Statements.

### b) KPMG independence

Martin Newsholme confirmed KPMG's independence from the Group and directed the Committee to the Audit independence letter included at Appendix 2 of the presentation.

### c) Outstanding points

Martin Newsholme noted that the KPMG tax reconciliation proof was outstanding.

### d) Management representation

It was noted that KPMG's management representation letter was to be tabled at the Board meeting to be held on 27 May 2004.

### e) Bank facilities and covenants

Martin Newsholme noted his concerns that current forecasts showed that there would be insufficient funds to satisfy the new facility at certain points during the 2004/05 financial year. Mike Quayle noted that mitigating actions had been detailed, and largely taken, and that this would reduce the potential shortfalls indicated by the forecast to two, in December and January.

Martin Newsholme required the Committee to consider that if the forecast breach occurred, the Company's trading position would be poor and therefore the Company would not be in a good position to approach the banks for further funding.

Steve Smith noted that the Company has inactive security with Barclays, in the form of a debenture, and that facilities could be put in place within days, based on this position. He further noted that there was no intent to release this debenture, which stands as "insurance" until the Board was comfortable with the forecasting process. Paul Deakin noted that the new invoice discounting facility was not yet clear in terms of the facility level. He noted that despite the projected shortfalls, the new facility was a more robust structure since it took away the covenant breach problems.

Martin Newsholme noted that, further to documentation of these considerations, he was comfortable, particularly in view of the fact that the Board had clearly considered strategies for addressing the projected shortfall.

### f) Revenue recognition

A new policy is now in place, where goods in transit still insured by European Colour are not recorded as sales. Further to this, there is no current year profit impact but there was a prior year adjustment which affected cumulative reserves. .

### g) Stock valuation

It was noted that the stock policies in the UK and the US had been aligned. All stock greater than 12/6 months old is now fully provided, subject to a reasonable certainty/probability test. A more prudent position has been taken on indirect overhead absorption, eliminating the risk of capitalising under capacity.

### h) Severance provisions

Martin Newsholme that, strictly speaking, per FRS12 there should not be a provision against Brian Quinn and Neil McKinlay's severance payments as they were not informed of their redundancy before the year end. However, he noted that a flexible view would be taken due to the good commercial reasons for not informing them prior to the year end and the fact that a pre-year end Board minute, detailing the decision, was in evidence. It was noted that the US staff who had been made redundant had been informed prior to the year end and their severance pay was correctly provided.

i)    **Litigation and claims**

With regard to the accident at Fall River, there is no expectation that any claims against the company will be made by Mr. Custadio's widow.

With regard to potential environmental issues, it was noted that Roma has been relieved of the carbon tetrachloride charges made against it. It was noted that vinyl chloride had been found in the soil but that this was not a chemical used by the Company and, if a liability were to arise, it would be covered by insurance.

David Ingles noted that insurance cover terminates in 2006 and that all litigation and claims should be resolved as soon as possible. Steve Smith noted that he would discuss the issues with Bob Edmonston, Ned Almeida and Jon White.

It was noted that molybdenum discharge levels at the Woolwich site were over the permitted levels and that the Company had notified the relevant authorities. It was noted that no response had been received to date and that the Company was performing technical work to resolve the issue.

David Ingles noted that this issue would be a regular Board agenda item until resolved. Steve Smith noted that it was not viewed as a contingent liability.

j)    **Impairment of Roma goodwill**

Martin Newsholme noted that, given the variables in the impairment calculation, he agreed with management's view that all goodwill should be written off.

k)    **Treatment of plc loans to EC(US) and foreign exchange**

Martin Newsholme agreed that KPMG agreed with management's view that the long-term debtor should be classified as a pseudo-equity investment.

l)    **CNAPCI**

It was noted that Mike Quayle, George Hughes and Steve Smith had discussed the issue of significant control with regard to CNAPCI and had concluded that the Company had no influence now nor was likely to in the future. It was agreed that it would be treated as a fixed asset investment throughout the financial year 2003/04. Martin Newsholme confirmed that he concurred with this treatment, subject to the Board's management representation.

Steve Smith noted that the joint venture would die a natural death when the fixed time period of the contract elapsed.

m)  **MAC Casualty**

Martin Newsholme noted that he concurred with the Company's valuation.

n)  **Deferred taxation**

It was noted that deferred taxation would no longer be discounted.

o)  **Interest rate collar**

Martin Newsholme noted that he concurred with the year end valuation of £195,000.  Mike Quayle noted that, given the general perception of interest rates and the cash flow advantage, there was no reason to close the collar out.

p)  **Exceptional items**

Paul Deakin enquired as to whether the severance payments had been agreed.  Steve Smith noted that Neil McKinlay had verbally agreed although he had not signed the agreement.  He further noted that the agreed monies had been substantially paid during April and May.

Martin Newsholme noted that some exceptional items were exceptional by way of size rather than by nature.

q)  **Corporate governance**

It was noted that the Revised Combined Code did not apply for the financial year 2003/04.  It was noted that consideration of Paul Deakin's independence had been documented at the September 2003 Board meeting.  KPMG noted that, going forward per the Revised Combined Code, if a director had held an executive position within the last five years, he could not be considered to be independent.

David Ingles noted that, if the shareholders were dissatisfied with the position, they would have redress.

r)  **Management reporting points**

It was noted that all prior year management reporting points had been resolved with the exception of the ongoing reconciliation of the sales database.

Richard Bate suggested that, in terms of stock valuation, consideration should be given to the possibility of moving to a FIFO basis.  Mike Quayle noted that he would review the BPCS system capability but that the main point was to review the impact of the valuation.

Richard Bate noted that average delivery time should be monitored with regard to sales cut off.  Mike Quayle confirmed that this would be done at half year and year end.

## 3.  Review of Internal Controls

It was noted that the internal controls had been discussed at the Board meeting held on 25 March 2004 and that the Board were satisfied that there were no significant internal controls issues.

The intention to formalise and update delegated authorities was noted. It was proposed that progress on this issue would be reported to the September Board meeting and it was noted that this was an improvement exercise rather than dealing with a serious problem.

It was noted that an ethics policy questionnaire had been circulated with responses received from salaried staff and that the risk register was ongoing.

David Ingles noted that he was keen that internal controls should be a regular agenda item for the Committee but further noted that he recognised that there had been other priorities since Mike Quayle's appointment and that he would be satisfied with a report made in September.

## 4. Any other business

Steve Smith repeated his concerns with regard to information provided by KPMG on the US operations. Martin Newsholme noted that only a limited scope review was performed in the US. It was agreed that, prior to the audit, the Audit Committee would review the need for a wider scope US audit for the financial year 2004/05.

## 5. Audit Committee and KPMG only

The executives left the room.

## 6. Closure of meeting

There being no further business to discuss the Chairman declared the meeting closed at 10:30.

.....................................
Chairman

Date:............................

For Immediate Release                                          25 November 2003

<div align="center">

**European Colour plc**

**Interim Results for the Six Months Ended 30 September 2003**

</div>

European Colour, the speciality chemical pigments manufacturer, announces interim results for the six months ended 30 September 2003.

**Chairman's Statement**

In my first statement to shareholders, I want to start by thanking Paul Deakin for his excellent work as Non-executive Chairman and, for a brief period, Executive Chairman. Paul joined the Board during a difficult time and guided our company through a period of change.

**Group results and dividend**

Group results for the first six months of the financial year are not directly comparable to those of last year as they included the contribution of Tor Coatings, subsequently sold on 7 October 2002. We will, therefore, additionally give details of the comparisons for the EC Pigments activity, which is a more suitable reference for our business going forward.

Group turnover for the six months to 30 September 2003 was £14.8 million (2002: £23.9 million) generating profit before goodwill amortisation, exceptional items and taxation of £0.6 million (2002: £2.2 million). EC Pigments reported turnover for the period of £14.8 million (2002: £17.4 million) and operating profit before exceptional items of £0.9 million (2002: £1.7 million). Group headline earnings per share amounted to 0.88 pence (2002: 2.98 pence). These results are after the fixed asset write down of £119,000 as detailed below.

As you will read below, EC Pigments is in a challenging and fluid trading environment. With the level of uncertainty around the business at the moment, the Directors consider that the prudent course is to not declare an interim dividend. The Board will continue to monitor the situation closely and will assess the appropriateness of a final dividend following the year end.

**EC Pigments results**

EC Pigments continues to operate in a challenging trading environment, evident from the weaker second half of our last financial year. EC Pigments turnover for the six month period ended 30 September 2003 was £14.8 million, £2.6 million less than the first half of last year but only £0.3 million less than last year's second half. Operating profit before exceptional items of £0.9 million was £0.8 million less than the first half of last year and £0.2 million more than the six months to 31 March 2003. The result is £0.3 million more than the six months to 31 March 2003 before adjustments for accounting practices as detailed below, reflecting improved margins due to an improved product mix.

European Colour plc

Interim Results for the Six Months Ended 30 September 2003

The difficult trading environment reflects the competitive market conditions that our major customers face in Europe and North America. Although pigments for printing inks is an attractive, growing sub sector of the inks market, demand over the past year has been weak and we believe that these challenging market conditions will continue for the remainder of the year. This environment puts additional pressure on pricing as customers seek to lower costs. Consequently, we are working on specific programmes to support our customers, but these have resulted in lower margins and profitability. EC Pigments wants to be a positive element of our customer's strategic options, both in the short term and long term.

There are currently some indications of a stronger US economy. However, though we are ready to respond to higher demand, it is too early to assume a durable economic recovery and therefore we remain cautious.

**Group strategic direction**

The entire European Colour team is focussed on strengthening our business. The immediate task is the advancement of our Operational Excellence programme, which emphasises top quality performance in all aspects of our business. We will measure our success through introduction of successful new products and improved business performance.

Through the Operational Excellence programme, we are paying particular attention to Our business fundamentals. Improved focus and attention on this important area will positively impact our marketing efforts, manufacturing standards and the success rate of new product development. We have made significant organisational changes with special focus on operational management where the team is new and still in a development phase. We are seriously evaluating how our business processes are executed and establishing targets that are more challenging. Progress is being made but there is some way to go before we can deliver the level of customer service and new products that we strive to achieve.

When we are comfortable with our progress organically, we will consider external growth opportunities. If we do grow by acquisition, we will do so while maintaining a suitably prudent balance sheet. We will also maintain sufficient flexibility so that we can continue to manage our company strategically during difficult as well as healthy periods.

**EC Pigments strategy**

Our pigments activity will continue to serve its customers globally with specially developed products designed to add value to their coloration processes. EC Pigments will emphasise proprietary products developed to meet specific customer needs. This focus on product development will be supported by a co-ordinated sales and marketing campaign and a production and supply chain organisation that is sensitive to maintaining a quality product at a competitive cost. The organisational steps taken over the past year have supported this strategy.

**Changes to accounting practices**

As part of Operational Excellence, we have reviewed our accounting practices. We have decided, with auditor approval, to revise our practice of absorbing indirect overheads within

European Colour plc

Interim Results for the Six Months Ended 30 September 2003

finished goods and work in progress. This change will value our stocks more prudently and will lessen the variability of our earnings as stock levels change. The total impact of this is to reduce stock valuation by £364,000 as at 30 September 2003. We are also adjusting fixed asset values in the UK for equipment not fully utilised and the investment cost of our jointly owned captive insurance investment in the USA. These adjustments reduce fixed assets by £119,000 as at 30 September 2003. These adjustments are non-cash but they are reflected in the profit and loss account and balance sheet included with this results statement.

**Corporate governance**

Corporate governance has dominated the UK and international business news recently. Good corporate governance is not a fad; it is a philosophical approach to managing a business. As directors of a public company we all feel a strong sense of responsibility to our shareholders. We support current governance initiatives and have aligned ourselves to them.

**Board changes**

I joined the Board on 4 August 2003 as Chairman. Dr. David Ingles joined the Board on 23 September 2003 as an Independent Non-executive Director. On 21 July 2003, John E. Colchester resigned as a Director after seven years on the Board. His counsel has been of constant benefit to our company. Phillip Myles also resigned as a Director with effect from 15 July 2003 after a 12-year career with European Colour including nine months as a Director. Upon my appointment, Paul Deakin assumed the role of Senior Independent non executive director. At its September meeting the Board discussed Paul's independence and unanimously agreed that his six month tenure as Executive Chairman did not prejudice his independence. He was never directly involved in business operations and reverted to a non executive role as soon as possible.

**Board committees**

The Board committees have been re-energised. The Audit Committee comprises David Ingles (Chairman) and Paul Deakin. The Remuneration Committee comprises Nick Hawkins (Chairman) and Paul Deakin. I chair the Nominations Committee, the other member of which is David Ingles.

**European Colour people**

A good organisation is made up of teams of people working together. European Colour people have been through a period of restructuring and uncertainty. We are now in a phase of rebuilding and refocusing on our traditional strengths and business fundamentals in order to give us a solid platform for continued growth. I want to thank all of our people for their effort, support and, most importantly, ideas as we work together to build our company.

**Current trading and prospects**

At the beginning of my statement I characterised trading as challenging. In particular, we are in the process of reformulating a product line to meet a lower price expectation for an application. Several large customers are re-evaluating their purchasing forecasts. We are also working with targeted customers to supply additional volumes of existing products and new products, but at a somewhat lower margin for existing products. In both Europe and the USA,

European Colour plc

Interim Results for the Six Months Ended 30 September 2003

pricing continues to be difficult.  To offset these pressures we are increasing our technical resources and our supply chain team is working with suppliers to lower our costs.

The current environment is quite fluid and uncertain.  We believe our performance for the full year is likely to be materially below current market forecasts.  There are a number of economic forecasts that indicate brighter prospects and probably an equal number that see a softening after an initial burst of growth.  Our reading of key markets indicates to us that we should maintain a prudent approach to our business.  Consequently, we will continue to be cautious and strive to manage our company with professionalism and diligence.

**Steve Smith**
**Chairman**
**25 November 2003**

For further information, please contact:

European Colour
Steve Smith, Chairman                          Tel: +44 (0) 161 480 3891

Buchanan Communications
Charles Ryland/Suzanne Brocks                  Tel: +44 (0) 20 7466 5000

European Colour plc

Interim Results for the Six Months Ended 30 September 2003

Consolidated Profit and Loss Account

| | Note | 6 months ended 30 September 2003 (unaudited) | | | 6 months ended 30 September 2002 (unaudited) | | | 12 months ended 31 March 2003 (audited) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Continuing operations £'000 | Discontinued Operations £'000 | Total £'000 | Continuing operations £'000 | Discontinued operations £'000 | Total £'000 | Continuing operations £'000 | Discontinued Operations £'000 | Total £'000 |
| Turnover | | 14,837 | - | 14,837 | 17,441 | 6,418 | 23,859 | 32,510 | 6,418 | 38,928 |
| Gross profit | | 4,008 | - | 4,008 | 4,448 | 2,857 | 7,305 | 7,968 | 2,857 | 10,825 |
| **OPERATING PROFIT/LOSS** | | | | | | | | | | |
| Before goodwill amortisation and exceptional items | | 625 | - | 625 | 1,222 | 1,401 | 2,623 | 1,556 | 1,434 | 2,990 |
| Exceptional items | | (364) | - | (364) | (114) | - | (114) | (1,051) | - | (1,051) |
| Share of operating loss in joint venture – exceptional items | | - | - | - | - | - | - | (562) | - | (562) |
| Amortisation of goodwill | | (68) | - | (68) | (73) | - | (73) | (142) | - | (142) |
| | | 193 | - | 193 | 1,035 | 1,401 | 2,436 | (199) | 1,434 | 1,235 |
| Provision for costs incurred on disposal of subsidiary | 2 | - | - | - | - | (201) | (201) | - | - | - |
| Loss on disposal of discontinued operations | | - | - | - | - | - | - | - | (4,237) | (4,237) |
| Net interest payable | | (45) | - | (45) | (494) | 27 | (467) | (1,157) | 22 | (1,135) |
| **PROFIT BEFORE TAX** | | 148 | - | 148 | 541 | 1,227 | 1,768 | | | (4,137) |
| Tax | 2 | | | (76) | | | (685) | | | (863) |
| **PROFIT AFTER TAX** | | | | 72 | | | 1,083 | | | (5,000) |
| Paid and proposed dividends | | | | - | | | (148) | | | (345) |
| **RETAINED PROFIT** | | | | 72 | | | 935 | | | (5,345) |
| Headline earnings per share | 4 | | | 0.88p | | | 2.98p | | | 2.49p |
| Earnings per share (basic) | 4 | | | 0.16p | | | 2.22p | | | (11.07p) |
| Earnings per share (diluted) | 4 | | | 0.16p | | | 2.22p | | | (11.07p) |

European Colour plc

Interim Results for the Six Months Ended 30 September 2003

Consolidated Balance Sheet

| | | Notes | 30 September 2003 (unaudited) £000 | 30 September 2002 (unaudited) £000 | 31 March 2003 (audited) £000 |
|---|---|---|---|---|---|
| FIXED ASSETS | Intangible assets | | 2,077 | 2,448 | 2,242 |
| | Tangible assets | | 7,864 | 9,940 | 7,696 |
| | Investments | | 438 | 948 | 405 |
| | | | 10,379 | 13,336 | 10,343 |
| CURRENT ASSETS | Stocks | | 4,705 | 6,435 | 4,824 |
| | Debtors | | 6,221 | 9,624 | 6,341 |
| | Cash | | 408 | 71 | 462 |
| | | | 11,334 | 16,130 | 11,627 |
| CREDITORS – less than one year | | | | | |
| Borrowings | | | (1,479) | (4,624) | (1,748) |
| Other | | | (5,343) | (7,820) | (5,152) |
| | | | (6,822) | (12,444) | (6,900) |
| NET CURRENT ASSETS | | | 4,512 | 3,686 | 4,727 |
| TOTAL ASSETS LESS CURRENT LIABILITIES | | | 14,891 | 17,022 | 15,070 |
| CREDITORS – greater than one year | | | | | |
| Other | | | (27) | (7,203) | - |
| Deferred taxation | | | (612) | (590) | (611) |
| Other provisions | | | (285) | - | (285) |
| TOTAL NET ASSETS | | | 13,967 | 9,229 | 14,174 |
| CAPITAL AND RESERVES | | | | | |
| Called up share capital | | | 2,330 | 2,480 | 2,330 |
| Share premium account | | | 4,864 | 4,864 | 4,864 |
| Capital redemption reserve | | | 550 | 400 | 550 |
| Revaluation reserve | | | 429 | 438 | 434 |
| Special reserve | | | - | 3 | 3 |
| Profit and loss account | | 6 | 5,794 | 1,044 | 5,993 |
| SHAREHOLDERS' FUNDS | | | 13,967 | 9,229 | 14,174 |
| Attributable to: | | | | | |
| Equity shareholders' funds | | | 13,967 | 8,179 | 14,174 |
| Non-equity shareholders' funds | | | - | 1,050 | - |
| Total shareholders' funds | | | 13,967 | 9,229 | 14,174 |

European Colour plc

Interim Results for the Six Months Ended 30 September 2003

Consolidated Cash Flow Statement

| | 6 months ended 30 September 2003 (unaudited) £000 | 6 months ended 30 September 2002 (unaudited) £000 | 12 months ended 31 March 2003 (audited) £000 |
|---|---|---|---|
| Net cash inflow from operating activities | **1,254** | 1,885 | 2,253 |
| Dividends from joint ventures | **-** | - | 27 |
| Returns on investments and servicing of finance | **(126)** | (510) | (828) |
| Tax paid | **11** | (317) | (99) |
| Capital expenditure and financial investment | **(679)** | (519) | (769) |
| Proceeds of disposal | **-** | - | 12,515 |
| Less cash disposed of with subsidiary | **-** | - | (562) |
| Equity dividends paid | **(195)** | - | (95) |
| Cash inflow before financing | **265** | 539 | 12,442 |
| Financing | **(46)** | 721 | (7,475) |
| Preference share redemptions | **-** | (1,000) | (2,105) |
| Increase in cash in the period | **219** | 260 | 2,862 |

**Reconciliation of net cash flow to movement in net debt**

| | | | |
|---|---|---|---|
| Increase in cash in the period | **219** | 260 | 2,862 |
| Cash inflow from increase in loans | **-** | (1,000) | (1,500) |
| Cash outflow from repayment of loans and finance leases | **-** | 288 | 8,830 |
| Change in net debt resulting from cash flows | **219** | (452) | 10,192 |
| Exchange movement | **(4)** | 822 | 804 |
| New finance leases | **(32)** | - | - |
| Other non-cash movements | **-** | 30 | (126) |
| Movement in net debt in the period | **183** | 400 | 10,870 |
| Net debt at 1 April | **(1,286)** | (12,156) | (12,156) |
| Net debt at 30 September / 31 March | **(1,103)** | (11,756) | (1,286) |

**Analysis of net debt**

| | At 1 April 2003 £000 | Cash Flow £000 | Exchange differences £000 | Other non-cash changes £000 | At 30 Sept 2003 £000 |
|---|---|---|---|---|---|
| Cash | 462 | (54) | - | – | **408** |
| Overdrafts | (1,248) | 273 | (4) | – | **(979)** |
| | (786) | 219 | (4) | – | **(571)** |
| Debt due within one year | (500) | - | – | – | **(500)** |
| Debt due after one year | - | - | – | – | **-** |
| Finance leases | - | - | – | (32) | **(32)** |
| Total | (1,286) | 219 | (4) | (32) | **(1,103)** |

European Colour plc

Interim Results for the Six Months Ended 30 September 2003
Notes to the Financial Statements

1.  The financial information set out above does not constitute the Company's statutory financial statements for 2003 or 2002. Full accounts for the year to 31 March 2003, on which the auditors gave an unqualified report, have been delivered to the Registrar of Companies.

2.  The interim report has been prepared on the basis of the accounting policies set out in the March 2003 financial statements.

3.  The charge for taxation on the profit for the period is based on the estimated effective rate for the full year.

4.  With the exception of the profit for the financial period and the prior year adjustment, there were no recognised gains or losses in the group.

5.  Earnings per ordinary share have been calculated using 44,902,760 (basic and diluted), being the weighted average of ordinary shares in issue in the period (2002: 46,569,698 basic and 48,743,174 diluted)

    Headline earnings per share has been stated before goodwill amortisation and exceptional items and on a diluted basis. The directors consider that this gives a better understanding of the group's earnings.

6.  Copies of this report are being sent to all shareholders. Further copies are available on request from the registered office of the Company.

7.  Statement of retained profit:

|  | 30 September 2003 (unaudited) £000 | 30 September 2002 (unaudited) £000 | 31 March 2003 (audited) £000 |
|---|---|---|---|
| Reserves at 1 April | 5,993 | 1,102 | 1,102 |
| Transfer from revaluation reserve | 5 | 7 | 11 |
| Retained profit for the period to date | 72 | 935 | (5,345) |
| Preference share redemption | - | (1,000) | (2,105) |
| Goodwill taken to the profit and loss account on disposal | - | - | 12,321 |
| Write back of special reserve | 3 | - | - |
| Foreign exchange | (279) | - | 9 |
| Reserves at 30 September / 31 March | 5,794 | 1,044 | 5,993 |

**Directors**
Paul Deakin, Senior Independent Non-Executive Director
Nick Hawkins ACA, Non-Executive Director
George Hughes, Managing Director
Dr. David Ingles, Non-Executive Director
Steve Smith, Chairman

**Senior Management Team**
George Hughes, Managing Director
Neil McKinlay, Supply Chain Director
Brian Quinn, Sales and Marketing Director
Lee Schofield, Technology Director
Christine Thompson FCCA, Chief Financial Officer

**Company Secretary**
Lisa de Caux ACA

**U.S. Department of Labor**
Occupational Safety and Health Administration

Inspection Number: 306808973
Inspection Dates: 11/20/2003 - 03/26/2004
Issuance Date:    04/16/2004



## Citation and Notification of Penalty

**Company Name:** EC Pigments
**Inspection Site:** 749 Quequechan Street, Fall River, MA  02723

---

Citation 1 Item 1 Type of Violation:    **Serious**

Section 5(a)(1) of the Occupational Safety and Health Act of 1970:  The employer did not furnish employment and a place of employment which were free from recognized hazards that were causing or likely to cause death or serious physical harm to employees in that employees were exposed to the struck by hazards associated with a free falling inclined conveyor lifts with inoperable safety devices and fall hazards associated with landing gates that were not interlocked with the operation of the lift.

Inclined Lift, First Floor, Center of the Building:

1) On or about 11-20-03 the safety device to prevent the inclined lift from over-travelling or falling in the event of a mechanical or electrical problem did not function allowing the lift to fall approximately 20 feet. An employee who was on the lift attempting to clear and repair a jam, was thrown onto a post and died.

2) On or about 11-20-03 the interlock devices for third and second floor landing gates were inoperable allowing the landing gates to be opened when the platform was on the first floor exposing employees to falls approximately twenty to forty feet.

Feasible methods to abate the hazard among others are:

1) Rebuild the inclined lift.

2) Repair the interlocked gates, and set up an inspection and maintenance plan for the interlocked gates.

3) Replace the lift safety device that allowed the free fall and set up an inspection and maintenance plan for the lift safety devices.

4) Ensure that employees who maintain the inclined lift receive training and technical support from the manufacturer.

5) Ensure that the lift is operated and maintained in accordance with manufacturer recommendations and in accordance with the latest American Society of Mechanical Engineers (ASME), "Safety Standards for Conveyors and Related Equipment."

---

See pages 1 through 3 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

**U.S. Department of Labor**
Occupational Safety and Health Administration

Inspection Number:  306808973
Inspection Dates: 11/20/2003 - 03/26/2004
Issuance Date:    04/16/2004



## Citation and Notification of Penalty

**Company Name:**   EC Pigments
**Inspection Site:**    749 Quequechan Street, Fall River, MA  02723

---

Inclined lift, Shipping Department:

On or about 11-20-03 the interlock device for the landing gate was inoperable allowing the gate to open while the platform was in the basement.

Feasible method to abate the hazards among others is:

1) Repair the interlocked gates, and set up an inspection and maintenance plan for the  interlocked gates.

2) Ensure that employees who maintain the inclined lift receive training and technical support from the manufacturer.

3) Ensure that the lift is operated and maintained in accordance with manufacturer recommendations and in accordance with the latest American Society of Mechanical Engineers (ASME), "Safety Standards for Conveyors and Related Equipment."

**"ABATEMENT DOCUMENTATION IS REQUIRED FOR THIS ITEM"**

Date By Which Violation Must be Abated:                          06/03/2004
Proposed Penalty:                                       $      3500.00

---

See pages 1 through 3 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty              Page 5 of 13                    OSHA-2 (Rev. 9/93)

## Coverage Information/Additional Comments

### SAFETY NARRATIVE

| Inspection Number | |
|---|---|

**COVERAGE INFORMATION**
Giant Lift - NH

**NATURE AND SCOPE**

Check Applicable Boxes and Explain Findings:

☐ Complaint Items

☐ Referral Items

☒ Accident Investigation Summary & Findings

The platform of an inclined Giant lift was stuck. The maintenance employee went on the lift platform to try to clear the jam. The lift fell and the maintenance employee was impaled by the stanchion of the guardrail. Since the accident the company has had the inclined lift rebuilt. The lift is supposed to have a safety device which prevents it from falling in case of mechanical or electrical failure. The safety device was reinstalled wrong so that the safety cam was not actuated. The lift also had fallen in January 2002. Some employees stated that the lift also fell in the summer of 2003. In September 2003 a part of the safety mechanism was ordered from LK GoOodwin and was going to be fabricated by Giant Lift. An opening conference was held on 11-20-03 with John White and Ned Almeida and Mike Clayton. On 11-21-03 I returned the company with ⊓⊂    On 11-24-)3 We interviewed two witnesses. The company complained about having trouble getting Giant or LK Goodwin down to repair the lift. On 11-25-03 I interviewed a former employee with ⊓⊂ On 12-1-03 I interviewed employees with  ⊓⊂    . On 12-4-03 I conducted a walkaround inspection. On 12-11-03 I returned with  ⊓⊂    and mechanics from Accurate Elevator showed how the safety mechanism works. On 2-23-04 I returned for a closing conference. On 3-26-04 I returned to the company because there was a caustic burn incident. I reccommended to John White that they install a partial partition so that if there was a problem at a filling connection the partition would deflect the chemical away from a person under the deluge shower. The company was given a zero for good faith because they were using the lift even though there was a part on order for the safety mechanism.

On 3-18-04 there was a release of sodium hydroxide from a truck during a delivery. A police officer got sodium hydroxide on his clothing. The release occurred when the police officer was questioning the driver and the truck became over pressurized. The truck driver took the police officer into the filling shed and operated the deluge shower but the pressure was inadequate. An informal complaint was called into Univar the trucking company. On 3-26-04 I returned to EC Pigments due to this incident. See Citation 1 Item 2. The truck driver and the police officer say the water pressure was not adequate. The company said that the police officer never attempted to use the shower inside the shed.

☐ LEP

☐ Planned Inspection

**NATURE AND SCOPE -- UNUSUAL CIRCUMSTANCES** (Mark X and explain all that apply:)

☒ None

☐ Denial of entry (see denial memo)

☐ Delays in conducting the inspection

☐ Strikes

OSHA-1A(Rev. 6/93)

Page 2
EC Pigments

Case 1:05-cv-1055?JLT    Document 11-6    Filed 05/??/2005    Page 4 of 28
                                                                 Apr 10, 2004 2:03pm
Inspection Nr. 306808973 Citation Nr. 01 Item/Group 001

Feasible method to abate the hazards among others is:

1) Repair the interlocked gates, and set up an inspection and maintenance plan for the interlocked gates.

2) Ensure that employees who maintain the inclined lift receive training and technical support from the manufacturer.

3) Ensure that the lift is operated and maintained in accordance with manufacturer recommendations and in accordance with the latest American Society of Mechanical Engineers (ASME), "Safety Standards for Conveyors and Related Equipment."

| Penalty Calculations | | | | Adjustment Factors | | | Proposed Adjusted Penalty |
|---|---|---|---|---|---|---|---|
| Severity | Probability | Gravity | GBP | Size | Good Faith | History | |
| H High | G Greater | 10 | 7000.00 | 40 | 0 | 10 | 3500.00 |
| Repeat Factor | | 0 | | | | | |

| Employee Exposure: | | | | | |
|---|---|---|---|---|---|
| Occupation | **Maintenance Manager** | | Employer | | |
| Nr of Employees | **20** | | Duration | **unknown** | Frequency **daily** |
| Employee Name | **Steve Custadio** | | | | |
| Address | | | | Phone | ( )   - |

| Instance Description: | A. Hazard | B. Equipment | C. Location | D. Injury/Illness | E. Measurements |
|---|---|---|---|---|---|

| 4. Date/Time |
|---|
| |

20. Instance Description -  Describe the following:
     a) Hazards-Operation/Condition-Accident
          A fatality occurred on 11-20-03. The accident occurred at an inclined lift. The inclined lift travels 3 floors. The inclined lift was stuck at the second floor. A shipping mechanic was trying to send the lift from the second floor to the first. The shipping employee got the maintenance manager. The Maintenance Manager was trying to move a guardrail post of the platform to clear the jam. When the jam was cleared the lift platform dropped to the first floor ( free fall ). The Maintenance Manager was bounced from the back of the lift onto one of the guardrail posts. The guardrail post entered his face and he was killed. It is assumed that the cable paid out when employees were pressing the buttons of the platform. The ANSI standard for inclined lifts requires the lift to have a safety device so that the lift would not drop if there was a mechanical, electrical, or hydraulic failure.
          Following the accident, a part of the safety device was disconnected. It had part of the cable attached to it. The mirror part of the safety device was positioned improperly. These parts are supposed to drop if there is a cable problem. Then to springs contract and then two geared cams grab the rail. This did not happen. An elevator contractor stated that the safety device was assembled wrong. The salesman for LK Goodwin in Providence stated he talked to the deceased and to Ned Almeida in September about the safety device. He said they ordered one of the parts of the safety device to be made. L.K. Goodwin sent me a purchase order. On 2-24-04 EC Pigments faxed me a copy of the purchase order for a part of the safety device to be fabricated. They said they just found the purchase order after I conducted the closing conference on 2-23-04.

          In addition to the lift dropping another hazard is that the gates on the second and third floor can be opened when the lift is on the first floor.

          ANSI B20.1-2000 section section 6.6.1 (a) talks about a safety device being needed to prevent such an accident.

The platform is 6 feet by 50". The base plate of the post that the platform gate latches onto was 7 1/2" x 5". The gate is 89" long. The pipe is 1 1/2" in diameter. The railing was 41" high. The part the cable is connected to is 13" x 5". It is 21 feet between floors. 18 3/4" was left of the post.

Ned Almeida, the Plant Manager, remembers the lift free falling once before.
        a shipping employee, stated that the inclined lift has dropped twice.
        stated that the lift fell once early this summer.
        stated that Steve replaced a cable a couple months prior to the accident.
        stated that the lift has fallen 3 or 4 times during the last 20 years.
        stated he has opened the gates on the upper floors without the lift being at that floor.

Accurate Elevator has rebuilt the lift and it is back in service now.

The first floor gate of the inclined lift in the shipping dept. was open while the platform was in the basement. They took the lift out of service after the accident on 11-20-03. An employee could fall through a floor opening.
Equipment- two inclined lifts

1) Hazard - One hazard is that due to the lack of a working safety device the platform could come crashing down as it did and somebody on it could get injured. One hazard is that if an enclosure gate is openable an employee could fall 20 feet or more to the first floor.

2) Recognition of the Hazard - The Hazards mentioned in 1 are recognized in Ansi B20.1 Section 6.6. One section says that means shall be provided to prevent hazard to personnel in the event of mechanical or electrical failure. The conveyor housing shall be equipped with doors at each manual loading or unloading station, interlocked so they can be opened only when the carrier has stopped at that level and such that they cannot be actuated until they are closed. The hazards in 1 are recognized in the elevator industry.
The lift platform has fallen previously during the last few years. A part of the safety mechanism had been ordered from a service representaive of the manufacturer.

3) The hazards mentioned in 1 could cause death or broken bones.

4) Feasible method of abatement - A method of abatement would be to rebuild the safety device and to redo the interlocks for the landing gate enclosures. A maintenance contract should be established for the inclined lifts also.
c) Location - Center of the Shop and Shipping Dept.
d) Injury/Illness - fatality, broken bones
e) Measurements

| 21. Photo Number | Location on Video |
|---|---|
|  |  |

23. Employer Knowledge :
  The lift had fallen previously. There was part on order for the safety mechanism. They should have known.

24. Comments (Employer, Employee, Closing Conference) :
  Both lifts have been repaired.
25. Other Employer Information :

| 26. Classification: | | | | |
|---|---|---|---|---|
| Serious | Knowledge | S or O | Repeat? | Willful? |
| y | y | s |  |  |

The Hazard Referenced In: EC Pigments OSHA# 306808973 N8631

## ABATEMENT CERTIFICATION FORM

The hazard referenced in Inspection #306808973 for violation identified as:

**(Give a brief description of what actions were taken to correct each hazard)**

→ Abatement Documentation Attached:

Citation #____1____, Item #____1____ was corrected on (date) _2-26-04_,
Inter active lift was rebuilt with New interlocked gates & lift safety device to prevent Free Fall. A maintenance plan was put into effect.
**(Describe Action Taken)**

Citation #____1____, Item #____1____ was corrected on (date) _3-5-04_,
Shipping Dept incline lift was Repaired & installed with New interlocks etc.
**(Describe Action Taken)**

Citation #____1____, Item #____3____ was corrected on (date) _12-8-03_,
A New machine guard was installed on the metal cutting Band Saw
**(Describe Action Taken)**

Citation #____1____, Item #____3____ was corrected on (date) _1-10-04_,
A New motor guard for Rotating parts was installed on yellow pulver.
**(Describe Action Taken)**

Citation #____1____, Item #____4A____ was corrected on (date) _12-8-03_,
The guard for saw Blade on the table Saw was installed
**(Describe Action Taken)**

Citation #____1____, Item #____4B____ was corrected on (date) _12-8-03_,
the spreader Bar was installed on the table saw.
**(Describe Action Taken)**

Citation #____1____, Item #____4C____ was corrected on (date) _12-8-03_,
the Non Kick Back Fingers were installed on the Table Saw
**(Describe Action Taken)**

Citation #____1____, Item #____5____ was corrected on (date) _12-11-03_,
A New disconnect with New Wiring were installed on Hot water Heater
**(Describe Action Taken)**

I Attest that the information contained in this document is accurate, and I further attest that affected employees and their representatives have been informed of this abatement.

_Ned D. Almeida_
**Employers Signature**

_Ned D. Almeida_
**Typed or Written Name**
**U.S. Department of Labor**



# ACCURATE ELEVATOR AND LIFT CO., INC.™
### Residential-Commercial Elevators • Dumbwaiters • Wheelchair Lifts
### Elevator Repair • Service • Maintenance

# Agreement

December 16, 2003

*P.O.# 1850*

Submitted to: E.C. Pigment

*AT-E #126*

Address: 749 Quequechan Street
Fall River, MA 02723

Lift:    Middle Lift

## SCOPE OF WORK " MIDDLE LIFT"

- Remove all existing enclosures and gates and properly dispose of. Furnish and install (F&I) new enclosure panels with gates and code compliant electromechanical interlocks. Enclosure to have a locked service access door for pump/motor/controller. All enclosure gate components to be painted with an epoxy based enamel.
- F&I new platform assembly with 60" guard panels and to include: lifting chains, chain anchor bolts, universals and connector links, rams head assembly including head plates, chain load rollers with press fit bearings, ram pin, bolts and shim washers, flanged guide rollers, slip axles and complete falling platform safety assembly.
- F&I new conduit and wiring throughout.
- F&I new hydraulic oil, jack packing, down solenoid, hydraulic oil supply lines and motor/pump drive belt. New code compliant hall call/send stations included as well as all proper signage.
- Clean, lubricate and adjust all lift components and operating systems per code and manufacturers requirements, full load test for bypass pressure relief and falling platform safety operation to be performed and certified. All test documentation to be presented to E. C. Pigments.
- Accurate Elevator and Lift Co to provide structural engineer to certify lift.
- All replacement parts O.E.M. and supplied by Giant Lift Mfg.
- Work to be performed contingent on comprehensive maintenance service plan in force upon equipment turnover to plant.

## WORK BY OTHERS

- Ensure work area free of material or other obstructions.
- This agreement assumes pump/controller/motor are all in proper operational condition.

### • TAKING YOU TO THE TOP •
22 Cambridge St., Unit 1, P.O. Box 1389, Middleborough, MA 02346
Phone (508) 946-8077 • Fax (508) 946-8088 • Toll Free 888-737-8077
e-mail: Liftyou@tmlp.com



# ACCURATE ELEVATOR AND LIFT CO., INC.™
### Residential-Commercial Elevators • Dumbwaiters • Wheelchair Lifts
### Elevator Repair • Service • Maintenance

$ 55,000.

Investment cost: $58,600 (Fifty-eight thousand six hundred dollars)

Payment terms: 50% to begin $29,300.00 (Twenty-nine thousand three hundred dollars)

      50% upon completion and delivery to E.C. Pigments, $29,300.00 (Twenty-nine  thousand three hundred dollars).

_____     Date  12/16/03
(Customer)

_____     Date  12/16/05
(Accurate Elevator)

**• TAKING YOU TO THE TOP •**
22 Cambridge St., Unit 1, P.O. Box 1389, Middleborough, MA 02346
Phone (508) 946-8077 • Fax (508) 946-8088 • Toll Free 888-737-8077
e-mail: Liftyou@tmlp.com

 **ACCURATE ELEVATOR AND LIFT CO., INC.™** 
Residential-Commercial Elevators • Dumbwaiters • Wheelchair Lifts
Elevator Repair • Service • Maintenance

# Agreement

December 16, 2003

*Start 12-19-03*

Submitted to: E.C. Pigment

Address: 749 Quequechan Street
Fall River, MA 02723

*PO# 1849*
*AFE#125*

Lift:    Shipping Lift

## SCOPE OF WORK " SHIPPING LIFT"

- Remove all existing enclosures and gates and properly dispose of. Furnish and install (F&I) new enclosure panels with gates and code compliant electromechanical interlocks. Enclosure to have a locked service access door for pump/motor/controller. All enclosure gate components to be painted with an epoxy based enamel.
- F&I new lifting chains, chain anchor bolts, universals and connector links, rams head assembly including head plates, chain load rollers with press fit bearings, ram pin, bolts and shim washers, flanged guide rollers, slip axles and complete falling platform safety assembly.
- F&I new conduit and wiring throughout.
- F&I new hydraulic oil, jack packing, down solenoid, hydraulic oil supply lines and motor/pump drive belt. New code compliant hall call/send stations included as well as all proper signage.
- Clean, lubricate and adjust all lift components and operating systems per code and manufacturers requirements, full load test for bypass pressure relief and falling platform safety operation to be performed and certified. All test documentation to be presented to E. C. Pigments.
- All replacement parts O.E.M. and supplied by Giant Lift Mfg.
- Work to be performed contingent on comprehensive maintenance service plan in force upon equipment turnover to plant.

## WORK BY OTHERS

- Ensure work area free of material or other obstructions.
- This agreement assumes pump/controller/motor are all in proper operational condition.

# ACCURATE ELEVATOR AND LIFT CO., INC.™
### Residential-Commercial Elevators • Dumbwaiters • Wheelchair Lifts
### Elevator Repair • Service • Maintenance

Investment cost: $32,400.00 (Thirty-two thousand four hundred dollars)

Payment terms: 50% to begin $16,200 (Sixteen thousand two hundred)

50% upon completion and delivery to E.C. Pigments $16,200.00(Sixteen thousand two hundred dollars).

**Option:** Provide structural steel guarding system to surround enclosure panels and prevent damage from fork trucks, hand jacks, pallets, Etc.

Investment consideration $3,500.00 (Three thousand five hundred dollars)  *OK- to da*

*total $35.900*  *rui ml,*

_____  Date _____
(Customer)

_____  Date  *12·16·03*
(Accurate Elevator)

### • TAKING YOU TO THE TOP •
22 Cambridge St., Unit 1, P.O. Box 1389, Middleborough, MA 02346
Phone (508) 946-8077 • Fax (508) 946-8088 • Toll Free 888-737-8077
e-mail: Liftyou@tmlp.com

 **ACCURATE ELEVATOR AND LIFT CO., INC.™** 
Residential-Commercial Elevators • Dumbwaiters • Wheelchair Lifts
Elevator Repair • Service • Maintenance

*ac Acct's Payable*

## LIFT CERTIFICATION AND TURNOVER DOCUMENT

This document will attest to and verify that the Giant Lift Serial # 2509 *-(Shipping Dept)* conforms to all provisions and requirements of the ASME B20.1 safety standards for conveyers and related equipment. The full load falling platform safety test and by-pass pressure relief were tested on March 4, 2004. The lift is now ready for general use.

_____          _____
Accurate Representative                           3/8/04  Date

_____          _____
E. C. Pigment Representative                     3/8/04  Date

*ref to: PO# 1849*
*AFR#125*

• **TAKING YOU TO THE TOP** •
22 Cambridge St., Unit 1, P.O. Box 1389, Middleborough, MA 02346
Phone (508) 946-8077 • Fax (508) 946-8088 • Toll Free 888-737-8077
e-mail: Liftyou@tmlp.com



# ACCURATE ELEVATOR AND LIFT CO., INC.™
### Residential-Commercial Elevators • Dumbwaiters • Wheelchair Lifts
### Elevator Repair • Service • Maintenance

## The Accu-Trac™ Preventative Maintenance Agreement

**February 18, 2004**

*Purchase Order 2068*

E.C. Pigments
749 Quequechan Street
Fall River, MA 02723

Accurate Elevator and Lift Company, Inc. for the sum of: **$4,600.00 (Four thousand six hundred dollars) annually**, we will provide examination and lubrication services on the existing lift(s) located in the above noted building.

**\*This agreement includes Annual Full Load Safety Inspection\***
**Certification documents to be forwarded to E.C. Pigments**

Number of lifts: **2**                                   Manufacturer: **Giant Lift**

Lift(s)/Location(s): **Middle Lift, Shipping Lift**

This service agreement provides for 12 examination(s), the cleaning and lubrication of the following applicable equipment: the machine and motor, interlocks, controller, guide rails car top and pit. Accurate Elevator & Lift Co. will provide all cleaning equipment and lubricants.

All examinations will be conducted during regular working hours Monday through Friday (7am through 3:30pm) unless other arrangements are made. Should service calls or repair work be necessary the work will be billed at our current rates for labor and material.

As owner, custodian or lessee, possession or control of the elevator shall remain exclusively yours. It is incumbent upon you to instruct passengers in the safe and proper use of the equipment. Your responsibility also includes removing this equipment from service when it becomes unsafe or is operating in an erratic manner and to notify us promptly. It is mutually agreed that only licensed and trained mechanics employed by Accurate Elevator & Lift Co. Inc. will be authorized to perform any maintenance, troubleshooting or repair procedures in regards to the lifts noted in this contract.

Lifts are electro/mechanical devices and through normal operation are subject to wear and tear. This agreement is not a guarantee against the aforementioned wear and tear. The purpose of our service is to prolong the useful life of the equipment through examination and lubrication, and to make you aware of needed repairs or potential malfunctions. We assume no liability for the use, operation, control or management of the elevator. Accurate

**• TAKING YOU TO THE TOP •**
22 Cambridge St., Unit 1, P.O. Box 1389, Middleborough, MA 02346
Phone (508) 946-8077 • Fax (508) 946-8088 • Toll Free 888-737-8077
e-mail: Liftyou@tmlp.com

 **ACCURATE ELEVATOR AND LIFT CO., INC.™** 
Residential-Commercial Elevators • Dumbwaiters • Wheelchair Lifts
Elevator Repair • Service • Maintenance

is not responsible for loss, damage or delay resulting from fire, flood or inability to access the building.

It is understood and agreed that in consideration of our performing the service specified herein, you agree to indemnify us from and against all claims, other than those resulting from improper service by Accurate Elevator and Lift. Company, Inc. made or brought us at any time, and from and against all expenses, legal and otherwise which may be sustained on account of or in connection with any injury to any person or persons (with the exception of Accurate employees), and/or any loss or damage to property, in any way due to the presence, operation, use, maintenance, repair or removal of said elevator: irrespective or the manner in which such injury, loss or damage was caused.

It is mutually agreed that this contract will commence on the 1ˢᵗ day of March 2004 and shall continue until canceled. Either party may cancel this contract at the end of the first ~~five~~ ONE year period after commencement of this contract or any following ~~five~~ ONE year term by giving the other party 90 (ninety) days advanced written notice prior to the end of said ~~five~~ ONE year period. Accurate Elevator and Lift Co. reserves the right to review and adjust the contract price in relation to the rate of inflation.

> 1 yr. Period.

**ACCEPTED**
**PURCHASER** _EC PIGMENTS_

**BY** _Mike Clapp_
      (SIGNATURE OF AUTHORIZED OFFICER)

**DATE** _1-13-04_     20_04_

**ACCURATE ELEVATOR AND LIFT COMPANY INC.**

**BY** _____

**DATE** _____20_____

Contract Offer Expires: March 31ˢᵗ, 2004

• **TAKING YOU TO THE TOP** •
22 Cambridge St., Unit 1, P.O. Box 1389, Middleborough, MA 02346
Phone (508) 946-8077 • Fax (508) 946-8088 • Toll Free 888-737-8077
e-mail: Liftyou@tmlp.com

12-04-03

Ned Almeida lives at

Mr. Almeida was in and out of this plant from 1968 to 1979 for special projects for United Merchants.

He worked for United Merchants from 1979 to 1992 in other plants.

On the day of the accident he was in his office. The switchboard operator notified him that Steve was hurt at the lift.

He only remembers the lift freefalling once before ( the vendor machine incident ). The vendor put the cart on the lift. It was January or February 2002.

He does not know about any incident this summer.

He would probably find out about something like that if it happened.

He knows that a couple work orders for replacing cables were issued.

Work orders were given to Steve and after the work is done it is entered into the computer and the paperwork is thrown out.

There may have been a couple work orders for replacing or adjusting the cables.

He does not remember any calls made this year for the cables.

As far as a preventative maintenance program goes Ned would be only speculating as to what Steve looked for.

Ned was Steve's supervisor.

If there is a problem with a lift they probably call Steve.

It's possible that Steve called to find out about replacing the lift.

If it was something that Steve wanted to have done he would come to Ned to sign it to get approval to get it done.

He does not know how often that lift got stuck.

He does not think Steve kept a daily log.

Steve kept records of boiler operator duties.

A quote from FS Industries could be by phone or paper.

He does not know how Steve would know if the brake had to be replaced on that lift.

Steve never brought to his attention that the brake was worn or would not activate.

The shipping lift had a problem with the door mechanism.

He does not know when that lift went out of service.

Steve would call FS Industries and make arrangements and let Ned know.

FS Industries installed interlocks on the gates before.

He does not know if Steve ever chained the lift and used a cumalong to secure it.

Steve did some work this year on the hydraulics for the piston. He does not know why, leaking maybe.

Adam would assist his father.

He has never seen anybody moving around the upright of the guardrail before.

FS Industries or LK Goodwin never offered annual maintenance for that lift.

No other lifts have free fallen.

Mike Clayton found Atlantic Elevator.

There were no complaints about that lift at a safety meeting.

People complained the lift was too slow or people wished they could put more on it.

Sometimes was told by operators that they had called Steve or Steve would tell me himself of problems with the operating controls.

He does not know what repairs were made by FS Industries in January 2002.

He thinks the normal practice is to move the pallet into the lift.

There is a steel plate to prevent items from shifting or moving to the left to prevent items from getting stuck going up.

They would stop it if they saw material protruding.

He does not remember if any other United Merchants factories ever had a lift fall.

United Merchants is worldwide.

There were six different divisions at this location and on the other side of the pond.

He has not hired a new maintenance person yet.

has a boiler room license. He has had it a long time. He is the weigh room lead person.

12-4-03

Michael Clayton lives at

He is the general manager of EC Pigments. He has worked there for 4 ½ years. He is the general manager of the business. He corresponds with England. He deals with the managers here to see they do their jobs properly. He has one peer in Fall River. He is Frank Laveiri, Sales and Marketing VP.

Mike supervises John White, Technical Director, Ned Almeida, Plant Manager, Monique Deschesnes, Purchasing and Administration Manager, and Amy Lawton, Financial Controller.

On the day of the accident Mike was walking by and the accident had just happened and somebody was waving their hands and somebody said call 911.

The only time the lift has fallen was in January 2002. It was the candy vendor. Ned, Steve, and LK Goodwin did the work on it. He is not aware of any times when a cable has broken.

Mike was not aware of the lift falling in January 2002. He has been told now about that incident.

Ned has final say to bring in LK Goodwin.

Anything over $10,000 needs capital expenditure approval from England.

The repair in 2002 was a repair and Ned did not need Mike's approval.

Mike has seen material fall off the lift. He was out in the plant. Maybe the material was loaded wrong. Bags of pigment came down. Mike did not see the material fall but saw the material on the ground afterwards. Mike has never used the lift. Mike does not know the condition of the lifts.

The receiving lift is in use.

Atlantic Elevator is assessing the situation.

Mike is not aware of that lift getting stuck.

There were no work orders recently that he is aware of.

If there was a problem with the lift a person would call Steve.

There was no policy before on annual lift inspections.

They are looking on doing annual lift inspections in the future.

He does not know if Atlantic Elevator works on lifts.

He does not know if Steve kept a record of what he did every day.

Mike is not aware of the lift falling a few months ago.

Mike did not know there was a brake that prevents freefalls of the lift.

# GIANT LIFT EQUIPMENT MFG. CO. INC.

P.O. BOX 626 . NORTH HAMPTON, N.H. 03862 . (603)964-5127

RECEIVED
U.S. DEPT. OF LABOR
OSHA
BAO-SOUTH
03 DEC 12 PM 12: 15

December 8, 2003

Sent UPS Overnite Tracking #1Z 038 355 01 5126 5525

OSHA
639 Granite Street
Braintree, MA 02184

RE: EC Pigments / Roma Color
    Fall River, MA

Dear :   Ex 9C

Pursuant to our phone conversation on Wednesday December 3rd, please find the enclosed package. To briefly recap the information for you, the brand new Inclined Reciprocating Conveyor only was purchased from Giant Lift disassembled, by Crellin Material Handling, 12 Commercial Way, East Providence, Rhode Island 02914 (phone 401-438-6400). Either Crellin Material Handling or the customer EC Pigments supplied their own controls, platform guarding, pushbutton stations, contacts, motor starter, relays, signage, and landing enclosure guarding with electro-mechanical interlocked gates. The equipment was installed by Crellin Material Handing and Crellin picked it up at Giant lift in March of 1985.

‾    9C    , a seasoned salesman who works for a local material handling sales and service company, LK Goodwin has seen this specific piece of equipment in operation on many occasions over a period of many years in the EC Pigments factory.    has talked to both Steve, the maintenance man who had the accident, and Mr. Almeda of EC Pigments on numerous occasions. The equipment is almost 20 years old and has seen heavy use with very little qualified maintenance over this extensive time period. The platform carriage has been overloaded and jammed many times over the years and EC Pigments has failed to properly maintain it.

For this reason    9C    has for years told EC Pigments that the equipment is unsafe in its current condition and should be replaced along with a similar model of approximately the same age. Our records show very few parts have been purchased for this equipment in almost 20 years of use.    did a quote for replacing this unit as far back as January 18, 2002. The Giant Lift quote number 39768 dated January 18, 2002 to    9C    for EC Pigments/ Roma Color is enclosed. EC Pigments knew that the equipment should be replaced but failed to act on this.

(Cont)

MFG. OF:

VERTICAL LIFTS . INCLINE LIFTS . DUMBWAITERS . SIDEWALK LIFTS . MORTUARY LIFTS . FREIGHT LIFTS
DUMPERS . DOCK LIFTS . MOBILE CRANES . FORK LIFT MAINTENANCE LIFTS . WHEELCHAIR LIFTS

Page 2 of 3
December 8, 2003
Scott Kennedy
OSHA

Not only did EC Pigments know that the equipment should be replaced all together, but EC Pigments also knew very recently in the months and weeks leading up to the accident that they had a specific safety problem with the Falling Platform Safety Device in its current condition. On September 19,2003 Giant Lift quoted      ηℓ       a complete replacement falling platform safety device and a ram head trolley per   ηℓ   request so he could quote EC Pigments.  EC Pigments failed to act on this and purchased nothing. A copy of Giant lift quote number 41610 dated September 19,2003 is enclosed.  As late as November 6, 2003 Giant Lift quoted     ηℓ     of LK Goodwin two rocker cams ,which are parts from the Falling platform safety device, per   ηℓ   request so he could quote EC Pigments. EC Pigments again failed to act on this and purchased nothing. A copy of Giant Lift quote number 41768 dated November 6,2003 is enclosed.

    ηℓ        told me in a conversation on Wednesday September 23rd that he was over at EC Pigments a month or two ago after the platform had already fallen to the ground after the cables had broke. While  ηℓ  was there Steve , the EC Pigments maintenance man, had the Falling Platform Safety Device all apart on the floor.   ηℓ  asked Steve if he wanted LK Goodwin to quote putting the Falling Platform Safety Device back together properly or replacing it.  Steve told ηℓ   that Steve himself had the Falling Platform Safety Device put together wrong but Steve believed he could put the Falling Platform Safety Device back together properly this time. Steve told  ηℓ  that EC Pigments would not pay for LK Goodwin to put the Falling Platform Safety Device back together properly this time. Ε ηℓ told me that LK Goodwin only does work for EC Pigments / Roma Color on a prepaid basis  - no credit extended as they don't have good credit. ηℓ  also told me that Steve at EC Pigments had complained that the company had cut farther and farther back and just will not spend the money where it is needed to maintain the shop equipment like it should be.

I spoke to Mr. Almeda myself on Monday December 1st at 1:27 pm. Mr Almeda had explained that he had called for my boss, Joe Fitzgerald who had been out on a brief vacation Thanksgiving holiday. I told Mr. Almeda that I could help him and that we had already spoken with        ηℓ      of LK Goodwin about the condition of the equipment. Mr. Almeda admitted that he was aware of the quote to replace the unit awhile back but they just had no gotten around to it yet. Mr Almeda told me that LK Goodwin would not fix this equipment any more. I told Mr Almeda that we also would not put in time trying to repair equipment that is old, and has not been maintained and abused and altered. Mr. Almeda told me that they really need to get up and running. I told Mr. Almeda that we could build the new equipment very quickly but they need to order it from LK Goodwin and the time for anyone to mickey mouse with this unit is over.

(Cont)

OSHA


Also enclosed is a copy of the letter dated December 3rd that we received from a Mr. Clayton of EC Pigments. This is the first time he has surfaced. I have never spoken with this gentleman, and I asked ⌐ ⌐ ⌐ of LK Goodwin if he knew him and ⌐ ⌐ said that he had never spoken with him either. The tone of the letter, is indicative of mind set down there which is to get up and running quickly. In the first paragraph of Mr. Clayton's letter is states that "Our service provider, LK Goodwin, has refused to fix the lift unless the manufacturer is present." I checked with _ ⌐ ⌐ , and he told me that this is not what he told EC Pigments at all . ⌐ ⌐ told me that he told EC Pigments that the machines should have been replaced years ago and that running it after all of this time to tape it together it too little too late and would be unsafe. ⌐ ⌐ told me that he again told Mr Almeda at EC Pigments that they should replace both machines , not just the one.

Giant Lift would like to be of assistance as would LK Goodwin. Mr. Almeda and Steve the maintenance man at EC Pigments have been told that the machines have needed to be replaced for years. Should you require any further information feel free to contact myself or Mr. Fitzgerald at any time. We believe that ⌐ ⌐ could shed a lot of light on this for you. Below is the address and phone number to contact

Based on the information from ⌐ ⌐ we asked OSHA to shut down lift #2 (serial #2509) until it is brought up to code. It appears that the management, Mr. Clayton and Mr. Almeda at EC Pigments just want production and do not have their eyes on the safety issues.

Regards,

Jim Hennessy
General Manager

# GIANT LIFT
## EQUIPMENT MFG. CO., INC.

**QUOTATION**

P.O. BOX 626 – 185 LAFAYETTE RD.

U.S. RTE: 1 – NORTH HAMPTON, N.H. 03862

1-800-52-GIANT  (603) 964-5127  FAX # (603) 964-9263

L K Goodwin Company Inc
890 Broad Street
Providence RI 02907

ATTN:

Phone: 800-343-2478 Fax: 401-781-2880

| | |
|---|---|
| QUOTATION NUMBER | 39768 |
| | Page 1 of 2 |
| DATE | January 18, 2002 |
| REQUESTED BY | "Roma Color" |

Gentlemen: We propose to furnish the items listed below, as specified, subject to the conditions printed on the back of this form and upon the terms as shown.

| NTITY | DESCRIPTION | UNIT PRICE | TOTAL PRICE |
|---|---|---|---|
| 1 | **RJS MODEL** – VERTICAL RECIPROCATING CONVEYOR, STATIONARY BASE PLATFORM TYPE<br><br>Capacity:  4000 lbs. Electric Hydraulic drive<br>Platform: 6' out x 9' wide; solid backplate; 42" high guardrail with kickplate on front; dual safety chains with snap hooks on sides<br>Raised hgt: 20'<br>Lowered hgt:  7" surface mount<br>Travel:  19' 5"<br>Lift Speed:  20 FPM<br>Power:  230/460/3/60    5 HP TEFC motor<br>Controls:  2 pushbutton stations; up-down-(pull to reset) stop; self-maintained with upper & lower limit switches; to be on 110 volt, 60 cycle circuit in NEMA I enclosures<br>Includes:  Falling Platform Safety Device<br>Includes:  Side thrust rollers<br>Includes:  Paint, container blue or grey enamel<br>Includes:  Manual lowering valve<br><br>SELLING PRICE<br>Discount:<br><br>Option: Vanadium spring ramhead, positive stops, pressure switch for more accurate indexing of platform at upper level        ADD NET<br><br>NOTE: Federal and/or State Taxes are not included in the above price and will have to be added when applicable unless your Sales Tax & Use Tax Certificate is on file with us. | $17,990.00<br>-20%<br><br><br>$1,600.00 | |

| .B. | ESTIMATED SHIPMENT (AFTER RECEIPT OF APPROVAL DRAWING) | TERMS |
|---|---|---|
| N.Hampton, NH | 4 weeks ARAD | To be determined |

PLEASE REFER TO ABOVE QUOTATION NUMBER WHEN ORDERING

STOMER ACCEPTANCE

Y _____

TLE _____

ATE _____

GIANT LIFT EQUIPMENT MFG. CO. INC

SUBMITTED FOR **Joseph F Fitzgerald, Pres.**

SUBMITTED BY **Jim Hennessy, Sales Manager**

ACCEPTED BY _____

**PRICES QUOTED ABOVE ARE SUBJECT TO ACCEPTANCE WITHIN 30 DAYS**

# GL GIANT LIFT
## EQUIPMENT MFG. CO., INC.

P.O. BOX 626 – 185 LAFAYETTE RD.

U.S. RTE. 1 – NORTH HAMPTON, N.H. 03862

1–800–52–GIANT   (603) 964–5127   FAX # (603) 964–9263

**QUOTATION**

L K Goodwin Company Inc
890 Broad Street
Providence RI 02907

ATTN:   MC
Phone: 800-343-2478 Fax: 401-781-2880

| QUOTATION NUMBER | 39768 |
|---|---|
| | Page 2 of 2 |
| DATE | January 18, 2002 |
| REQUESTED BY | |

Gentlemen: We propose to furnish the items listed below, as specified, subject to the conditions printed on the back of this form and upon the terms as shown.

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL PRICE |
|---|---|---|---|
| 1 | Lower unit enclosure consisting of 4 sides of expanded metal 7' high with 1 electro-mechanical interlocked double swing gate 6' wide within access side  SELLING PRICE Discount: | $2,400.00 -20% | |

NOTE: Upper unit enclosure with electro-mechanical interlocked gate/door to be supplied by others.

NOTE: Design changes after final approval on enclosure and/or gate drawings will be subject to additional engineering charges.

NOTE: State and Federal law requires the following:

a. Platform must be guarded to 42" high on non-loading sides; loading side with snap chains or equivalent.
b. Riding the conveyor is prohibited by all personnel Warning signs shall be posted at each point of access and operation.
c. Conveyor must be guarded by enclosures and interlocking gates.
d. Controls shall be located so they cannot be actuated by a person on the carrier.

| F.O.B. | ESTIMATED SHIPMENT (AFTER RECEIPT OF APPROVAL DRAWING) | TERMS |
|---|---|---|
| N.Hampton, NH | 4 weeks ARAD | To be determined |

PLEASE REFER TO ABOVE QUOTATION NUMBER WHEN ORDERING

CUSTOMER ACCEPTANCE

GIANT LIFT EQUIPMENT MFG. CO. INC

SUBMITTED FOR Joseph F Fitzgerald, Pres.

SUBMITTED BY Jim Hennessy, Sales Manager

ACCEPTED BY

PRICES QUOTED ABOVE ARE SUBJECT TO ACCEPTANCE WITHIN 30 DAYS

# ec Pigments

*your creative partner*

December 3, 2003

Joe Fitzgerald
Giant Lift Manufacturing Co.
185 Lafayette Rd.
North Hampton, NH 03862

Dear Mr. Fitzgerald,

I am sending this letter to you because we have had a difficult time reaching one another. EC Pigments has left messages with you on Nov. 25th, 26th and Dec. 1st, 2nd and 3rd. We also spoke with Jim Hennessy and are still waiting for a response. As you should be aware, our Giant Lift # 2443 crashed on November 20th and is currently not functioning. In this crash there was a fatality. OSHA has been investigating this accident and has given us permission to fix the lift. Our service provider, LK Goodwin, has refused to fix the lift unless the manufacturer is present. Therefore, I am requesting that we can schedule a time for Giant to come and fix the lift.

Time is of the essence as we are trying to resume production in order to continue business operations. This delay is impacting our ability to do so. Also, OSHA would like to conclude their inspection and has requested to review the underside of the carriage. I would greatly appreciate your cooperation in this matter so no further delays occur.

Please be assured that as we bought the lift almost 20 years ago, our reason for requesting your assistance is only to put the machine back in good order as quickly as possible.

Please contact me at your earliest convenience at (800) 456-7662 ex. 187 so we can discuss this further.

Thank you,

Mike Clayton
General Manager – USA

ec Pigments
72 Quequechan Street
P.O. Box 5360
Fall River
MA 02723

Tel: 508 676 3481
     800 284 8829

Fax: 508 676 9011

Web
www.ecpigments.com

A Subsidiary of
European Colour plc

ETAD   Responsible Care
CHEMICAL INDUSTRIES ASSOCIATION